## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD MUELLER II, individually, and for the estate of KAYLA MUELLER; MARSHA MUELLER; ERIC MUELLER; DIANE FOLEY, individually, and for the estate of JAMES FOLEY; JOHN W. FOLEY; JOHN E. FOLEY; MARK FOLEY; KATHRYN SIMPSON; MICHAEL FOLEY; ARTHUR SOTLOFF, individually, and for the estate of STEVEN SOTLOFF; SHIRLEY SOTLOFF; and LAUREN SOTLOFF,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT and DEUTSCHE BANK TRUST COMPANY AMERICAS,<br><br>                    Defendants. | JURY TRIAL DEMANDED<br><br>Case No. 24-cv-6225 |

## COMPLAINT FOR VIOLATIONS OF THE
## <u>TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT</u>

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

PARTIES ................................................................................................................... 3

    A.    Plaintiffs ...................................................................................... 3

    B.    Defendants ................................................................................... 3

JURISDICTION AND VENUE .................................................................................. 4

FACTUAL ALLEGATIONS ...................................................................................... 5

I.    The Terror Fundraising Venture ........................................................................ 5

    A.    The Terrorist Groups Leading the Terror Fundraising Venture............................ 7

        1.    Al-Qaeda ............................................................................ 7

        2.    Al-Qaeda-in-Iraq (AQI), the Predecessor to ISIS.................................... 10

        3.    AQI Becomes ISIS and Later Splits from Al-Qaeda ............................... 12

    B.    Trafficking Crimes Committed by the Terror Fundraising Venture..................... 14

II.    Deutsche Bank Participated In The Terror Fundraising Venture ...................................... 20

    A.    Deutsche Bank Knowingly Facilitated and Benefitted from Financial Fraud Schemes that Funded the Venture................................................ 21

        1.    Overview of VAT Fraud................................................... 21

        2.    The Relevant VAT Fraud Cells ................................................. 24

    B.    Deutsche Bank Provided Banking Services for ISIS............................................. 35

        1.    ISIS Sought Access to the International Financial System to Exploit Its Newfound Wealth.................................................... 36

        2.    As ISIS Grew, the International Community Worked to Prevent ISIS from Accessing the International Financial System—and Deutsche Bank Knew About Those Efforts .............................. 40

        3.    Defying the International Community and Its Own Policies, Deutsche Bank Performed Illegal Banking Services for ISIS ................. 50

        4.    Deutsche Bank Knew That It Provided Banking Services to ISIS ........... 56

III.    Deutsche Bank's Participation In The Terror Fundraising Venture Helped Terrorists Commit Trafficking Crimes ........................................................................ 67

IV.    Deutsche Bank Knew Or Recklessly Disregarded That The Terror Fundraising Venture Committed Trafficking Crimes .............................................................. 70

V.    Deutsche Bank Knowingly Benefitted From Participating In The Terror Fundraising Venture ................................................................................................ 74

VI.    Deutsche Bank's Participation In The Terror Fundraising Venture Was Of A Piece With Its History Of Illegal Behavior ......................................................... 76

    A.    Deutsche Bank's Role in Jeffrey Epstein's Sex Trafficking Enterprise ............... 77

    B.    Deutsche Bank's Systemic Failure to Adequately Monitor Correspondent Banking Relationships ......................................................................................... 79

        1.    FBME ........................................................................................ 80

        2.    Danske Estonia ......................................................................... 81

    C.    Deutsche Bank Conducted Voluminous Dollar-Clearing Transactions for Sanctioned Financial Institutions ....................................................................... 82

    D.    Deutsche Bank Facilitated an Illegal Mirror-Trading Scheme ............................ 83

VII.    The Terror Fundraising Venture's Trafficking Crimes Harmed Plaintiffs ...................... 85

    A.    The Torture and Murder of Kayla Mueller ......................................................... 87

    B.    The Torture and Filmed Beheading of James Foley ........................................... 93

    C.    The Torture and Filmed Beheading of Steven Sotloff .......................................... 99

VIII.    Plaintiffs' Claims Are Timely .................................................................................... 102

CLAIMS FOR RELIEF ................................................................................................................ 105

JURY DEMAND .......................................................................................................................... 108

PRAYER FOR RELIEF ................................................................................................................ 108

## INTRODUCTION

1.      This lawsuit seeks damages under the Chapter 77 of Title 18 of the U.S. Code, which includes the Trafficking Victims Protection Reauthorization Act ("TVPRA") (as codified at 18 U.S.C. §1589 *et seq.*).

2.      Plaintiffs are the estates and family members of a humanitarian worker and two journalists who were kidnapped and trafficked by terrorists. While held captive, they endured horrific physical pain and unspeakable mental anguish. The humanitarian worker, Kayla Mueller, was enslaved, raped, and sexually abused before being murdered—nearly two years after being abducted. The two journalists, James Foley and Steven Sotloff, were tortured, coerced into providing labor and services for their terrorist captors, and forced to participate in gruesome propaganda videos that culminated in their filmed beheadings.

3.      All the while, Deutsche Bank knowingly participated in—and profited from—a fundraising venture for the very groups that committed these, and other, human-trafficking crimes: al-Qaeda and al-Qaeda-in-Iraq (which later became the Islamic State of Iraq and Syria or "ISIS").

4.      From at least the mid-2000s until at least early 2015, Deutsche Bank knowingly provided illicit financial services to these terrorist groups and their agents, which helped these groups to generate funds to commit trafficking crimes and terrorist attacks. Those trafficking crimes, in turn, generated revenue for the terrorist groups, including through the sale of women into sex slavery and the publication of propaganda videos.

5.      As an al-Qaeda financier characterized it, Deutsche Bank acted as a ***willing financial partner*** in tax fraud schemes involving notorious al-Qaeda fundraisers. Indeed, several Deutsche Bank employees have been convicted for their involvement. Those schemes raised tens of millions of dollars for the terrorist group, funds that were routed to al-Qaeda branches in

Syria—where Kayla Mueller, James Foley, and Steven Sotloff were abducted, trafficked, physically and psychologically tortured, and eventually murdered.

6.      Moreover, even as the U.S. and international community issued a steady drumbeat of warnings to financial institutions about the necessity of cutting off ISIS's access to the international financial community—and while Kayla Mueller, James Foley, and Steven Sotloff were held captive by ISIS—Deutsche Bank chose to provide ***nearly $3 billion*** in banking services for ISIS, through Iraqi banks that ISIS had seized. As revealed in Suspicious Activity Reports ("SARs") submitted to the U.S. government, Deutsche Bank employees routinely processed these illicit transactions—***thousands*** of them—notwithstanding their illegality.

7.      Deutsche Bank's participation in the venture was yet another chapter in Deutsche Bank's long history of readily engaging in illegal schemes for profit, including actively facilitating Jeffrey Epstein's notorious sex-trafficking enterprise, systematically failing to scrutinize banking relationships with money-laundering banks, and repeatedly deciding to provide illegal banking services for sanctioned entities. Deutsche Bank has paid victims and regulators hundreds of millions of dollars for its offenses.

8.      Deutsche Bank's decision to participate in a fundraising venture with al-Qaeda, al-Qaeda-in-Iraq, and ISIS was intentional, culpable, and substantial. And it was profitable for Deutsche Bank: its years-long participation in the venture generated substantial fees, commissions, and other charges. Plaintiffs seek to hold Deutsche Bank accountable under the TVPRA.

## PARTIES

### A.    Plaintiffs

9.    Kayla Mueller was an American humanitarian aid worker who was kidnapped, tortured, subjected to forced labor, raped, sexually abused, and murdered by terrorists. Her estate and her family members are Plaintiffs.

10.    James Foley was an American journalist who was kidnapped, tortured, subjected to forced labor, and murdered by terrorists. His estate and his family members are Plaintiffs.

11.    Steven Sotloff was an American-Israeli journalist who was kidnapped, tortured, and murdered by terrorists. His estate and his family members are Plaintiffs.

### B.    Defendants

12.    Defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank AG") is a global financial institution headquartered in Frankfurt, Germany. Deutsche Bank AG's U.S. headquarters is located at 1 Columbus Circle, New York, NY, 10019. Deutsche Bank AG's stock trades publicly in the United States on the New York Stock Exchange under the symbol "DB."

13.    Deutsche Bank AG is licensed to—and does—operate a foreign bank branch in New York (the "NY Branch"), which is located at 1 Columbus Circle, New York, NY, 10019.

14.    Defendant Deutsche Bank Trust Company Americas ("DBTCA") is a wholly owned subsidiary of Deutsche Bank Trust Corporation, which is a wholly owned subsidiary of Deutsche Bank AG. DBTCA conducts correspondent banking and U.S. dollar-clearing activity for customers of Deutsche Bank AG and other Deutsche Bank entities. DBTCA conducts U.S. dollar-clearing transactions in this District. DBTCA is licensed and regulated by the New York

State Department of Financial Services. DBTCA's address is 1 Columbus Circle New York, NY, 10019. DBTCA employees "often" "refer to [themselves] as Deutsche Bank" employees.[1]

15.     Deutsche Bank AG—through DBTCA and the NY Branch—operates one of the largest U.S. dollar-clearing banks in the world. Deutsche Bank AG relies on DBTCA to perform U.S. dollar-clearing services for its customers. Deutsche Bank AG directs U.S. dollar-denominated transactions to be processed through DBTCA, in this District.[2]

16.     DBTCA and the NY Branch act for the benefit of Deutsche Bank AG, consistent with the latter's "One Bank" globally integrated business model.

17.     Deutsche Bank AG's policies and procedures regarding anti-money laundering ("AML"), countering the financing of terrorism ("CFT"), and sanctions compliance apply to all branches and subsidiaries—including DBTCA and the NY Branch.

18.     This Complaint refers to Deutsche Bank AG, the NY Branch, and DBTCA collectively as "Deutsche Bank" or "Defendants," unless otherwise specified.

## JURISDICTION AND VENUE

19.     This action is brought under Chapter 77 of Title 18 of the U.S. Code, which includes the TVPRA (as codified at 18 U.S.C. §1589 *et seq.*).

20.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331, 18 U.S.C. §1595, and 18 U.S.C. §1596.

21.     No foreign government has prosecuted or is prosecuting Defendants for the conduct alleged herein.

---

[1] Trial Tr., *United States v. Atilla*, No. 15-cr-867 (S.D.N.Y. Dec. 12, 2017), ECF 422 (Sloan Testimony at 1538).
[2] *See id.* at 1531-32.

22.     This Court is an "appropriate district court of the United States" in which to bring

this action. *See* 18 U.S.C. §1595.

23.     Venue is proper in this District under 28 U.S.C. §1391(b)(2) because Deutsche

Bank conducted substantial suit-related activities in this District. Among other things, Deutsche

Bank processed U.S. dollar-denominated correspondent bank transactions in DBTCA's office in

this District. Deutsche Bank also received financial benefits in this District from participating in

the venture.

## FACTUAL ALLEGATIONS

## I.    The Terror Fundraising Venture

24.     Defendants participated in a global fundraising venture for al-Qaeda and

al-Qaeda-in-Iraq (and later, ISIS) ("Terror Fundraising Venture" or "Venture"), the object of

which was raising money for these terrorist groups to fund both their terrorist attacks and their

trafficking crimes, which in turn generated additional revenues for the Venture. The Terror

Fundraising Venture was led by the terrorist groups al-Qaeda and al-Qaeda-in-Iraq ("AQI") (the

latter of which eventually became ISIS).[3]

25.     From 2004 through 2015, al-Qaeda and AQI (and later, ISIS) embraced human

trafficking, hostage-taking, kidnapping, forced labor, forced services, and sex trafficking

(collectively, "Trafficking Crimes") as a core part of the Terror Fundraising Venture. To raise

---

[3] This group has had various names since its creation, including Tawhid wal Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura Council (from January 2006 through October 2006), the Islamic State of Iraq (from October 2006 through April 2013), Islamic State in Iraq and Syria, aka ISIS, aka Islamic State in Iraq and the Levant, aka ISIL (from April 2013 through June 2014) and finally the Islamic State (from June 2014 through present).
    In this Complaint, for ease of comprehension, Plaintiffs collectively refer to all such groups as "al-Qaeda-in-Iraq" or "AQI" when discussing events before 2013, and Plaintiffs refer to the group as "ISIS" when discussing events in 2013 and later.

money, these terrorist groups sold humans as slaves, extracted ransom payments in exchange for captured victims, and extorted labor through force and coercion, among other things.

26.    Al-Qaeda and AQI (and later, ISIS) also committed Trafficking Crimes to inflict pain on victims, intimidate and terrorize, generate propaganda, and recruit or conscript fighters. These objectives were instrumental to the Terror Fundraising Venture's financial success. For example, the more intimidating their Trafficking Crimes, the more effective the terrorist groups' threats of violence were at extracting ransoms and protection payments. Similarly, the more sensational the groups' Trafficking Crime-related propaganda, the more successful their radicalization, recruitment, and donation solicitation efforts.

27.    To contextualize Deutsche Bank's participation in the Terror Fundraising Venture, this section provides relevant background on the growth and evolution of the terrorist organizations that led the Venture, as well as their extensive Trafficking Crimes. Deutsche Bank participated in the Terror Fundraising Venture, even though it knew about the Trafficking Crimes for which al-Qaeda, AQI, and ISIS were notorious. Deutsche Bank knew these facts about these terrorist groups for at least several reasons, including, but not limited to, Deutsche Bank's sophisticated in-house and outside consulting, security, and intelligence functions that monitored and reported upon such activities. Indeed, Deutsche Bank employed scores of former U.S. and European government officials—as employees and agents—and their knowledge was imputed to Deutsche Bank; and Deutsche Bank monitored high-profile reports by the U.S. government, U.N. Security Council, and mainstream media outlets about these topics.

A.     **The Terrorist Groups Leading the Terror Fundraising Venture**

1.  **Al-Qaeda**

28.     Osama bin Laden established and operationalized al-Qaeda in the late 1980s. Ever since, al-Qaeda has been a global terrorist organization that notoriously sought to kidnap, hold hostage, enslave, and ransom Americans.[4]

29.     While al-Qaeda's trafficking crimes began in the 1990s, they intensified after al-Qaeda planned and executed the September 11th terrorist attacks against the United States, after which al-Qaeda relocated most of its leadership to Pakistan, Iran, and Iraq.

30.     In 2003, al-Qaeda turned its attention to sowing a campaign of terror in Iraq. Al-Qaeda believed that it could kill, injure, and terrorize Americans *en masse* there, and emphasized hostage-taking as a key tool. Al-Qaeda focused on indoctrination, propaganda, recruiting, and developing illicit networks necessary for smuggling fighters, money, and weapons into Iraq. On April 25, 2003, al-Qaeda issued a *fatwa* that declared jihad in Iraq and called on all pious Muslims to help attack and kill Americans there.

31.     Al-Qaeda organized itself like a multinational corporation that had branches all over the world, but also partnered with affiliates.[5]

32.     From the 2000s through 2010s, Al-Qaeda's leadership in Afghanistan and Pakistan—which many dubbed "al-Qaeda Core"—cultivated a network of al-Qaeda branches in

---

[4] Al-Qaeda translates as "the base" in Arabic. This name references bin Laden's vision of al-Qaeda serving as a consortium of allied jihadist groups under his leadership.
[5] Al-Qaeda's web of relationships are commonly described as "branches," "franchises," "affiliates," "alliances," and the like. As used in this Complaint, an al-Qaeda "branch" comprises another designated terrorist organization for which the leadership and members are formally part of al-Qaeda through, *inter alia*, their oath of loyalty to al-Qaeda and Osama bin Laden, and later, Ayman al-Zawahiri. An al-Qaeda "affiliate" comprises another designated terrorist organization for which the leaders and members have closely integrated with al-Qaeda to the point of being fused, but have not formally pledged an oath of allegiance. For example, AQI was an al-Qaeda *branch*, while the Taliban was an al-Qaeda *affiliate*.

Afghanistan, Iraq, and Syria, among other places, who were often co-located with and/or used operatives simultaneously employed by al-Qaeda affiliates, like the Taliban. In Afghanistan and Pakistan, for example, Sirajuddin Haqqani simultaneously served as a member of al-Qaeda's Military Council—whose lanes of effort included nodes of al-Qaeda's trafficking efforts—while simultaneously serving as the Deputy Emir of the Taliban. In Iraq and Syria, AQI served as al-Qaeda's branch and often drew from overlapping membership rolls with Ansar al-Islam, a Kurdish affiliate there. In all such circumstances, operations of the branches were led by al-Qaeda Core in Afghanistan and Pakistan, and were substantially financed and logistically supported by al-Qaeda's cells in Western Europe.

33.     To accommodate this organizational structure, al-Qaeda established, essentially, "parent/subsidiary" or "franchisor/franchisee" relationships between al-Qaeda Core (in Afghanistan and Pakistan) and branches like AQI (in Iraq and Syria). While al-Qaeda Core set the strategy, facilitated attacks and kidnapping, provided fighters and funding, and led the overall campaign, its branches—including AQI—conducted operations on a cellular level. Al-Qaeda thus operated in both a centralized and decentralized manner.

34.     Al-Qaeda and its branches engaged in a continuous, two-way exchange of value. Al-Qaeda Core (in Afghanistan and Pakistan) supported al-Qaeda's branches in Afghanistan, Iraq, and Syria—and the branches supported al-Qaeda Core.

35.     That two-way support took numerous forms, including financial support, training and sharing expertise in terrorist tradecraft, logistical support for terrorist operations, and managerial support. Al-Qaeda Core and its branches and affiliates used shared strategies, training sites, terrorist operatives, financiers, and the like, under the group's multinational approach.

36.    From 2003 through 2014, for example, al-Qaeda Core supported training programs conducted by AQI terrorists at al-Qaeda camps in Afghanistan and Pakistan. Those camps were for the mutual benefit of the AQI terrorists providing the training (who used the opportunity to network, improve their own skills, and develop new fundraising relationships) as well as al-Qaeda-affiliated terrorists in the camps.

37.    Because of this two-way relationship, support for al-Qaeda Core necessarily benefitted AQI—and vice versa.

38.    Al-Qaeda Core and AQI regularly pursued fused terrorist finance and logistics strategies. For example, al-Qaeda Core and AQI collaborated to distribute ransoms received by either group to al-Qaeda's other global franchises and partners, or between their respective cells.

39.    Al-Qaeda Core leaned heavily into al-Qaeda's branches, most of all AQI, when the former was under pressure and the latter were not. Al-Qaeda Core also served as a haven for such al-Qaeda branches when the tables were turned.

40.    Al-Qaeda's formal organizational structure ran from al-Qaeda Core in Afghanistan and Pakistan to al-Qaeda's branches, including AQI. Among other things, al-Qaeda's emir appointed a representative co-located with the leadership of each affiliate to act as a direct channel to al-Qaeda Core in Afghanistan and Pakistan. Through its direct chain of command that emanated from al-Qaeda Core to al-Qaeda's branches—including AQI—al-Qaeda reinforced the branches' subordination to al-Qaeda Core.

41.    Al-Qaeda Core managed the terrorist finances, logistics, recruiting, and communications of al-Qaeda branches as a precursor to al-Qaeda's desired global caliphate. Accordingly, al-Qaeda Core created and maintained detailed bylaws and established formal governing committees and a chain of command among its leaders.

42.     Al-Qaeda Core required every al-Qaeda branch, like AQI, to swear an oath of allegiance to al-Qaeda (which often swore a reciprocal oath to its counterpart), and al-Qaeda Core required its branches to follow al-Qaeda's playbook concerning terrorist operations, finance, logistics, doctrine, and communication. Accordingly, all al-Qaeda members, including at its various branches, believed themselves—correctly—to be part of the same organization.

43.     Al-Qaeda Core devised and oversaw AQI's financial bureaucracy, which AQI operationalized and executed. The resulting financial infrastructure was purpose-built to ensure that the money both received was optimized to maximize the lethality of their terrorist campaign throughout Iraq, Syria, Afghanistan, and Pakistan. This infrastructure ensured that al-Qaeda Core and AQI senior leadership could redirect payments from one place to another.

44.     Under al-Qaeda's model, when any al-Qaeda branch (*e.g.*, AQI) facilitated attacks or kidnappings, the branch needed to communicate directly with al-Qaeda Core, receive al-Qaeda's authorization, follow al-Qaeda's plan, and strictly adhere to al-Qaeda doctrine.

45.     Al-Qaeda Core ensured that its branches, including AQI, followed an organizational structure like that of al-Qaeda Core.

46.     Al-Qaeda experts have long warned against treating al-Qaeda Core as a separate operational, financial, logistical, and doctrinal organization from al-Qaeda's various branches, particularly AQI.

### 2. Al-Qaeda-in-Iraq (AQI), the Predecessor to ISIS

47.     AQI was al-Qaeda's most important branch outside of Afghanistan/Pakistan. It served as an indispensable component of al-Qaeda's global terrorist finance, logistics, operational, and communications infrastructure. Through their shared networks, al-Qaeda and AQI greatly facilitated, and greatly enhanced the lethality of, both groups' attacks in

Afghanistan, Iraq, Syria, and elsewhere. This outcome was the entire point of al-Qaeda's and AQI's respective terrorism "business models."

48.    The origins of AQI trace to Abu Musab al-Zarqawi, a Jordanian terrorist who created a training camp in Afghanistan in the late 1990s at bin Laden's invitation. By the time of the September 11th terrorist attacks, Zarqawi had trained several thousand terrorists and established a terrorist network in Iraq, Syria, and other countries in the Middle East and Africa.

49.    In summer 2003, Zarqawi wrote to bin Laden and his deputy, Ayman al-Zawahiri, to explain that Zarqawi's group in Iraq wished to be officially affiliated with al-Qaeda. Zarqawi described a new terrorist force that would operate in-country, led by him, under al-Qaeda's banner. He also requested al-Qaeda Core's strategic aid in Iraq.

50.    In or around November 2003, bin Laden personally approved al-Qaeda's direct role in funding terrorists in Iraq. Bin Laden authorized regular monthly payments of $1.5 million, ordinarily denominated in U.S. dollars, to finance the leadership cells and "start-up" costs of al-Qaeda-affiliated terrorists in Iraq. Those payments were supervised by senior personnel from al-Qaeda Core. On information and belief, regular payments from al-Qaeda Core to AQI continued through early 2014.

51.    On or about October 15, 2004, the U.S. State Department designated the Zarqawi terrorist network as a Foreign Terrorist Organization. Around that time, Zarqawi also formally pledged allegiance to al-Qaeda and renamed his terrorist network al-Qaeda-in-Iraq. By then, Zarqawi and his organization were among the most prolific group of terrorists in terms of attacking Americans in Iraq and elsewhere.

52.    AQI's violent campaign of terrorism against the United States persisted even after a U.S. airstrike killed Zarqawi in June 2006.

53.     In or around 2010, Abu Bakr al-Baghdadi took control of the AQI terrorist network. He eventually became the world's most-wanted terrorist mastermind, with the U.S. government at one point offering a record-breaking $25 million bounty for his capture.

54.     In early 2011, shortly after Baghdadi's emergence, Syria spiraled into civil war. Many terrorist groups and other armed factions began vying for power, precipitating a near-total breakdown in Syrian governance and other civil institutions.

55.     Later that year, Baghdadi sent an AQI operative named Abu Muhammad al-Julani to establish an AQI branch in Syria. Baghdadi also sent Abu Muhammad al-Adnani—who would later become the head of one of ISIS's most powerful cells—to assist Julani.

### 3.  AQI Becomes ISIS and Later Splits from Al-Qaeda

56.     In 2013, Baghdadi changed AQI's name to the Islamic State of Iraq and Syria ("ISIS") to reflect AQI's expansion into Syria.[6]

57.     ISIS's goal was constructing a global religious caliphate. ISIS attempted to achieve that goal not through legitimate governance, but through widespread terrorist violence, intimidation, and criminality—including Trafficking Crimes. U.S. government officials described ISIS as "one of the most brutal terrorist organizations the world has ever known."[7]

---

[6] Later, on May 15, 2014, the U.S. Secretary of State listed the "Islamic State of Iraq and the Levant" as the organization's primary name (thus U.S. government documents sometimes refer to the organization as "ISIL"). *See* Public Notice 8732, Amendment of the Designation of al-Qa'ida in Iraq, 79 Fed. Reg. 27,972, 27,972 (May 15, 2014). On September 30, 2015, the Secretary of State amended that designation to add more aliases, including the Islamic State, ISIL, and ISIS. *See* Public Notice 9290, Amendment of the Designation of Islamic State of Iraq and the Levant, 80 Fed. Reg. 58,804, 58,805 (Sept. 30, 2015).

[7] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

58.    ISIS's brutal crimes were legion. ISIS tortured and ruthlessly slaughtered civilians, expelled certain ethnic and religious minorities and committed genocide against others, performed suicide bombings, and engaged in other heinous forms of violence, such as rape.

59.    Like AQI before it, abducting hostages was a central tool of ISIS's terrorist tradecraft. ISIS sometimes kidnapped hostages to "generate ransom payments"; other times, ISIS kidnapped and murdered hostages "for political messaging."[8] ISIS commonly filmed executions of its hostages, and it broadly distributed those videos through social-media sites to raise money, inspire terror, and attract recruits.

60.    As one example of ISIS's brutality, in June 2014, the group executed hundreds of Shia men by forcing them to kneel along the edge of a ravine before shooting them, point-blank, with assault rifles and automatic weapons.

61.    ISIS frequently "targeted and killed" journalists merely for "doing their job."[9] James Foley and Steven Sotloff—whose estates and family members are Plaintiffs—were two such journalists that ISIS targeted, abducted, held captive, tortured, exploited, and later murdered brutally on film.

62.    ISIS terrorists routinely committed "rape and other forms of sexual violence" against women and girls.[10] Ms. Mueller—whose estate and family members are Plaintiffs— endured rape and sexual violence committed by ISIS members, including Baghdadi, during the nearly two years ISIS held her captive following her abduction.

---

[8] U.N. Security Council, The Islamic State in Iraq and the Levant and the Al-Nusrah Front for the People of the Levant: Report and Recommendations Submitted Pursuant to Resolution 2170 (2014) ¶ 23 (Nov. 14, 2014).
[9] *Id.*
[10] *Id.*

63.     In February 2014, al-Qaeda and ISIS formally split. That month, al-Qaeda's "central leadership cut ties with ISIS and al-Baghdadi . . . calling for ISIS to withdraw from Syria."[11]

**B.      Trafficking Crimes Committed by the Terror Fundraising Venture**

64.     Al-Qaeda and its progeny, including AQI and ISIS, have notoriously—and proudly—embraced every element of human trafficking as a core component of their operations for decades, including by using trafficked humans and forced labor to raise funds and extract substantial cash-equivalent value for their organization. Slavery, forced labor, and sex trafficking are three common al-Qaeda trafficking lanes of effort.

65.     Scholarly analyses of al-Qaeda and its progeny that were vetted and published by the U.S. Army's Combating Terrorism Center at West Point ("CTC") confirmed the inextricable connection between al-Qaeda financing and trafficking. In May 2008, for example, the CTC published an analysis by terrorism and trafficking scholars Jacob Townsend and Hayder Mili, which emphasized that United States "law enforcement, national security agencies and policymakers" were aware of, and focused on combatting, the "threat" created by "the terrorism dimension of human smuggling and trafficking."[12]

66.     For decades, al-Qaeda's trafficking, kidnapping, and forced labor efforts centered heavily upon the close collaboration between al-Qaeda's branches in Western Europe, Iraq, and Syria, all supported and/or led by al-Qaeda Core in the Afghanistan/Pakistan border regions.

---

[11] U.K. House of Commons Library (Ben Smith, Louisa Brook-Holland and Rob Page, International Affairs and Defence Section), *Islamic State of Iraq and the Levant (ISIS) and the Takeover of Mosul*, Standard Note No. SNIA 6915, at 2 (June 20, 2014), https://researchbriefings.files.parliament.uk/documents/SN06915/SN06915.pdf.

[12] Jacob Townsend and Hayder Mili, *Human Smuggling and Trafficking*, CTC Sentinel (May 2008), https://ctc.westpoint.edu/human-smuggling-and-trafficking-an-international-terrorist-security-risk/.

According to the same 2008 analysis published by the CTC, for example, al-Qaeda smuggling networks leveraged personnel and funds in Europe, as well as al-Qaeda's leadership in Afghanistan/Pakistan, to monetize trafficking activity committed by al-Qaeda (including its branches and affiliates) in Iraq and Syria:

**An Expanding Market**
Since 2001, al-Qa'ida's infrastructure has weakened and ... terrorist groups … have responded to law enforcement and globalization by decentralizing. Driven by profit, operating in illicit industries and against state power, such networks are economically efficient. ***Human smuggling and trafficking is a profitable business with strong and inelastic demand*** ….

[Al-Qaeda's] terrorist cells … have developed … ***criminal enterprises … [that] include in their repertoire the forcible movement of people***, such as described by a Tajik victim: "the mujahideen in Tajikistan routinely kidnap children and release them after extorting ransom, steal people's belongings, including their livestock." ***Terrorist kidnappings of foreigners … for ransom*** … ***have remained a constant in Iraq and Afghanistan***.

With global annual profits in the billions of dollars, a slice of the illicit migration market is valuable to terrorists for finance alone. Throughout the 1990s, the Tamil Tigers were involved in human trafficking …. More recently, investigations ***into a Milan-based [al-Qaeda affiliate] Ansar al-Islam network uncovered cells responsible for organizing safe houses, recruiting volunteers and raising upwards of a million euros smuggling Kurdish migrants into Europe***. These funds were then reinvested into smuggling around 200 militants in the opposite direction, from Europe into Iraq.

In Portugal, the national intelligence service observed a ***regular pattern of [al-Qaeda] terrorist fundraising through … illegal immigration operations***. An Italian example of criminal cooperation for terrorist migration involved three persons convicted in May 2005 of ***providing al-Qa'ida members in Europe and the Middle East with support***, including the provision of false documents. …

**Trafficked for Terrorism?**
***More sinister than terrorists using people smuggling to transport themselves is utilizing those same networks for unwitting recruitment. Human trafficking is movement without consent and generally occurs to service illicit labor markets. Emerging evidence suggests that terrorist groups*** may traffic children to obtain new, pliant recruits—a common form of recruitment in many conflicts across Africa. Jihadists now ***seem to have adopted the tactic***, at least in Waziristan. Lieutenant General Safdar Hussain, who leads Pakistan's hunt for ***al-Qa`ida militants in northwestern Pakistan***, reported to *Radio Free Europe* the presence of young foreigners, "boys whose average age is 16 or 17 years, and it is

15

my assessment that ***most of them have either been kidnapped or they were sold…and after bringing them here***, these [boys] are used for terrorism."[13]

67.    Al-Qaeda and AQI (and later, ISIS) collaboratively supported and operated the Terror Fundraising Venture from at least 2004 until 2014. After ISIS and al-Qaeda split in February 2014, ISIS continued to support and operate the Venture without al-Qaeda's participation. The Venture itself persisted at all times relevant to the events in the Complaint.

68.    **Al-Qaeda's Role.** From 2004 until February 2014, al-Qaeda and AQI embraced, directed, and supported the commission of Trafficking Crimes as part of the Venture.

69.    Al-Qaeda Core's own documents have confirmed the centrality of hostage-taking to al-Qaeda's (and its branches') mutually reinforcing fundraising and terrorist missions. For example, data retrieved from bin Laden's compound following his demise revealed that al-Qaeda Core continued to play a close role in kidnapping and prized the economic benefits of trafficking.

70.    Al-Qaeda Core supported the Terror Fundraising Venture by operating what amounted to a centralized fundraising and hostage-taking enterprise that included both pure financing schemes supported by rogue Western banks and support for kidnapping operations that both sowed terror and raised funds in their own right. Among other forms of support, al-Qaeda Core provided financial and logistical support and advised on hostage-taking tradecraft.

71.    To finance the Venture, al-Qaeda Core relied on European fundraisers who remitted precious U.S. dollars back to al-Qaeda Core's leadership in Afghanistan and Pakistan.

72.    To logistically enable the Terror Fundraising Venture, al-Qaeda Core relied upon close collaboration between: (1) al-Qaeda's European cells, who provided safe houses, expertise, fake documents, and access to Europe; (2) al-Qaeda Core, who provided training, market rates,

_____

[13] *Id.* (emphasis added).

and direction; and (3) al-Qaeda's branch in Iraq and Syria, *i.e.*, AQI, who sourced the trafficked persons and labor upon which their Venture relied, including al-Qaeda's most valuable trafficking commodity of all: Americans—like James Foley, Steven Sotloff, and Kayla Mueller, whom AQI (and later ISIS) trafficked and murdered.

73.    To plan the Terror Fundraising Venture, al-Qaeda Core prepared detailed written instructions and associated training, which al-Qaeda circulated to its branches and employed in its training camps. In 2004, for example, an al-Qaeda Core operative published a book that included a detailed chapter on kidnapping and hostage-taking. Al-Qaeda Core's guide to kidnapping included directions on how to commit kidnappings and how to treat hostages.[14] Al-Qaeda Core disseminated this guide to its branches and affiliates, including AQI.

74.    To operate the Terror Fundraising Venture, al-Qaeda Core had to maintain the requisite branches in Western Europe, Syria/Iraq, and Afghanistan/Pakistan because these three regions (as viewed by Venture participants) comprised a three-legged stool upon which the Venture would collapse if any leg were removed. Without the Terror Fundraising Venture's financial operations in Europe, it would have lacked a major source of the terrorism funding that was its *raison d'être* and one of its primary mechanisms for accessing the global financial system. Without the Venture's operations in Afghanistan/Pakistan, the efficiency of, and ultimate profits derived from, the Venture would have been bereft of critical direction and planning. And without the Venture's operations in Iraq/Syria through AQI, it could not have carried out the abductions of Westerners like James Foley, Steven Sotloff, and Kayla Mueller, which both relied upon the other two legs of the stool for its success and provided its own stream of illicit terrorist

---

[14] New York Times, *Al Qaeda Guide to Kidnapping* (July 29, 2014),
https://www.nytimes.com/interactive/2014/07/30/world/africa/31kidnap-docviewer3.html.

finance, both in the form of ransom payments and propaganda videos used to solicit financial support.

75.    **AQI's (and later, ISIS's) Role.** During all relevant times, including during and after its transformation into ISIS, AQI embraced, directed, and supported the widespread commission of Trafficking Crimes as part of the Terror Fundraising Venture.

76.    AQI forcibly abducted hostages, tortured or otherwise abused them, and exploited their captivity to gain information and occasionally ransom payments. AQI filmed and distributed propaganda videos featuring hostages (and AQI's violent murder of those hostages) to improve AQI's standing, boost recruitment, and win greater financial contributions from backers.

77.    AQI's brutal hostage-taking operations and Trafficking Crimes accelerated as the group grew and transformed into ISIS.[15]

78.    Consistent with its al-Qaeda pedigree, and like its predecessor entity AQI, ISIS publicly embraced—or was otherwise accused of engaging in—every core modality of human trafficking, including kidnapping; hostage torture; forced services; forced labor; sex trafficking; child trafficking; and sales of human beings.

79.    Contemporaneous reports confirmed ISIS's takeover of control over the Terror Fundraising Venture from al-Qaeda and embrace of Trafficking Crimes. In 2013, for example, *Agence France Presse* reported that ISIS routinely kidnapped "foreign journalists," "[f]oreign aid workers," and "Syrian journalists,"[16] and the *Guardian* reported that abductions quickly

---

[15] For the avoidance of doubt, AQI and ISIS were always the same juridical entity; there was never any gap or separation between AQI and ISIS. From 2004 through 2014, AQI (which called itself the Islamic State of Iraq in the later part of this period) was al-Qaeda's branch in Iraq and Syria. After 2014, AQI spun off from al-Qaeda.

[16] Agence France Presse, *With risks multiplying, reporters stay out of Syria* (Oct. 16, 2013); *see* Agence France Presse, *Two Spanish journalists held by Al-Qaeda-linked group in Syria* (Dec. 10,

became "***prolific***" as a tactic that allowed ISIS to "impos[e] its will" on communities it sought to control.[17] In 2014, similarly, the CTC published a scholarly analysis by Dr. Michael Knights, who observed that ISIS committed "***large-scale kidnap-murder sprees***" as a form of "exemplary violence."[18]

80.     Contemporaneous reports also confirmed ISIS's abhorrent trafficking of children. In 2014, for example, the non-governmental organization Human Rights Watch reported that ISIS kidnapped and "tortured" children. Child-hostages were "repeated[ly] beat[en] with a hose and electric cable" and forced to "watch videos of ISIS beheadings and attacks."[19]

81.     Contemporaneous reports confirmed ISIS's sex trafficking as well. In 2014, for example, *PBS Newshour* reported that ISIS "abducted" "thousands of women" and young girls who were sexually abused and raped by ISIS fighters.[20]

82.     Consistent with its al-Qaeda pedigree, and like predecessor entity AQI, ISIS was ***openly*** pro-trafficking. ISIS boasted about its trafficking in its English-language magazine, *Dabiq*, where it published articles such as "The Revival of Slavery before the Hour." In its

---

2013) (reporting that ISIS "kidnapped two Spanish journalists reporting in Syria in September and is holding them captive").

[17] The Guardian, *Wife breaks silence over Spanish journalist's kidnap in Syria* (Dec. 10, 2013) (emphasis added).

[18] Michael Knights, *ISIL's Political-Military Power in Iraq*, CTC Sentinel – Combating Terrorism Center at West Point, Vol. 7, Issue 8 (Aug. 2014), https://ctc.westpoint.edu/isils-political-military-power-in-iraq/ (emphasis added).

[19] Human Rights Watch, *Syria: ISIS Tortured Kobani Child Hostages* (Nov. 4, 2014), https://www.hrw.org/news/2014/11/04/syria-isis-tortured-kobani-child-hostages.

[20] PBS NewsHour, *How Islamic State uses systematic sexual violence against women* (Oct. 7, 2014), https://www.pbs.org/newshour/show/islamic-state-uses-systematic-sexual-violence-women.

publications, ISIS cited its (fatally corrupted) understanding of "Islamic theology" to justify "its kidnapping of women as sex slaves."[21]

83.    Consistent with its al-Qaeda pedigree, and like predecessor entity AQI, ISIS published "internal policy memos and theological discussions" that "established guidelines for slavery, including a lengthy how-to manual issued by the Islamic State Research and Fatwa Department."[22] The group published and distributed "a color-printed pamphlet 'Question and Answers on Female Slaves and their Freedom,'" which "explained that capturing women is permissible if they are 'nonbelievers.'" ISIS explained that "captors have full control of their captives" and that it is "'permissible to buy, sell or give as a gift female captives and slaves.'"[23]

84.    ISIS's "use of modern slavery as a tactic" alarmed the U.S. State Department.[24] As the State Department reported: in 2014, ISIS "abducted, systematically raped, and abused thousands of women and children, some as young as 8 years of age."[25] ISIS's "horrific human rights abuses" "amount[ed] to human trafficking."[26]

## II.    Deutsche Bank Participated In The Terror Fundraising Venture

85.    Deutsche Bank participated in the Terror Fundraising Venture in at least two ways. First, Deutsche Bank facilitated and supported tax-fraud schemes that generated funds for

---

[21] Salma Abdelaziz, *ISIS states its justification for the enslavement of women*, CNN (Oct. 13, 2014), https://www.cnn.com/2014/10/12/world/meast/isis-justification-slavery/index.html; *see* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 348 (Hoffman Testimony at 111-12).
[22] Rukmini Callimachi, *ISIS Enshrines a Theology of Rape* (Aug. 13, 2015), https://www.nytimes.com/2015/08/14/world/middleeast/isis-enshrines-a-theology-of-rape.html?_r=0.
[23] Greg Botelho, *ISIS: Enslaving, having sex with 'unbelieving' women, girls is OK*, CNN (Dec. 13, 2014), https://www.cnn.com/2014/12/12/world/meast/isis-justification-female-slaves/.
[24] U.S. Dep't of State, *Trafficking in Persons Report*, at 37 (2015) https://2009-2017.state.gov/documents/organization/245365.pdf.
[25] *Id.*
[26] *Id.*

al-Qaeda and the Venture. Second, defying warnings from the U.S. government and international community, Deutsche Bank provided banking services to ISIS and its agents and gave those terrorists access to the U.S. (and international) financial system, which helped the Venture transact and raise money. These modes of Deutsche Bank's active and instrumental participation in the Terror Fundraising Venture are discussed in turn.

### A. Deutsche Bank Knowingly Facilitated and Benefitted from Financial Fraud Schemes that Funded the Venture

86.     Deutsche Bank participated in the Terror Fundraising Venture by knowingly supporting al-Qaeda tax-fraud schemes that helped fund the Venture. Deutsche Bank actively facilitated al-Qaeda's Value-Added Tax ("VAT") fraud schemes, serving as a ***willing financial partner***, according to al-Qaeda financier and convicted VAT fraudster Samir Azizi (discussed *infra*).

87.     Since at least the 2000s, al-Qaeda raised funds through tax-fraud schemes. One such scheme involved stealing VAT funds from European taxing authorities, by either intentionally failing to remit VAT taxes or by falsely claiming and receiving VAT refunds. To execute the scheme, al-Qaeda set up cells in Europe. These cells obtained fraudulent VAT refunds from European governments; laundered the proceeds through complicit international banks—including Deutsche Bank—to convert the proceeds to U.S. dollars; and then routed those dollars to al-Qaeda.

88.     This section provides a brief overview of VAT fraud before discussing specific VAT fraud schemes that Deutsche Bank facilitated.

### 1. Overview of VAT Fraud

89.     European nations impose VAT on goods and services. As the name suggests, VAT is essentially a tax on the value added to a product, imposed at each stage in the supply chain,

from manufacture to delivery of the finished product to the final consumer. VAT resembles U.S. sales tax in that it is based on the value of a physical good. However, VAT is imposed at each step of production, from processing raw materials to distributing final products. Each seller in the supply chain charges VAT to its immediate customers based on the value it has added to the product. For each buyer in the supply chain, VAT is a tax on the purchase price paid. Each seller in the chain must report its sales and pay to the government the VAT due—but may deduct from that payment any VAT it already paid on the product. Thus, goods make their way through the supply chain with each buyer and seller reporting sales and paying the relevant VAT at each step. Ultimately, the VAT is borne entirely by the end-user of the finished product—typically the consumer of the product, who cannot deduct any VAT from their purchases (because they typically do not resell the product and add no value even if they do).

90.    In the European Union, intra-Community goods move from one nation to another essentially tax-free. Products exported from one EU country to another are exempt from VAT, and the exporting county collects no VAT on such sales. Imported products are subject to a "reverse charge," meaning that an importer pays VAT (at the importing country's rate) on the purchase price when the goods are first sold into the country, but the importer is entitled to a credit or refund of that VAT payment.

91.    VAT is vulnerable to certain types of fraud, including "Missing Trader Intra-Community" fraud.

92.    Through Missing Trader Intra-Community fraud, criminal groups illegally obtain refunds of VAT input tax. Missing Trader Intra-Community fraud operates as follows:

a. The initial purchaser is the so-called "missing trader." The purchaser may be a non-existent company without any real business activity, or it may be an actual company that does not comply with its obligations to declare and pay VAT to the tax office.

b. The missing trader purchases goods and then charges VAT when the goods are re-sold down the supply chain. But then the trader disappears without making the required VAT payment to the taxing authority.

93.     The Missing Trader Intra-Community fraud scheme may continue through a series of sham purchases and sales. A continuing Missing Trader Intra-Community fraud scheme is also known as "carousel" fraud. Carousel fraud operates as follows:

a. The missing trader purports to sell goods downstream through a supply chain comprised of pre-determined and fixed buyers, known as buffer companies. But the sales from the missing trader to the buffer companies are bogus transactions; no goods ever change hands among the buffer companies.

b. Nonetheless, the missing trader will issue (fraudulent) invoices purporting to show sales. Those invoices give downstream buffer companies the opportunity to claim unwarranted deductions of input VAT from taxing authorities (based on the fake invoices).

c. Often, several buffer companies are used in the fraud carousel to conceal the delivery paths and carousel structure. Buffer companies who "purchase" goods from the missing trader, in turn, "sell" the goods to other buffer companies. And the process continues.

d.  Eventually, the goods pass from a buffer company to a so-called distributor who ensures the goods re-enter the same fraudulent supply chain—usually through a VAT-exempt sale to a gang member in another EU country.

e.  This explains the "carousel" label: the same "goods" may be moved round and round through the supply chain.

## 2.  The Relevant VAT Fraud Cells

94.  Al-Qaeda Core supported VAT fraud cells in Europe. It maintained "research departments" to analyze markets and countries to find opportunities to implement the fraud, and organized "VAT fraud boot camps" to train prospective fraudsters.[27] Al-Qaeda Core supported VAT fraud cells because they generated significant cash proceeds that could be, and were, remitted to al-Qaeda Core.

95.  Al-Qaeda-affiliated VAT fraud cells based their fraud on various commodities, including cell phones and, later, carbon emissions credits.[28]

96.  Al-Qaeda Core used proceeds from VAT frauds to support the Terror Fundraising Venture by funding its branches and affiliates, including AQI. Those branches and affiliates, including AQI, used those funds to implement and support the Venture on the ground, including in the commission of Trafficking Crimes, such as by funding kidnapping operations that generated additional cash flows.

---

[27] *See* Marius-Cristian Frunza, Value Added Tax Fraud, at 118 (Routledge 2019).
[28] Michael Day & Tom Bawden, *Briton 'Used Carbon Trading to Fund Terror'*, The Independent (UK) (Sept. 24, 2014), https://www.independent.co.uk/news/uk/crime/briton-usedcarbon-trading-to-fund-terror-9754108.html; *see* Order, *In re Azizi*, No. 5:14-xr-90282 (N.D. Cal. Mar. 20, 2015), Dkt. 60 at 20, 22 [hereinafter "Azizi Order"].

### a. The Azizi Cell

97.    One al-Qaeda-affiliated VAT fraudster was Samir Azizi. He was an Afghan-born German operative of al-Qaeda. By the time he was sixteen, Azizi led a fraud cell operating out of Europe and the United Arab Emirates ("U.A.E."). Azizi and his associates who directly participated in his financial crimes are referred to in this Complaint as the "Azizi Cell."

98.    The Azizi Cell operated from the mid-2000s through 2015. During that time, the cell funneled tens of millions of dollars to al-Qaeda Core. This made Azizi one of al-Qaeda's most prolific fundraisers.

99.    The Azizi Cell committed VAT carousel fraud through a network of sham companies. The Azizi Cell would convert the proceeds of the VAT fraud to U.S. dollars and then remit the freshly laundered dollars to accounts controlled by al-Qaeda.

100.    Several sources corroborate that the Azizi Cell's VAT fraud scheme funded al-Qaeda's terrorist operations.

a.    In its formal request for Azizi's extradition from the United States to Germany, the German government confirmed that it had found "indicators" that the Azizi Cell was using "the VAT procured" through fraud to "finance terrorism."[29]

b.    In 2010, "documents found by British special forces in a cave on the Afghan-Pakistan border," revealed that the "proceeds" from Deutsche Bank's fraudulent trades could be "traced" "to Middle Eastern terror groups" operating "in a cave on the Afghan-Pakistan border"—*i.e.*, al-Qaeda.[30]

---

[29] Azizi Order at 22 (quoting Germany's Formal Request for Extradition at 11).
[30] *See* Jim Armitage, *Life Is A Carousel Of Fraud And The People Involved Can Be Clever And Very Dangerous*, Independent (Aug. 14, 2015), 2015 WLNR 24079306.

c.  A 2007 report by the Financial Action Task Force connected VAT fraud and terrorism. And the United Kingdom's Home Secretary drew "an explicit link . . . between fundraising by terrorist groups and the European-wide so-called 'carousel' VAT fraud."[31]

101.  **Deutsche Bank's Role Regarding the Azizi VAT Fraud Cell.** Deutsche Bank's knowing and willing participation helped the Azizi Cell's VAT Fraud scheme succeed.

102.  From the mid-2000s through 2015, Azizi used accounts at several Deutsche Bank branches—including branches in New York (through DBTCA), Frankfurt, and London—to conduct his Cell's VAT fraud scheme.

103.  After his arrest, Azizi admitted to German authorities how proceeds from the VAT fraud scheme flowed through Deutsche Bank accounts at various points in the carousel of trading (fraudulent) emission allowances.[32] According to Azizi, Deutsche Bank acted as a ***willing financial partner*** to help the Azizi Cell commit VAT fraud.

104.  Deutsche Bank's involvement is further confirmed by a confidential investigative summary prepared by an elite Western law enforcement agency that had direct access to Samir Azizi himself and his bank records (the "Final Azizi Memo").[33] As memorialized in the Final Azizi Memo, one or more members of the Azizi Cell "generally confessed" to the scheme and "cooperat[ed] with the investigation." The Final Azizi Memo confirms that Deutsche Bank, through its services to Azizi and the Azizi Cell, helped route ***tens of millions*** of dollars in value to al-Qaeda.

---

[31] Alan Travis & Ashley Seager, *Reid Wants Europe to Fight VAT Fraud Linked to Terror Funds*, The Guardian (Oct. 26, 2006), https://www.theguardian.com/politics/2006/oct/26/eu.terrorism.
[32] *See* Azizi Order at 44-48.
[33] Given al-Qaeda's long history of intimidating witnesses, Plaintiffs paraphrase the substance from this confidential law enforcement summary.

105.    Deutsche Bank's participation in the Azizi Cell's VAT fraud scheme was
deliberate.

106.    "Early on" in the life of the scheme, a financial crimes investigator "warned
Deutsche [Bank] in writing that its traders appeared to be partaking in tax fraud. But the
Deutsche traders" "kept doing it."[34] "In November 2009," the same investigator "marched into
[Deutsche Bank London's] offices and told its lawyers that Deutsche [Bank] had already been
put on written notice that it was likely engaged in fraud and that the consequences for the
continued misbehavior could be severe."[35] "[T]he following month," the same investigator "paid
another visit . . . and read [Deutsche Bank's] lawyer the riot act."[36]

107.    In April 2010, German law enforcement searched Deutsche Bank's offices in
Frankfurt based upon the belief that Deutsche Bank had been aiding and abetting VAT fraud
relating to, among other things, Deutsche Bank's carbon emissions-related trades on behalf of the
Azizi Cell.

108.    In December 2012, German authorities raided multiple Deutsche Bank offices in
connection with these schemes.

109.    In August 2015, German prosecutors brought criminal charges against several
Deutsche Bank employees for their role in aiding VAT fraud.[37] On information and belief, at least

---

[34] David Enrich, *Dark Towers: Deutsche Bank, Donald Trump, and an Epic Trail of Destruction*
150 (Custom House 2020).
[35] Enrich, *supra*, at 150-51.
[36] Enrich, *supra*, at 151.
[37] Reuters, *Seven Deutsche Bank staff charged over carbon trading scandal* (Aug. 13, 2015),
https://www.reuters.com/article/business/seven-deutsche-bank-staff-charged-over-carbon-
trading-scandal-idUSKCN0QI1KV/.

some of those employees participated in the Azizi Cell's VAT fraud scheme. Those employees

were later convicted, with some receiving jail sentences, for their role in aiding the VAT fraud.[38]

110.    Deutsche Bank's involvement was essential to the success of the VAT fraud

scheme. According to the German magazine *Der Spiegel*, Deutsche Bank played an **active role** in

VAT Fraud schemes, and the bank's involvement afforded key operational benefits:

> Several witnesses testified that [the fraudster's] **relations with
> Deutsche Bank** had proven to be particularly helpful. [Deutsche
> Bank's] role . . . was to buy up the certificates from various front
> companies, export them, and put them back into the system.
> Deutsche Bank **made the accounts available to the fraudulent
> companies** and **made sure that there were no indications of
> suspected money laundering**. Deutsche Bank gave the dealings a
> serious demeanor . . . [and] used a special Deutsche Bank program
> that enabled **super-fast transfers**. In just a few minutes, the
> transactions were run across multiple accounts. This allowed the
> carousel to turn faster and generate even more profit.[39]

111.    Deutsche Bank's actions suggest it knew about the Azizi Cell's VAT fraud

scheme, but nonetheless provided financial services for the Azizi Cell.

112.    Indeed, Deutsche Bank's own compliance officers noted to each other that the

Azizi Cell's transactions raised red flags for fraud, but then decided not to stop them. With

respect to the Azizi Cell's VAT fraud scheme involving carbon credits, a Deutsche Bank

employee emailed a colleague to inform Deutsche Bank's compliance department that "[t]he

CO2 market" (*i.e.*, the market for carbon credits) was "showing **typical characteristics of a sales

tax carousel**," which is a universally recognized red flag for VAT fraud.

---

[38] Reuters, *Former Deutsche banker jailed for carbon trading fraud* (June 13, 2016), https://www.reuters.com/article/world/former-deutsche-banker-jailed-for-carbon-trading-fraud-idUSKCN0YZ1S5/.

[39] Martin Hesse and Andreas Ulrich, *Batman vor Gericht*, Spiegel (Mar. 30, 2017) (translated by Plaintiffs), https://www.spiegel.de/wirtschaft/unternehmen/co2-betrug-urteil-gegen-peter-virdeesingh-erwartet-a-1140945.html (emphasis added).

113.    When Deutsche Bank serviced the Azizi Cell and furthered the Azizi Cell's VAT

fraud schemes, Deutsche Bank knew—or was willfully blind to the risk—that Azizi was an agent

for al-Qaeda, including al-Qaeda Core and AQI. Deutsche Bank knew such facts to be true

because the totality of the red flags before Deutsche Bank permitted no other conclusion for at

least four reasons.

114.    *First*, Deutsche Bank knew that Azizi was a teenage Afghan national who lacked

any business track record—yet rapidly established several companies focused on exporting

goods to Afghanistan. Deutsche Bank knew such a profile was a red flag for a person who, like

Azizi, was serving as an al-Qaeda agent.

115.    *Second*, Deutsche Bank knew that the Azizi Cell's transactions were fraudulent

and bore the characteristics of VAT fraud. Deutsche Bank further knew (or willfully ignored) that

VAT fraud was a red flag for terrorist financing schemes—particularly ones designed to raise

money for al-Qaeda. Indicia of VAT fraud included the virtually nonexistent public record of the

Azizi Cell's companies, the backgrounds of key members of the Azizi Cell, the types of

transactions, the suspicious nature of the business records and papers furnished by members of

the Azizi Cell to Deutsche Bank, and Deutsche Bank's direct communications with Azizi Cell.

Deutsche Bank also knew that al-Qaeda was one of the preeminent practitioners of VAT fraud in

Europe. Deutsche Bank therefore knew that Azizi's status as a VAT fraudster indicated that he

was likely an al-Qaeda agent and financier, as he was.

116.    *Third*, Deutsche Bank knew that the Azizi Cell operated in several high-risk

geographies for al-Qaeda finance, especially when viewed in combination. Deutsche Bank knew

that the Azizi Cell operated in substantial part out of Germany (like the 9/11 hijackers), and

Deutsche Bank knew that Germany was always a vital European geography for al-Qaeda

fundraising, al-Qaeda's VAT fraud schemes, and al-Qaeda's use of Europe to provide money and logistical support to the Terror Fundraising Venture. Deutsche Bank also knew that the Azizi Cell operated in substantial part out of the U.A.E., and Deutsche Bank knew that the U.A.E. was always a vital waypoint geography for al-Qaeda fundraising, al-Qaeda's VAT fraud schemes, and al-Qaeda's use of Europe to provide money and logistical support to the Venture, and served as al-Qaeda's bridge between its branches in Europe and Iraq/Syria (AQI), on the one hand, and al-Qaeda Core in Afghanistan and Pakistan, on the other. In this context, Deutsche Bank knew that the Azizi Cell transacted a carousel of U.S. dollar-denominated payments that leveraged DBTCA and the New York banking system to flow money between every geography that mattered to the Terror Fundraising Venture.

117.    *Fourth*, Deutsche Bank knew that, in addition to the carbon credits scheme, Azizi also engaged in VAT fraud schemes that involved the export of cell phones to Afghanistan. Deutsche Bank knew that cell phone exports are frequently involved in VAT fraud schemes. While cell phone exports, standing alone, were not a red flag, the fact that cell phone exports were the object of already suspect transactions was itself a powerful additional red flag. Deutsche Bank knew that al-Qaeda Core trained al-Qaeda's VAT fraud agents in Europe to prioritize the cross-border trade of dual-use items between western countries and al-Qaeda Core's fronts in Afghanistan and Pakistan. Indeed, Deutsche Bank knew that al-Qaeda Core and al-Qaeda's agents in Europe prized cell-phone related transactions in their VAT fraud schemes given al-Qaeda Core's insatiable need for cell phones to supply both the triggers for their IEDs and the supply of burner phones needed for their operatives to securely communicate.

118.    While knowing that Azizi and the Azizi Cell were agents for al-Qaeda, or being willfully blind to such facts, Deutsche Bank deliberately facilitated the Azizi Cell's VAT fraud in

several ways. It enabled execution of the trades that formed the basis for VAT fraud. It prepared

key documentation that enabled the execution of the scheme, and its involvement gave those

trades a veneer of professionalism and legitimacy. It enabled proceeds of the VAT fraud scheme

to be converted to U.S. dollars. And it helped the Azizi Cell transfer funds to accounts controlled

by or affiliated with al-Qaeda.

119.    From 2007 through 2014, Deutsche Bank directly enabled the Azizi Cell's VAT

fraud schemes that likely transferred well over $1 million each year to al-Qaeda, including al-

Qaeda Core and AQI, through U.S. dollar-denominated trades. These trades provided the Terror

Fundraising Venture, through its agent, the Azizi Cell, with vital access to the New York

financial system. The Azizi Cell VAT fraud scheme likely caused the transfer of, at a minimum,

nearly $10 million to al-Qaeda Core, which supported its own malign activities and those of

AQI. Given al-Qaeda's tradecraft, doctrine, and tactics, techniques, and procedures, al-Qaeda

Core used proceeds from the Azizi Cell's VAT fraud scheme to support the Terror Fundraising

Venture until February 2014—throughout the time when Kayla Mueller, James Foley, and Steven

Sotloff were abducted, detained, and tortured.

120.    Deutsche Bank entities located outside the United States that were involved in the

Azizi Cell relied on the NY Branch and DBTCA to process millions in U.S. dollar-denominated

transactions, over the lifetime of the Azizi Cell's VAT fraud scheme.

121.    Azizi himself admitted that his ability to access U.S. dollars, which he did through

DBTCA, was crucial to the success of the VAT fraud scheme. Indeed, a significant portion of the

scheme's proceeds were converted to U.S. dollars and then transferred to al-Qaeda Core (while

other scheme proceeds remained in British pounds or Euros and remained in the fraud carousel).

122.    The involvement of the NY Branch and DBTCA imbued the Azizi Cell's scheme with legitimacy, which aided the Azizi Cell's efforts to move its illicit proceeds through the legitimate financial system *en route* to al-Qaeda Core.

123.    Deutsche Bank knew, or was willfully blind to the fact, that proceeds from the Azizi Cell's VAT fraud scheme aided al-Qaeda Core.

124.    Deutsche Bank knew, or was willfully blind to the fact, that proceeds from the Azizi Cell's VAT fraud scheme aided AQI because Deutsche Bank knew about al-Qaeda Core's close relationship with AQI.

125.    Consistent with Al-Qaeda Core's commitment to supporting the hostage-taking operations of its affiliates, al-Qaeda Core used the Azizi Cell's profits generated through Deutsche Bank's services to support the Terror Fundraising Venture from 2009 until February 2014, including by sending money and supplies to AQI (and later, ISIS) to commit Trafficking Crimes in furtherance of the Venture.

### b.  The Ahmed Cell

126.    Deutsche Bank also facilitated a VAT fraud cell led by Imran Yakub Ahmed. Ahmed and his associates (collectively, the "Ahmed Cell") raised funds for al-Qaeda through VAT fraud schemes. Ahmed would convert the proceeds of those schemes to U.S. dollars and send those laundered funds to al-Qaeda.

127.    From the mid-2000s through 2010, the Ahmed Cell raised more than 1.15 billion Euros through VAT fraud schemes. In 2017, Ahmed was convicted in Italy for conspiracy to steal VAT.

128.    When Deutsche Bank serviced the Ahmed Cell and thus participated in the Ahmed Cell's VAT fraud schemes, Deutsche Bank knew—or was willfully blind to the risk—that Ahmed was an agent for al-Qaeda, including al-Qaeda Core and AQI. Deutsche Bank knew such

facts to be true because the totality of the red flags permitted no other conclusion for at least four reasons.

129.    *First*, Deutsche Bank knew that Ahmed was a Pakistani national who lacked any business track record yet rapidly stood up a series of companies exporting goods to Pakistan and Afghanistan. Deutsche Bank knew such a profile was a red flag for a person serving as an al-Qaeda agent, as Ahmed was.

130.    *Second*, Deutsche Bank knew that the Ahmed Cell's transactions were fraudulent and bore the characteristics of VAT fraud, which Deutsche Bank knew (or willfully ignored) was a red flag for terrorist financing schemes—particularly ones designed to raise money for al-Qaeda. Indicia of VAT fraud included the virtually nonexistent public record of the Ahmed Cell's companies, the backgrounds of key members of the Ahmed Cell, the types of transactions, the suspicious nature of the business records and papers furnished by members of the Ahmed Cell to Deutsche Bank, and Deutsche Bank's direct communications with the Ahmed Cell. Deutsche Bank also knew that al-Qaeda was one of the preeminent practitioners of VAT fraud in Europe. Deutsche Bank therefore knew that Ahmed's status as a VAT fraudster indicated that he was likely an al-Qaeda agent, as he was.

131.    *Third*, Deutsche Bank knew that the Ahmed Cell operated in substantial part out of Italy, which, like Germany, Deutsche Bank knew to be a key European territory for al-Qaeda fundraising, al-Qaeda's VAT fraud schemes, and al-Qaeda's use of Europe to provide money and logistical support to the Terror Fundraising Venture.

132.    *Fourth*, Deutsche Bank knew that the Ahmed Cell conducted cross-border trades involving cell phones. And Deutsche Bank knew that cell phone exports are frequently involved in VAT fraud schemes. Even if cell phone exports standing alone were not a red flag, the fact that

cell phone exports were the object of transactions that independently raised red flags was itself a powerful additional red flag.

133.    **Deutsche Bank's Role Regarding the Ahmed VAT Fraud Cell.** Deutsche Bank entities located outside the United States that were involved in the Ahmed Cell's VAT fraud scheme depended on the NY Branch and DBTCA to process millions in U.S. dollar-denominated transactions, over the lifetime of the Ahmed Cell's VAT fraud scheme.

134.    While knowing that Ahmed and the Ahmed Cell were agents for al-Qaeda, or being willfully blind to such facts, on information and belief, Deutsche Bank deliberately enabled the Ahmed Cell's VAT fraud in several ways. It enabled execution of the trades that formed the basis for VAT fraud. It prepared key documentation that enabled the execution of the scheme, and its involvement gave those trades a veneer of professionalism and legitimacy. It enabled proceeds of the VAT fraud scheme to be converted to U.S. dollars. And it helped the Ahmed Cell transfer funds to accounts controlled by or affiliated with al-Qaeda.

135.    Consistent with Al-Qaeda Core's commitment to supporting the hostage-taking operations of its affiliates, al-Qaeda Core used proceeds from the Ahmed Cell's VAT fraud scheme to support the Terror Fundraising Venture from the mid-2000s through 2010.

136.    Deutsche Bank knew, or was willfully blind to the fact, that proceeds from the Ahmed Cell's VAT fraud scheme aided al-Qaeda Core.

137.    Deutsche Bank knew, or was willfully blind to the fact, that proceeds from the Ahmed Cell's VAT fraud scheme aided AQI because Deutsche Bank knew about al-Qaeda Core's close relationship with AQI.

138.    Consistent with Al-Qaeda Core's commitment to supporting the hostage-taking operations of its affiliates, al-Qaeda Core used the Ahmed Cell's profits generated through

Deutsche Bank's services to support the Venture from the mid-2000s until February 2014 by sending money and supplies to AQI (and later, ISIS) to commit Trafficking Crimes in furtherance of the Venture.

139.    Proceeds from the Ahmed Cell's VAT fraud that flowed to al-Qaeda in turn flowed to AQI, and those proceeds supported the Venture.

**B.    Deutsche Bank Provided Banking Services for ISIS**

140.    Deutsche Bank also participated in the Terror Fundraising Venture by knowingly providing banking services to ISIS, including by giving it access to the U.S. financial system at a time when the United States, the government of Iraq, and the international community were working tirelessly to deny ISIS access to the international financial system.

141.    Specifically, DBTCA—independently and/or at the direction of Deutsche Bank AG—provided U.S. dollar-clearing correspondent banking services for ISIS-controlled banks in Iraq. DBTCA—while knowing about (or being willfully blind to) ISIS's involvement—both performed transactions sourced by other Deutsche Bank entities *and* performed dollar-clearing services for other, unaffiliated, non-Deutsche Bank entities.

142.    Deutsche Bank's knowing provision of banking services for ISIS and its agents lasted from at least June 2014 until February 2015. Deutsche Bank's provision of correspondent banking services for ISIS-affiliated banks allowed ISIS to obtain millions of U.S. dollars—which helped sustain and grow the Terror Fundraising Venture.

143.    The below allegations reflect the transactions of which Plaintiffs are aware that Deutsche Bank executed in connection with its participation in the Terror Fundraising Venture. This list is not exhaustive; it reflects what Plaintiffs have been able to piece together without discovery. The full details of Deutsche Bank's financial transactions and the full scope of its participation in the Terror Fundraising Venture rest within Defendants' sole control. Discovery

will likely uncover many other similar transactions and/or ways in which Deutsche Bank

participated in the Terror Fundraising Venture.

144.    This section first provides the events leading to Deutsche Bank's decision to

provide correspondent-banking services for ISIS.

### 1.    ISIS Sought Access to the International Financial System to Exploit Its Newfound Wealth

145.    In early June 2014, ISIS took over the city of Mosul, Iraq. Counterterrorism

experts considered that takeover "perhaps the most significant act by a jihadist group since the

9/11 attacks."[40]

146.    In its conquest of Mosul, ISIS seized banks, including the local branch of the

Central Bank of Iraq.[41] That bank seizure alone gave ISIS access to 500 billion Iraqi dinars (*i.e.*,

roughly $425 million).[42]

147.    As ISIS expanded further into Iraq, it continued to seize banks. By the end of

2014, at least "90 Iraqi bank branches [were] located in territory that [was] either held or

contested by ISIL, including in and around the provinces of Nineveh, Salah Din, Anbar, and

Kirkuk."[43] Indeed, the Central Bank of Iraq estimated that ISIS seized at least 121 bank branches

---

[40] U.K. House of Commons Library (Ben Smith, Louisa Brook-Holland and Rob Page, International Affairs and Defence Section), *Islamic State of Iraq and the Levant (ISIS) and the Takeover of Mosul*, Standard Note No. SNIA 6915, at 4 (June 20, 2014), https://researchbriefings.files.parliament.uk/documents/SN06915/SN06915.pdf.

[41] *See also* U.N. Security Council, *The Islamic State in Iraq and the Levant and the Al-Nusrah Front for the People of the Levant: Report and Recommendations Submitted Pursuant to Resolution 2170 (2014)* ¶ 71 (Nov. 14, 2014) (reporting that ISIS "seized vast amounts of assets from the Mosul branch of the Central Bank of Iraq").

[42] Terrence McCoy, *ISIS just stole $425 million, Iraqi governor says, and became the 'world's richest terrorist group,'* Washington Post (June 12, 2014), https://www.washingtonpost.com/news/morning-mix/wp/2014/06/12/isis-just-stole-425-million-and-became-the-worlds-richest-terrorist-group/.

[43] Financial Action Task Force (FATF), *Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 27 (Feb. 2015), https://www.fatf-gafi.org/content/dam/fatf-

in all.[44] ISIS's bank seizures included both state-run banks and branches of international banks. This Complaint refers to all such ISIS-captured banks as the "Seized Banks."

148.    The Seized Banks gave ISIS a financial windfall. By "seizing control of state-owned banks in northern and western Iraq," ISIS "gained access to *at least half of a billion* dollars," according to the U.S. Treasury Department.[45]

149.    When ISIS seized a bank, ISIS not only treated the cash located there as its property to transact with as it pleased, but the group also sought to "ensur[e] continuity of business" in those banks, so it could "profit from bank transactions."[46] In Mosul, for example, ISIS "installed managers at many bank branches."[47] As the banks continued to operate, ISIS took "all the cash deposits of local Christians and Muslims" and "lev[ied] a tax of 5 percent on all customer cash withdrawals."[48] ISIS did the same in other parts of Iraq where it "operate[d] freely, such as Fallujah and Ramadi."[49] ISIS thus controlled the assets and operations of the Seized Banks.

---

gafi/reports/Financing-of-the-terrorist-organisation-ISIL.pdf.coredownload.pdf [hereinafter "FATF Report"].

[44] Hala Nouhad Nasreddine, *Deutsche Bank: Suspected of Facilitating Funds to ISIS in Iraq*, Arab Reporters for Investigative Journalism (ARIJ) (Sept. 20, 2020), https://arij.net/investigations/fncnfinvest-IRQ-en/.

[45] Jennifer Fowler, Remarks of Deputy Assistant Secretary for Terrorist Financing Jennifer Fowler at the Washington Institute for Near East Policy on U.S. Efforts to Counter the Financing of ISIL, U.S. Dep't of the Treasury (Feb. 2, 2015), https://home.treasury.gov/news/press-releases/jl9755 (emphasis added); *see* FATF Report at 12 ("The US estimates that ISIL has generated, or has had access to the equivalent of at least a half billion US Dollars (USD) in cash alone as it has taken control of state-owned bank branches located in the Ninevah, Al-Anbar, Salah Din, and Kirkuk provinces in Iraq over the latter half of 2014.").

[46] FATF Report at 13.

[47] *Id.*

[48] *Id.*

[49] *Id.*

150.    By summer 2014, ISIS had become "the richest terrorist organization on Earth,"[50]

"deriv[ing] a ***significant portion of its wealth*** from controlling the bank branches in Iraq where it

operate[d]."[51]

151.    Despite this newfound wealth, cash-rich ISIS found itself in a bind. While it

"generated" or "had access to" cash as part of its control and domination of banks in Iraq,

"[m]uch of this cash [was] ***denominated in the dinar***, the local Iraqi currency." That made it

difficult for ISIS to use the cash externally. To use its "cash assets outside of Iraq," ISIS needed

to "exchange the cash [*i.e.*, Iraqi dinars] for foreign currency."[52]

152.    ISIS thus needed to access the international financial system, so it could "make

the most effective use of the money it rais[ed]."[53] Indeed, ISIS's very "***surviv[al]***" depended on

its ability to launder money seized from Iraqi banks (or otherwise generated through its criminal

---

[50] Rep. Carolyn Maloney, *Terrorist Financing and the Islamic State: Hearing Before the H. Comm. on Financial Servs.*, 113th Cong., at 14 (Nov. 13, 2014), https://financialservices.house.gov/uploadedfiles/113-99.pdf; *see* Terrence McCoy, *ISIS just stole $425 million, Iraqi governor says, and became the 'world's richest terrorist group,'* Washington Post (June 12, 2014), https://www.washingtonpost.com/news/morning-mix/wp/2014/06/12/isis-just-stole-425-million-and-became-the-worlds-richest-terrorist-group/.

[51] FATF Report at 12 (emphasis added).

[52] *Id.* at 12.

[53] David Cohen, Under Secretary for Terrorism and Financial Intelligence at the U.S. Department of Treasury, Remarks at Carnegie Endowment for International Peace (Oct. 23, 2014), https://carnegieendowment.org/2014/10/23/remarks-by-u.s.-treasury-under-secretary-david-s.-cohen-on-attacking-isil-s-financial-foundation-pub-57007 [hereinafter "Cohen Carnegie Speech"]; *see* Matthew Levitt, Director of the Stein Program on Counterterrorism and Intelligence at The Washington Institute for Near East Policy, *The Islamic State's Backdoor Banking* (Mar. 24, 2015), https://www.washingtoninstitute.org/policy-analysis/islamic-states-backdoor-banking ("[T]o make effective use of the funds it raise[d], ISIS depend[ed] on access to banking services in . . . Iraq and the connectivity they provide to the wider international financial system."); *see also* FATF Report at 21 ("The payment of fighters and the development of international recruitment hubs are endemic to a global movement, as seen in the case of core-AQ. Managing a multinational operation and the logistical and financial framework will require, in one form or another, use of the conventional banking system.").

activities) through "the legitimate banking system . . . to pay external parties for weapons, goods and services."[54]

153.    Not only did it need access to the international financial system, but ISIS also needed a way to obtain its "preferred currency"—the "U.S. dollar."[55] ISIS thus needed access to the U.S. financial system in particular.

154.    ISIS accessed the U.S. financial system by exploiting correspondent banking relationships that the Seized Banks had with banks located in the United States. As the Financial Action Task Force ("FATF") recognized, ISIS's Seized Banks "access[ed] the international financial system through [the banks'] headquarters, which retain[ed] access to the international financial system through *correspondent relationships* with foreign banks."[56]

155.    By way of background, correspondent banking is generally defined as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks."[57] Such arrangements are needed when a sender seeks to transfer funds to a recipient whose bank lacks a direct relationship with the sender's bank. In that scenario, the sender must rely on additional

---

[54] Nasreddine, *supra* (quoting Henrich Böhmke (emphasis added)).

[55] David Cohen, Under Secretary for Terrorism and Financial Intelligence at the U.S. Department of Treasury, *Press Briefing by Press Secretary Josh Earnest, 10/23/2014* (Oct. 23, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/10/23/press-briefing-press-secretary-josh-earnest-10232014; *see also* Anshu Siripurapu and Noah Berman, *The Dollar: The World's Reserve Currency*, Council on Foreign Relations (July 19, 2023), https://www.cfr.org/backgrounder/dollar-worlds-reserve-currency ("In addition to accounting for the majority of global reserves, the dollar remains the currency of choice for international trade. Major commodities such as oil are primarily bought and sold using U.S. dollars, and some major economies, including Saudi Arabia, still peg their currencies to the dollar.").

[56] FATF Report at 27 (emphasis added); *see id.* (Those bank branches could "process funds transfers" "through the international financial system" "via their headquarters in Baghdad.").

[57] Bank for International Settlements Committee on Payments & Market Infrastructures, Correspondent banking at 9 (July 2016).

banks—typically called "correspondent" or "intermediary" banks—to establish a chain of banking relationships that can complete the transfer from sender to recipient. Correspondent banking is "an essential component of the global payment system, especially for cross-border transactions."[58] A related concept is "[c]orrespondent banking involving U.S. dollar clearing," which is the process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank."[59] It was widely understood by banks, including Deutsche Bank, that "U.S. dollar clearing may be a potentially high-risk business line for many banks, as it may be used by bad actors to launder money or facilitate terrorist transactions."[60]

## 2. As ISIS Grew, the International Community Worked to Prevent ISIS from Accessing the International Financial System—and Deutsche Bank Knew About Those Efforts

156.    As ISIS seized banks and continued to grow, the international community sounded the alarm that ISIS would attempt to launder its ill-gotten gains through legitimate international financial institutions and took concrete steps to deny ISIS access to those legitimate institutions.

157.    Deutsche Bank, as a sophisticated multinational financial institution, knew about these actions and warnings.

### a. Actions by the U.S. Government and International Community

158.    The U.S. government, Central Bank of Iraq, international community, and major financial institutions issued warnings and took steps to prevent banks in ISIS-held territory from accessing the international financial system.

---

[58] *Id.* at 6.
[59] Consent Order Under New York Banking Law §§ 39, 44 and 44-a, *In the Matter of Deutsche Bank AG*, N.Y. Dep't of Financial Servs., at 9 n.5 (Jan. 30, 2017), https://www.dfs.ny.gov/system/files/documents/2020/03/ea170130_deustche_bank.pdf [hereinafter "2017 NYDFS Consent Order"].
[60] 2017 NYDFS Consent Order at 9 n.5.

159.    **U.S. Government**. Following ISIS's seizure of banks in Iraq, the U.S. government worked with the Iraqi government and regional governments to take "immediate steps to sever bank branches in Islamic State territory from the international banking network, declaring off-limits transactions with the identification code of seized branches."[61]

160.    The Treasury Department engaged in a multi-pronged effort, working with "the Iraqi authorities, bank headquarters, and the international financial community . . . to prevent ISIL from using those bank branches" and to limit ISIS's access to "international banking systems"—focusing on the "[s]cores of bank branches . . . located in territories where ISIL operate[d]" (*i.e.*, the Seized Banks).[62]

161.    The Treasury Department aimed to "ensure that ISIL [did] not have the opportunity to use" "Iraqi banks that have branches in the territory where ISIL operate[d]"—*i.e.*, the Seized Banks—"to make payments for whatever reason."[63]

162.    **Central Bank of Iraq**. The Central Bank of Iraq issued several directives designed to cut off ISIS's access to the international financial system.[64]

163.    Soon after ISIS took over Mosul, in July 2014, the Central Bank of Iraq issued a directive that ordered the suspension of the activity of bank branches—predominantly the Seized Banks—located in the governorates of Mosul, Salah al-Din, Diyala, and Anbar. At the time the directive was issued, ISIS controlled or contested each of those territories.

---

[61] Wall Street Journal, *How Islamic State's Secret Banking Network Prospers* (Feb. 24, 2016), https://www.wsj.com/articles/how-islamic-states-secret-banking-network-prospers-1456332138.
[62] Cohen Carnegie Speech.
[63] Congressional Testimony of David Cohen, *Terrorist Financing and the Islamic State*, Hearing Before the House Comm. on Financial Servs. (Nov. 13, 2014), https://www.govinfo.gov/content/pkg/CHRG-113hhrg92874/html/CHRG-113hhrg92874.htm.
[64] Central Bank of Iraq, *A report on the bank branches controlled by ISIS*, at 8 (July 2017) (translated by Plaintiffs) [hereinafter, "CBI Report"].

164.    That same month, the Central Bank of Iraq also issued a directive to stop bank branches in those same ISIS-controlled governorates (plus Kirkuk, which was also controlled by ISIS and home to several Seized Banks) from processing electronic payments and other general transactions.

165.    These Central Bank of Iraq directives were designed to protect Iraq's banking sector and prevent ISIS-controlled funds at the Seized Banks from entering the Iraqi banking sector and international financial system.

166.    **Responsible Financial Institutions.** In response to ISIS's rise, most banks limited operations, enhanced AML and terrorist-financing monitoring, and even *suspended* correspondent banking relationships with Iraqi banks in ISIS-held territories.

167.    As reported by the *Financial Times* in July 2014, the "growing crisis in Iraq has forced western banks . . . to tighten controls on clients' funds and pull senior staff out of the country amid growing security concerns."[65] By that time, due to the "rapid advance" of ISIS, western banks were "monitoring closely developments in Iraq" and "preparing for the situation to get worse."[66] And some "banks with branches in territory where ISIL operate[d] . . . shuttered their operations."[67]

168.    FATF confirmed that "*many* major global financial institutions ha[d] taken steps *to prevent* banks in ISIL-held territory from accessing the international financial system."[68]

---

[65] Financial Times, *Western banks start to pull out of Iraq* (July 7, 2014), https://www.ft.com/content/33c25276-02c7-11e4-81b1-00144feab7de.
[66] *Id.* (emphasis added); *see also* Chris Wright, *ISIS forces banking rethink in Iraq*, Euromoney (June 23, 2014), https://www.euromoney.com/article/b12kjycqcsx27d/isis-forces-banking-rethink-in-iraq.
[67] FATF Report at 37 (emphasis added).
[68] FATF Report at 6; *see also* Matthew Levitt, Director of the Stein Program on Counterterrorism and Intelligence at The Washington Institute for Near East Policy, *The Islamic State's Backdoor*

Those steps included, at a minimum, suspending correspondent banking with Iraqi banks located in ISIL-held territory.[69]

169.    The *Financial Times* echoed this, reporting that "[a]s regulators have cracked down on money laundering and terrorist finance, banks have severed their ties with many clients in developing nations in an attempt to limit the risk of being hit by massive fines." JPMorgan Chase, for example, "***severed its links*** with vast numbers of clients considered to be high-risk, including ***dozens of correspondent banks*** in developing countries." Responsible banks severed these relationships "because of the risk the money could end up in the wrong hands," including in the hands of ISIS.[70]

### b.  Warnings from the U.S. Government and International Community

170.    In addition to concrete efforts by the international community to prevent the Seized Banks—and, by extension, ISIS—from accessing the international financial system, the U.S. government and international bodies also issued warning after warning about the dangers of providing banking services for ISIS and its agents.

171.    Deutsche Bank, as a sophisticated multinational financial institution, knew about these warnings.

172.    <u>**U.S. Government.**</u> From 2013 to 2015, U.S. Government agencies and high-ranking officials repeatedly warned legitimate financial institutions about the terrorist-financing

---

*Banking* (Mar. 24, 2015), https://www.washingtoninstitute.org/policy-analysis/islamic-states-backdoor-banking ("The Iraqi government and other financial actors have taken laudable steps to curtail the Islamic State's ability to store and transfer funds through banks in areas under its control. When possible, assets have been removed, banks shuttered, and headquarters and staff relocated.").

[69] FATF Report at 36-37.

[70] Martin Arnold and Sam Fleming, *Regulation: Banks count the risks and rewards*, Financial Times (Nov. 13, 2014), https://www.ft.com/content/9df378a2-66bb-11e4-91ab-00144feabdc0 (emphasis added).

and money-laundering risks of processing transactions from or near Iraq. These warnings highlighted the risk of terrorist financing, money laundering, ransoms from kidnappings, and specific terrorist groups, like al-Qaeda and ISIS.

173.    As early as June 2013, for example, the U.S. State Department warned that Iraq lacked a "viable AML/CFT regime." The Department highlighted the "weak financial controls" in Iraq's "banking sector," the risks of "[b]ulk cash smuggling" and "trafficking in persons," and warned that "[r]ansoms from kidnapping and extortion are often used to finance terrorist[s]."[71]

174.    In December 2013, the U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN"), warned banks about "strategic deficiencies" in Iraq's AML/CFT regime.[72] FinCEN advised "U.S. financial institutions" to "consider the risks associated with the AML/CFT deficiencies" in Iraq and "reminded" those institutions of their regulatory obligations, including detecting and reporting suspicious activity involving "correspondent account[s]."[73]

175.    In March 2014, FinCEN again warned "U.S. financial institutions"—such as Deutsche Bank, via the NY Branch—about strategic deficiencies in Iraq's AML/CFT regime and again emphasized the importance of robust diligence.[74]

176.    That same month, David Cohen, Under Secretary for Terrorism and Financial Intelligence at the U.S. Treasury Department, gave a widely publicized speech regarding how

---

[71] U.S. Dep't of State, *International Narcotics Control Strategy Report Vol II: Money Laundering and Financial Crimes Country Database (2013)*, at 196-97 (June 2013), https://2009-2017.state.gov/documents/organization/211396.pdf.
[72] FinCEN, Advisory on the FATF-Identified Jurisdictions with AML/CFT Deficiencies, FIN-2013-A008 (Dec. 4, 2013).
[73] *Id.*
[74] FinCEN, Advisory on the FATF-Identified Jurisdictions with AML/CFT Deficiencies (Mar. 25, 2014).

even terrorist groups like ISIS "still depend on the international financial system."[75] Thus, he concluded, "banks must continue to be vigilant partners in protecting the global financial system from being infiltrated by terrorist groups and their facilitators," including by "identify[ing] new typologies of abuse" to "address current and forthcoming terrorist financing threats."[76]

177.    In June 2014, the State Department warned of "terrorists' abuse of [Iraq's] financial system and territory," and it highlighted the "weak financial controls" in Iraq's "banking sector" that left the country unable to implement an effective AML/CFT program.[77]

178.    In August 2014, FinCEN again warned "U.S. financial institutions"—such as Deutsche Bank, via the NY Branch—about deficiencies in Iraq's AML/CFT regime.[78]

179.    In October 2014, Under Secretary Cohen explained that the Treasury Department remained "focused on restricting ISIL's access to the international financial system in order to impair its ability to collect funds from abroad, and to move, store, and use the funds it acquires locally."[79]

180.    On information and belief, throughout that period, U.S. government agencies and high-ranking officials provided additional, non-public guidance and warnings to financial institutions operating in the United States, including Deutsche Bank, about the importance of

---

[75] David Cohen, Remarks before the Center for A New American Security on "Confronting New Threats in Terrorist Financing" (Mar. 4, 2014), https://home.treasury.gov/news/press-releases/jl2308.

[76] *Id.*

[77] U.S. Dep't of State, *International Narcotics Control Strategy Report Vol II: Money Laundering and Financial Crimes Country Database (2014)*, at 209-10 (June 2014), https://2009-2017.state.gov/documents/organization/222700.pdf.

[78] FinCEN, Advisory on the FATF-Identified Jurisdictions with AML/CFT Deficiencies (Aug. 5, 2014)

[79] Cohen Carnegie Speech (emphasis added).

preventing ISIS from laundering money or otherwise accessing the U.S. and international financial system.

181.    Deutsche Bank—as a sophisticated, regulated financial institution with a substantial presence in the United States and with legal obligations to comply with U.S. financial regulations—directly received and/or closely monitored these warnings. The bank declared as much in its securities filings: It repeatedly acknowledged that, from at least 2013 to 2015, a "major focus of U.S. governmental policy relating to financial institutions is aimed at preventing money laundering and terrorist financing," and "[f]ailure of an institution to have policies and procedures and controls in place to prevent, detect and report money laundering and terrorist financing could in some cases have serious legal, financial and reputational consequences for the institution."[80]

182.    Deutsche Bank incorporated these U.S. government warnings into internal diligence policies and procedures that are designed to prevent money laundering and terrorist financing, including diligence into correspondent banking accounts. Nonetheless, as discussed, Deutsche Bank intentionally and repeatedly violated these internal diligence policies and procedures when it chose to provide banking services for ISIS.

183.    **<u>Financial Action Task Force</u>.** FATF was—and remains—the global standard setting body for AML/CFT. FATF was a 36-member intergovernmental policy making body that establishes international standards to combat money laundering and counter the financing of

---

[80] Deutsche Bank Aktiengesellschaft, 2013 Annual Report filed on Form 20-F, at 54 (filed with the U.S. Securities and Exchange Commission on Mar. 20, 2014); Deutsche Bank Aktiengesellschaft, 2014 Annual Report filed on Form 20-F, at 61 (filed with the U.S. Securities and Exchange Commission on Mar. 20, 2015) (same); Deutsche Bank Aktiengesellschaft, 2015 Annual Report filed on Form 20-F, at 70 (filed with the U.S. Securities and Exchange Commission on Mar. 11, 2015) (same).

terrorism and proliferation of weapons of mass destruction. The United States and Germany were both members of the FATF. Throughout 2013 to 2015, FATF repeatedly warned Western financial institutions about ISIS's efforts to launder funds through banks in Iraq.

184.    In October 2013, FATF warned financial institutions about Iraq's "strategic AML/CFT deficiencies," including its need to "adequately" criminalize "terrorist financing," "establish[] effective customer due diligence measures," and "establish[] suspicious transaction reporting requirements."[81]

185.    By February 2014, FATF "determined" that these "AML/CFT deficiencies remain," and that "Iraq should continue . . . to address these deficiencies."[82] FATF also made the same determination, and reiterated the same guidance, in October 2014.[83]

186.    In October 2014, FATF issued an ISIS-specific warning to multinational banks and the international community. FATF expressed that it was "deeply concerned with the financing generated by and provided to" ISIS and highlighted the "importance of robust implementation of the FATF standards to disrupt and prevent ISIL financing."[84] In that warning, FATF "reiterate[d] the need for all countries to fully implement the FATF standards to combat terrorist financing and call[ed] on all countries to take steps to prevent ISIL from accessing their

---

[81] FATF, *Improving Global AML/CFT Compliance: On-going Process* (Oct. 18, 2013), https://www.fatf-gafi.org/content/fatf-gafi/en/publications/High-risk-and-other-monitored-jurisdictions/Fatf-compliance-oct-2013.html.

[82] FATF, *Improving Global AML/CFT Compliance: on-going process - 14 February 2014* (Feb. 14, 2014), https://www.fatf-gafi.org/content/fatf-gafi/en/publications/High-risk-and-other-monitored-jurisdictions/Fatf-compliance-feb-2014.html.

[83] FATF, *Improving Global AML/CFT Compliance: on-going process – 24 October 2014* (Oct. 24, 2014), https://www.fatf-gafi.org/content/fatf-gafi/en/publications/High-risk-and-other-monitored-jurisdictions/Fatf-compliance-oct-2014.html.

[84] FATF, *FATF action on the terrorist group ISIL* (Oct. 24, 2014), https://www.fatf-gafi.org/content/fatf-gafi/en/publications/Fatfgeneral/Fatf-action-isil.html.

financial systems."[85] Not only that, but FATF also "emphasize[d]" that, "for countering the financing" of ISIS, "[c]ountries should implement appropriate preventive measures to prevent ISIL from accessing the international financial system, including related to customer due diligence, correspondent banking, and wire transfers."[86]

187.    In February 2015, moreover, FATF issued a comprehensive report about ISIS's "rapid development" and the associated terrorist-financing risks posed by the group.[87] The report identified ISIS's "primary sources of revenue," which were "mainly derived from the illicit proceeds from its occupation of territory."[88] Those sources of revenue included "bank looting"— *i.e.*, ISIS's control of the Seized Banks—"control of oil fields and refineries," as well as human trafficking.[89]

188.    Deutsche Bank knew about FATF's AML/CFT guidance. Deutsche Bank ***itself*** declared in several annual corporate responsibility reports that its "policies and guidelines reflect[ed]" its "commitment" to "external standards, principles and initiatives," including those promulgated by the "Financial Action Task Force on Money Laundering"—*i.e.*, FATF.[90] Moreover, the U.S. Treasury Department recommended that "[f]inancial institutions," including

---

[85] *Id.*
[86] *Id.*
[87] FATF Report at 5.
[88] *Id.*
[89] *Id.* at 5, 12-13.
[90] Deutsche Bank, *Building for the Future: Corporate Responsibility Report 2013*, at 18 (2013), https://www.db.com/files/documents/csr/reports/deutsche-bank-cr-report-2013.PDF; *see also* Deutsche Bank, *Corporate Responsibility Report 2015*, at 22 (2015), https://investor-relations.db.com/files/documents/annual-reports/Deutsche_Bank_CR_Report_2015_eng.pdf?language_id=1.

Deutsche Bank, consider FATF's warnings about deficient AML/CFT regimes "when reviewing their [legal] obligations and risk-based approaches."[91]

189.    Deutsche Bank incorporated FATF's warnings into internal diligence policies and procedures that are designed to prevent money laundering and terrorist financing, including its diligence involving correspondent banking accounts. Nonetheless, as discussed, Deutsche Bank intentionally and repeatedly violated these internal diligence policies and procedures when chose to provide banking services for ISIS.

190.    **United Nations.** The United Nations issued several reports, adopted formal resolutions, and imposed sanctions relating to al-Qaeda, AQI, ISIS, and terrorism financing.[92] These U.N. actions highlighted the dangers of financial institutions giving ISIS access to the international financial system.

191.    As early as summer 2013, the United Nations warned of how "Al-Qaida and its affiliates"—including, among others, AQI, the predecessor organization to ISIS—"exploit[ed] formal and informal financial systems in order to move funds across borders and fund their activities."[93] The United Nations explicitly warned that "financial institutions" could thus be "implicate[d]" in the "financing of terrorism (and potentially in non-compliance with the Al-Qaida sanctions regime)."[94]

---

[91] FinCEN, Advisory on the FATF-Identified Jurisdictions with AML/CFT Deficiencies, FIN-2013-A008 (Dec. 4, 2013).
[92] *See, e.g.*, U.N. Security Council, *The Islamic State in Iraq and the Levant and the Al-Nusrah Front for the People of the Levant: Report and Recommendations Submitted Pursuant to Resolution 2170 (2014)* (Nov. 14, 2014); U.N. Security Council Resolution 2170 (Aug. 15, 2014); U.N. Security Council Resolution 2178 (Sept. 24, 2014).
[93] U.N. Security Council, Fourteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities ¶ 42 (Aug. 2, 2013).
[94] *Id.*

192.    Deutsche Bank knew about these warnings from the United Nations. Deutsche Bank—as a sophisticated, regulated multinational financial institution—closely monitored warnings from the United Nations, as well as sanctions imposed by that body.

193.    Deutsche Bank incorporated the United Nation's warnings into internal diligence policies and procedures that are designed to prevent money laundering and terrorist financing, including its diligence involving correspondent banking. Nonetheless, as discussed, Deutsche Bank intentionally and repeatedly violated these internal diligence policies and procedures when it chose to provide banking services for ISIS.

### 3.  Defying the International Community and Its Own Policies, Deutsche Bank Performed Illegal Banking Services for ISIS

194.    Deutsche Bank knowingly performed U.S. dollar-clearing and correspondent banking services for the Seized Banks (controlled by ISIS), thereby providing ISIS with access to the U.S. financial system.

195.    At all times relevant to the Complaint, Deutsche Bank offered correspondent banking and U.S. dollar-clearing services to its customers. Deutsche Bank processed these U.S. dollar-denominated correspondent banking transactions in New York—specifically through DBTCA.

196.    In 2014 and 2015, DBTCA processed *thousands* of transactions—worth *billions of dollars*—involving Seized Banks.

197.    Deutsche Bank tried to hide its role from public scrutiny. But Deutsche Bank's actions were revealed (at least partially) after journalists obtained a "huge trove of secret government documents" that "reveal[ed] for the first time" thousands of Suspicious Activity

Reports ("SARs") filed with the U.S. government reflecting Deutsche Bank's knowing provision of banking services to ISIS-controlled Seized Banks.[95]

198.    SARs are documents that financial institutions must file with the U.S. Treasury Department "to report known or suspected violations of law or suspicious activity observed by financial institutions subject to the regulations of the Bank Secrecy Act."[96]

199.    Several leaked SARs revealed that DBTCA processed ***thousands*** of suspicious money transfers involving scores of Seized Banks between June 15, 2014, and June 30, 2015.

---

[95] Jason Leopold *et al.*, *The FinCEN Files*, BuzzFeed News (Sept. 20, 2020), https://www.buzzfeednews.com/article/jasonleopold/fincen-files-financial-scandal-criminal-networks.

The leaked documents are referred to as the "FinCen Files," and the resulting investigation is referred to as the FinCEN Files Investigation. Ultimately, for their reporting, the global collective of journalists and media outlets involved in the FinCEN Files Investigation were "honored as a finalist for the 2021 Pulitzer Prize in International Reporting." See Michael Hudson, FinCEN Files investigation named Pulitzer Prize finalist, International Consortium of Investigative Journalists (June 11, 2021), https://www.icij.org/investigations/fincen-files/fincen-files-investigation-named-pulitzer-prize-finalist/.

[96] Financial Crimes Enforcement Network, *Guidance on Preparing A Complete & Sufficient Suspicious Activity Report Narrative* (Nov. 2003), https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf.

200.    Specifically, these leaked SARs revealed that Deutsche Bank employees flagged as suspicious ***4,703 transactions*** involving Seized Banks that were worth ***over $2.9 billion.***[97] The precise numbers of transactions routed through DBTCA are reflected in the below chart:

| Reporting Period of Suspicious Transactions | Number of Suspicious Transactions | Transaction Amount |
|---|---|---|
| 6/15/2014 to 12/15/2014 | 3,844 | $2,376,828,821.47 |
| 12/16/2014 to 12/31/2014 | 283 | $44,986,129.83 |
| 1/1/2015 to 1/15/2015 | 181 | $146,601,311.00 |
| 1/16/2015 to 1/31/2015 | 198 | $251,557,127.37 |
| 2/1/2015 to 2/15/2015 | 197 | $92,533,985.04 |
| | **4,703** | **$2,912,507,374.71** |

201.    Due to the presence of the Seized Banks in those transactions, it is virtually certain that a significant volume involved ISIS, as explained below.[98]

202.    **International Consensus.** The U.S. government, FATF, the United Nations, and others in the international community publicly warned that ISIS was actively trying to exploit its control over the Seized Banks to transact through the legitimate financial system. These suspicious transactions are what those entities warned of and acted to prevent: ISIS exploiting banks under its control to launder ill-gotten funds through legitimate financial institutions.

---

[97] Nasreddine, *supra*.

[98] *See* IFMAT.org, *Iran's Exploitation of the Central Bank of Iraq and Banking Sector* (Mar. 1, 2021), https://www.ifmat.org/03/01/irans-exploitation-of-the-central-bank-of-iraq-and-banking-sector/ ("In September 2020, major reports uncovered . . . massive transactions from Deutsche Bank to a number of Iraqi banks . . . . The funds are suspected of reaching ISIS and armed groups."); *see also* IFMAT.org, *Iran is exploiting Iraq's construction sector* (Apr. 12, 2021), https://www.ifmat.org/04/12/iran-is-exploiting-iraqs-construction-sector/ ("Deutsche Bank made massive money transfers to Iraqi banks (many of which have been or are currently designated for sanctions). The funds are believed to have reached ISIS and other armed groups in Iraq."); *see also* Nasreddine, *supra*.

203.    **Seized Banks.** The suspicious transactions occurred during the height of ISIS's reign in Iraq, when ISIS controlled dozens of Seized Banks.

204.    For example, ISIS seized the Mosul and Tikrit branches of the Trade Bank of Iraq.[99] And, "[a]ccording to the leaked SARs, the Trade Bank of Iraq was involved in the ***largest share***" of the correspondent banking transactions through DBTCA in 2014-2015.[100] It is likely that after ISIS seized control of the Mosul and Tikrit branches of the Trade Bank of Iraq, ISIS exploited the Trade Bank of Iraq's relationship with Deutsche Bank to conduct U.S dollar-denominated transactions that were processed by DBTCA.

205.    On information and belief, some Seized Banks had correspondent accounts at DBTCA, while other Seized Banks had a correspondent banking relationship with Deutsche Bank AG (or another Deutsche Bank entity). For the latter category of Seized Banks, Deutsche Bank AG would route U.S. dollar-clearing correspondent transactions through DBTCA and the NY Branch.

206.    More generally, the leaked SARs reflect that DBTCA processed a significant number of suspicious U.S dollar-denominated correspondent banking transactions for bank branches located in "Iraq's main cities including . . . Mosul, Kirkuk, and Erbil."[101] During the relevant period, ISIS controlled, contested, or had a substantial presence in and around Mosul, Kirkuk, and Erbil—and Seized Banks were located in those cities. ISIS exploited the relationship that the Seized Banks in Mosul, Kirkuk, and Erbil had with Deutsche Bank to conduct U.S dollar-denominated correspondent banking transactions that were processed by DBTCA.

---

[99] Newsweek, *ISIS Members Plundered $800 Million From Iraq, Central Bank Says* (Aug. 9, 2017), https://www.newsweek.com/isis-members-plundered-800-million-iraq-central-bank-says-648492; *see* CBI Report at 7.
[100] Nasreddine, *supra.*
[101] *Id.*

207.    In sum, there is no dispute that ISIS seized hundreds of banks in Iraq. Seizing those banks gave ISIS the power to direct their activities and marshal those funds. And ISIS did so, including by directing the banks to consummate U.S. dollar-denominated transactions through accounts at Deutsche Bank branches and DBTCA.

208.    **Transaction Volume.** Another factor supporting the inference that ISIS was involved in a significant number of the suspicious transactions identified by Deutsche Bank is that ISIS dominated economic activity in northern Iraq during 2014 and 2015.

209.    DBTCA processed ***nearly $3 billion*** in transactions originated from or involving banks in Northern Iraq at a time when ISIS was dominating economic activity in that region of Iraq, due to millions of dollars in monthly "proceeds of the illicit oil, gas and archaeological artifacts' trade" that ISIS "largely relied on in its areas of control."[102]

210.    As former Treasury official and terrorist financing expert Jimmy Gurulé has explained to Congress, the substantial profits generated from illicit oil sales were not "being transported in shoeboxes and placed under somebody's mattress"; that "money ha[d] to be entering into the financial system at some point" through "financial institutions," including "Iraqi banks" or other "foreign banks."[103]

---

[102] *Id.*

[103] Jimmy Gurulé, former Under Secretary for Enforcement at the U.S. Dep't of the Treasury from 2001 to 2003, and current Professor of Law at Notre Dame Law School, *Terrorist Financing and the Islamic State: Hearing Before the H. Comm. on Financial Servs.*, 113th Cong., at 53-54 (Nov. 13, 2014), https://financialservices.house.gov/uploadedfiles/113-99.pdf; *see also* Juan Zarate, *How ISIS, Endowed By Conquest*, Stocks Its War Chest, NPR (June 18, 2014), https://www.npr.org/2014/06/18/323351043/how-isis-endowed-by-conquest-stocks-its-war-chest (ISIS has "the ability to place that money in banks and largely that then flows the trade that they have with, for example, Turkish companies.").

211.    No entity other than ISIS was generating such substantial economic activity in that region at that time, so no one else could have been responsible for any meaningful portion of the nearly $3 billion in transactions made during a roughly 7-month period.

212.    Moreover, the global oil trade—even the illicit oil trade—is denominated primarily in U.S. dollars. On information and belief, the leaked SARs reveal that Deutsche Bank cleared U.S. dollar-denominated payments for purchasers of ISIS's illicit oil, who routed payments to ISIS through the Seized Banks.

213.    Thus, a significant portion of the nearly $3 billion in transfers that DBTCA identified as suspicious—but nonetheless processed—involved (and necessarily benefitted) ISIS.

214.    **Additional Transactions**. These leaked SARs are likely only the tip of the iceberg in terms of the volume of transactions processed by DBTCA. While the scale of these leaked transactions—over 4,700, worth nearly $3 billion—is enormous, the leaked SARs likely represent ***only a fraction*** of the transactions Deutsche Bank processed for ISIS between 2013 and 2015. The SARs reviewed in the FinCEN Files Investigation reflect transactions beginning in June 2014. On information and belief, there were additional SARs filed by Deutsche Bank relating to ISIS dating back to 2013 as ISIS grew in power in Iraq.

215.    It is no defense that Deutsche Bank filed SARs to report the suspicious transactions. For one thing, despite reporting the suspicious transactions, Deutsche Bank processed them, anyway—to ISIS's benefit.

216.    Moreover, Deutsche Bank's SARs filings were largely untimely filed. A leaked SAR that was filed in January 2015 described suspicious transactions that occurred in June 2014—*i.e.*, six months earlier.[104] That is untimely under relevant banking regulations, which

---

[104] *See* Nasreddine, *supra*.

provide that a bank must "file a SAR no later than 30 calendar days after the date of the initial detection of facts that may constitute a basis for filing a SAR."[105]

217.    And while Deutsche Bank could permissibly "delay filing a SAR for an additional 30 calendar days to identify a suspect," the regulations provide that "*[i]n no case* shall reporting be delayed more than 60 calendar days after the date of initial detection of a reportable transaction."[106] Deutsche Bank's SARs filings were plainly untimely—and that untimely filing would have prevented U.S. law enforcement from taking appropriate measures to interdict the suspicious transactions.

### 4.  Deutsche Bank Knew That It Provided Banking Services to ISIS

218.    Deutsche Bank knew (or was willfully blind to the fact) that it provided banking services to ISIS. Deutsche Bank's internal policies and procedures would have, or should have, revealed that it processed ***thousands*** of transactions, worth nearly $3 billion, for ISIS through DBTCA.

219.    During the relevant period, the U.S. government, FATF, the United Nations, and others in the international community loudly and publicly warned that ISIS was actively trying to exploit its control over scores of banks in Iraq [*i.e.*, the Seized Banks] to transact through the legitimate financial system. Deutsche Bank knew about these warnings.

220.    Deutsche Bank, as a sophisticated, multinational financial institution with AML, CFT, and other regulatory obligations, knew granular details about the nearly 5,000 suspicious transactions worth nearly $3 billion involving the Seized Banks. Those granular details about the transactions, combined with the litany of warnings from the international community, made it obvious to Deutsche Bank that the transactions involved ISIS.

---

[105] 12 C.F.R. §21.11(d).
[106] *Id.*

### a. Deutsche Bank's Internal Diligence Revealed ISIS's Involvement

221.    Deutsche Bank was required under U.S. banking laws to have robust AML/CFT policies and procedures, including for correspondent accounts that it held for foreign financial institutions.[107]

222.    Thus, Deutsche Bank had to "establish a due diligence program that include[d] appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that [we]re reasonably designed to enable the covered financial institution *to detect and report*, on an ongoing basis, *any known or suspected money laundering activity* conducted through or involving *any correspondent account* established, maintained, administered, or managed by" Deutsche Bank "for a foreign financial institution."[108] This included "policies, procedures, and controls" for "[a]ssessing the money laundering risk presented by such correspondent account, based on a consideration of all relevant factors," including but not limited to, the "nature of the foreign financial institution's business and the markets it serves," the "type, purpose, and anticipated activity of such correspondent account," the "anti-money laundering and supervisory regime of the jurisdiction that issued the charter or license to the foreign financial institution," and "[i]nformation known or reasonably available" to Deutsche Bank about "the foreign financial institution's anti-money laundering record."[109]

223.    Deutsche Bank was responsible for "[a]pplying risk-based procedures and controls to *each such correspondent account* reasonably designed *to detect and report known or suspected money laundering activity*, including a periodic review of the correspondent

---

[107] *See generally* FFIEC BSA/AML Manual, *Assessing Compliance with BSA Regulatory Requirements: Due Diligence Programs for Correspondent Accounts for Foreign Financial Institutions* (2023),
https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/10
[108] 31 C.F.R §1010.610(a) (emphasis added).
[109] *Id.* §1010.610(a)(2).

account activity sufficient to determine consistency with information obtained about the type, purpose, and anticipated activity of the account."[110]

224.     During the relevant period, Deutsche Bank had policies and procedures for detecting and reporting known or suspected money laundering activity—including for transactions involving the Seized Banks and their correspondent accounts.

225.     Between 2013 and 2015, Deutsche Bank itself ***repeatedly*** and ***publicly*** boasted about the strength of its AML and know-your-customer (KYC) policies and procedures, robust diligence, and commitment to preventing terrorist financing.[111]

226.     In its 2013 *Corporate Responsibility Report*, for example, Deutsche Bank announced that it had recently "enhanced the governance, resources and processes" of its "Anti-Money Laundering (AML) function."[112] Deutsche Bank also explained that "[a]dherence to anti-money laundering regulations [was] ***absolutely fundamental*** to all Deutsche Bank entities regardless of geographic location."[113] Deutsche Bank thus trained its staff "to detect money laundering," in part by encouraging "employees' adherence to risk-related policies and processes."[114]

---

[110] *Id.* §1010.610(a)(3) (emphasis added).

[111] *See, e.g.*, Deutsche Bank, *Building for the Future: Corporate Responsibility Report 2013* (2013), https://www.db.com/files/documents/csr/reports/deutsche-bank-cr-report-2013.PDF; Deutsche Bank, *Leveraging strengths, rising to the challenges, earning trust: Corporate Responsibility Report 2014* (2014), https://www.db.com/files/documents/csr/reports/deutsche-bank-cr-report-2014.pdf; Deutsche Bank, *Corporate Responsibility Report 2015* (2015), https://investor-relations.db.com/files/documents/annual-reports/Deutsche_Bank_CR_Report_2015_eng.pdf?language_id=1.

[112] Deutsche Bank, *Building for the Future: Corporate Responsibility Report 2013* (2013), https://www.db.com/files/documents/csr/reports/deutsche-bank-cr-report-2013.PDF.

[113] *Id.*

[114] *Id.*

227.    In its 2014 *Corporate Responsibility Report*, Deutsche Bank highlighted "internal controls" that "protect Deutsche Bank from being misused for criminal purposes."[115] It focused on preventing "money laundering, terrorist financing, and other financial crimes globally" through its "***dedicated team . . . responsible for preventing money laundering and financing terrorism.***"[116] And the bank's AML and KYC policies "aim[ed] to ensure" "[c]ompliance with regulations governing identification" and "[d]etection of suspicious transactions." Deutsche Bank's policies and procedures "expressly include[d] the authority to prohibit individual transactions or business relationships."[117]

228.    Deutsche Bank's risk monitoring for "terrorist financing" "include[d] advanced methodologies to assess the underlying risk factors such as country, industry and product risk."[118] Deutsche Bank performed "***monthly screening*** of existing clients against internal and external lists of adverse information, including matters related to ***terrorist financing***."[119]

229.    This monitoring, according to Deutsche Bank, underscored the important role that "Deutsche Bank and other financial institutions have an important role to play . . . in ***preventing financing for terrorism***."[120]

230.    In its 2015 *Corporate Responsibility Report*, Deutsche Bank again extensively discussed its efforts to combat money laundering and terrorist financing. Deutsche Bank recognized the "sophistication of some money laundering attempts" and the importance of

---

[115] Deutsche Bank, *Leveraging strengths, rising to the challenges, earning trust: Corporate Responsibility Report 2014* (2014), https://www.db.com/files/documents/csr/reports/deutsche-bank-cr-report-2014.pdf (emphasis added).
[116] *Id.* (emphasis added).
[117] *Id.*
[118] *Id.*
[119] *Id.* (emphasis added).
[120] *Id.* (emphasis added).

"transaction monitoring." As such, its "AML teams [were] responsible for establishing and monitoring measures **to prevent, detect, and advise on money laundering and the financing of terrorism**." And its "group-wide AML policy" "commit[ted]" Deutsche Bank to "fulfil regulations governing identification (authentication), recording, and archiving"; "***detect suspicious transactions*** and process internal ***suspicious-activity alerts***"; "develop, update, and implement internal policies, procedures, and controls"; and "create staff awareness, set a staff reliability process, and provide training." Deutsche Bank claimed that its "policies [were] put into practice at the front line of [its] business," and they are "continually monitored and updated at least once a year."[121] Deutsche Bank again advertised that its clients are "screened at least monthly against internal and external criteria that cover terrorist financing."[122]

231.    In addition to its public statements, Deutsche Bank employees explained that Deutsche Bank—and DBTCA—had robust policies and procedures in place for detecting, preventing, and reporting suspicious transactions.

232.    Douglas Sloan, Director and Coordinator of Deutsche Bank's Anti-Financial Crimes Special Investigations Unit, explained that the bank received detailed information about each U.S. dollar-denominated transaction that it processed.[123] That information included the name of the originating bank, the name of the originating bank's customer, the payment amount,

---

[121] Deutsche Bank, *Corporate Responsibility Report 2015* (2015), https://investor-relations.db.com/files/documents/annual-reports/Deutsche_Bank_CR_Report_2015_eng.pdf?language_id=1 (emphasis added).
[122] *Id.*
[123] *See* Trial Tr., *United States v. Atilla*, No. 15-cr-867 (S.D.N.Y.), ECF 422 (Sloan Testimony at 1535-38).

the currencies involved, the name of the beneficiary bank, and the name of the payment

beneficiary.[124] Deutsche Bank kept extensive documentation of these transactions.[125]

233.    Mr. Sloan further testified that Deutsche Bank also had the capabilities to stop

suspicious payments from being processed. Deutsche Bank operated a "proprietary payment

platform" that "receive[d] all payment orders," "processe[d] them," and "sen[t] them out." That

system, according to Mr. Sloan, had "triggers . . . that [would] stop a payment if there's

something wrong with the payment" or if there are suspicious indicia that put a payment on

"watch."[126] Thus, Deutsche Bank had in place "payment filters" in place for high-risk countries

or individuals such that that, when "processing . . . U.S. dollars here in the United States [*i.e.*,

through DBTCA]," its computer systems would "cause a payment to stop."[127]

234.    Deutsche Bank employees—operating under a "complicated control structure of

different levels of individuals"—would then "review" the stopped payment to determine whether

to proceed with the payment or reject it.[128]

235.    Deutsche Bank's (purportedly) robust internal policies and procedures provided

granular details about the transactions, which revealed to Deutsche Bank that it was facilitating

transactions that involved or benefited ISIS.

236.    DBTCA employees themselves filed SARs to flag 4,703 transactions, worth

nearly $3 billion, as suspicious—suspicious enough to alert the U.S. government.

237.    Those employees' suspicions were likely based on some, if not all, of the

following characteristics of the transactions:

---

[124] *See id.*
[125] *See id.* at 1533-35.
[126] *Id.* at 1532.
[127] *Id.* at 1542.
[128] *Id.* at 1542.

a.  The transactions were the type that the U.S. government, FATF, and United Nations warned that ISIS was trying to execute during that period;

b.  The transactions involved Seized Banks operating in or near ISIS-controlled territory in Iraq, at a time when ISIS had taken control of dozens of bank branches throughout Iraq;

c.  The transactions involved banks operating in or near ISIS-controlled territory [*i.e.*, the Seized Banks] at a time when the Central Bank of Iraq issued formal directives prohibiting money transfers into or out of banks in ISIS-controlled areas;

d.  The transactions involved the conversion of foreign currency (including Iraqi dinars) into U.S. dollars;

e.  The transactions involved cross-border transfers of funds to or from Iraq, at a time when ISIS was steadily gaining control of territory there;

f.  The transactions likely reflected atypical account activity—in terms of volume and frequency—for the respondent banks in or near Iraq; and/or

g.  The transactions involved large cash transfers into areas of Iraq controlled by ISIS.

238.    Despite these red flags that evinced ISIS's involvement, Deutsche Bank processed these transactions anyway—to the benefit of ISIS and the Terror Fundraising Venture.

### b.  Deutsche Bank's Internal Research Revealed ISIS's Involvement in the Transactions

239.    Distinct from Deutsche Bank's AML and KYC policies and procedures, Deutsche Bank's investor-focused research and analysis about AQI and ISIS's expansion into Iraq from 2013 through 2015 likewise laid bare that Deutsche Bank processed transactions that benefitted ISIS.

240.    Deutsche Bank, as a sophisticated, multinational financial institution, prides itself on its robust research capabilities. The "Deutsche Bank Research" unit "is responsible for economic analysis within Deutsche Bank Group and covers asset allocation and all major industry sectors." As that unit explains, it "analyse[s] relevant trends for the bank in financial markets, the economy and society, highlight risks and opportunities and act as consultant for the bank, its clients and stakeholders." And it performs "[g]lobal research on the financial sector."[129] Deutsche Bank Research performed that sort of analysis regarding global markets, trends, and risks during the period relevant to the events described herein.

241.    Consequently, Deutsche Bank knew about ISIS's dramatic expansion into Iraq in 2014 and 2015, its seizure and control of scores of bank branches in Iraq, its exploitation and domination of Iraq's and Syria's oil sectors, and its commission of Trafficking Crimes.

242.    For example, in or around June 2014, "analysts at Deutsche Bank" issued a "special report" about how "attacks and capturing of territory by fighters belonging to Islamic State of Iraq" did "'not yet pose a significant threat to the country's oil production.'" It continued: If "'ISIL [were] able to make southward progress towards Baghdad[,] this will heighten instability in the country and possibly threaten the operation of existing refineries and oilfields.'"[130] Deutsche Bank could not have issued this special report if it had not been closely monitoring ISIS's activities and expansion in Iraq during the relevant period.

---

[129] DB Research, "Our Mission," (accessed Nov. 2023), https://www.dbresearch.com/PROD/RPS_EN-PROD/Our_mission/RPS_MISSION.alias.
[130] Brai Odion-Esene, *Deutsche Bank: No Significant Threat Yet To Iraq Oil Prod*, Market News Service (June 13, 2014).

243.     That same month, Michael Lewis, Deutsche Bank's Global Head of Commodities Research, said "the pitched battles" in Iraq involving ISIS "created a 'new event risk' for global oil markets."[131]

244.     On or around June 25, 2014, Deutsche Bank Research published its monthly "flagship publication,"[132] entitled *The House View*.[133] In that issue, Deutsche Bank commented on the "ongoing violence" in Iraq as "ISIS jihadists and Iraqi government battle for control of the North." According to Deutsche Bank, that violence risked "material oil supply disruptions." Deutsche Bank further noted that in Syria "ISIS['s] breach of Iraq-Syria border mean[t] the two conflicts are increasingly interconnected" and "[c]hances of a peace settlement [were] low." To Deutsche Bank, that "rising violence in the Middle East" spurred by ISIS was a "key" geopolitical risk.[134]

245.     On or around July 29, 2014, Deutsche Bank Research published another edition of *The House View*,[135] where it identified geopolitical risks emanating from "[m]ultiple potential hotspots," including "[r]egional spill-over of sectarian conflicts in Syria / Iraq" that could "lead[]" to disruption in oil production and a rise in oil prices.[136]

---

[131] Ambrose Evans-Pritchard, *Iraq's civil war threatens structure of global energy supply for years ahead*, Postmedia News (Canada) (June 13, 2014).

[132] Deutsche Bank Research, "Welcome to The House View website" (accessed Dec. 2023), https://www.dbresearch.de/PROD/RPS_DE-PROD/PROD0000000000382616/Welcome_to_The_House_View_website.xhtml.

[133] Sam Ro, *Here Are The Key Geopolitical Risks That Threaten To Rock The Markets*, Business Insider (June 27, 2014), https://www.businessinsider.com/map-world-geopolitical-risks-2014-6.

[134] *Id.*

[135] Deutsche Bank Research, *The House View*, (July 29, 2014), https://www.dbresearch.com/PROD/RPS_EN-PROD/PROD0000000000339722/The_House_View_:_July_29_2014.pdf.

[136] *Id.*; *see id.* at 22 (highlighting "geopolitical tail risk scenarios," including "[i]ncreased regional spillover from sectarian conflicts in Syria, Iraq").

246.    On or around October 16, 2014, Deutsche Bank published another edition of *The House View* where it labeled "ISIS" as a key "idiosyncratic risk[]" whose actions could further slow global economic growth.[137]

247.    On information and belief, Deutsche Bank published additional research documents relevant to the events described herein; some were unavailable to the public and others that have been removed from public circulation.

248.    Deutsche Bank's extensive internal research unit and its publications further demonstrate that Deutsche Bank was closely monitoring the growth of ISIS during the relevant period, and therefore could not have avoided learning that ISIS took control of dozens of Iraqi banks (*i.e.*, the Seized Banks) and cities over the course of 2014 and 2015.

249.    Deutsche Bank thus knew that when it was processing transactions for banks in or near ISIS-controlled areas during that time, including the Seized Banks, it was processing transactions involving and/or for the benefit of ISIS.

### c.    Alternatively, Deutsche Bank Was Willfully Blind About Its Provision of Banking Services to ISIS

250.    To the extent Deutsche Bank lacked contemporaneous knowledge that it was actively facilitating ISIS's financial transactions and giving ISIS access to the international financial system when it performed those transactions, Deutsche Bank willfully blinded itself as to its participation in the Terror Fundraising Venture.

---

[137] Deutsche Bank Research, *The House View – The Comedown*, at 3 (Oct. 16, 2014), https://www.dbresearch.de/PROD/RPS_DE-PROD/PROD0000000000344508/The_House_View_:_October_16,_2014.PDF.

251.    Despite regulatory requirements and its public representations, Deutsche Bank "had direct knowledge for years of serious failings that left the bank vulnerable to money launderers."[138] Those failings were intentional.

252.    Leaked documents revealed several "warnings sent to committees" that included Deutsche Bank's "chair," and one warning "sent to the bank's supervisory board" about these AML deficiencies—but Deutsche Bank did little to address them.[139]

253.    Moreover, according to 2016 congressional testimony from Louise Shelley, who was the Director of the Terrorism, Transnational Crime and Corruptions Center at George Mason University, "Deutsche Bank, in violation of international regulations, receive[d] funds that are associated with terrorists and criminals as this helps increase profits. Officials at Deutsche Bank, in a significant number of suspicious files examined by auditors, revealed that ***officials were told to avoid warning signs or not to commit due diligence*** on what should be suspicious clients."[140] This intentional avoidance allowed Deutsche Bank to "receive funds that are associated with terrorists" "in violation of international regulations" to "increase profits."[141]

254.    Deutsche Bank was also subject to several enforcement actions based on the weaknesses of its AML and due diligence policies and procedures during the relevant period.[142]

---

[138] Tom Warren et al., *How Deutsche Let Dirty Clients Run Rampant*, BuzzFeed News (Sept. 20, 2020), https://www.buzzfeednews.com/article/tomwarren/deutsche-bank-money-laundering-mirror-trades.

[139] *Id.*

[140] Louise Shelley, Director, Terrorism, Transnational Crime and Corruptions Center at George Mason University, Prepared Statement for Hearing before Subcommittee on Counterterrorism and Intelligence (May 12, 2016), https://www.govinfo.gov/content/pkg/CHRG-114hhrg22761/html/CHRG-114hhrg22761.htm.

[141] *Id.* (footnotes omitted) (emphasis added).

[142] *See infra* Part VI (laundry list of enforcement actions).

These enforcement actions suggest that Deutsche Bank's AML and due diligence policies were set up to fail.

## III.    Deutsche Bank's Participation In The Terror Fundraising Venture Helped Terrorists Commit Trafficking Crimes

255.    Deutsche Bank's participation helped grow the Terror Fundraising Venture and bolstered other Venture participants' ability to commit Trafficking Crimes.

256.    As discussed, the Terror Fundraising Venture committed Trafficking Crimes both in furtherance of its terroristic goals and to raise funds for Al-Qaeda/AQI—and later, ISIS. At the same time, to carry out those Trafficking Crimes, the Venture required funds. "Hostage taking missions are complex" and "expensive operations."[143] They are, according to experts, among the "most risky" and "complex terrorist attacks."[144] Terrorist groups incur significant logistical costs, including for "acquiring the relevant materials, equipment, locations where the hostages will be held, and the payment of the individuals who will be involved throughout the process."[145]

257.    ISIS needed financial resources to pay for, among other things: (a) the salaries of its fighters who were responsible for holding the captives; (b) the personnel, facilities, and resources to sustain the hostage-holding operation; (c) bribes and post-abduction intelligence collection to prevent the hostages from being rescued; (d) transporting hostages to various

---

[143] Endro Sunarso, over 35 years of experience in security services, and numerous educational and professional credentials; Assistant Director of Physical Security (Southeast Asia)" for AIP Risk Consulting (Singapore), *Kidnapping for Ransom & Hostage Taking*, (April 22, 2022), https://www.linkedin.com/pulse/kidnapping-ransom-hostage-taking-endro-sunarso-/.

[144] *Id.*

[145] Global Counterterrorism Forum, Implementing the Algiers Memorandum on Good Practices on Preventing and Denying the Benefits of Kidnapping for Ransom (KFR) to Terrorists – Participant Manual (2016), https://www.thegctf.org/Portals/1/Documents/Framework%20Documents/2016%20and%20before/GCTF-KFR-Participants-Manual-ENG.pdf?ver=2016-09-13-131333-780.

terrorist safe-houses; (e) sustenance (albeit meager) for the hostages; and (f) equipment for recording and broadcasting propaganda videos.

258.    And ISIS used its revenue to "keep its jails operating and to pay its jailors," "to transport prisoners around the country," "to finance terrorist operations," and "fund its media operations, including those that recorded the deaths of Mr. Sotloff and Mr. Foley."[146]

259.    Deutsche Bank's provision of illicit financial services facilitated the Venture's commission of Trafficking Crimes in several ways.

260.    *First*, Deutsche Bank's facilitation of U.S. dollar-denominated transactions allowed ISIS to tap international procurement networks to supply weapons and goods. While ISIS "generated" or "had access to" cash as part of its control and domination of banks in Iraq, "[m]uch of this cash [was] denominated in the dinar, the local Iraqi currency, making it difficult for ISIL to use externally. Any use of these cash assets outside of Iraq would require ISIL to exchange the cash for foreign currency."[147] Thus, according to a forensic investigator specializing in state assets theft, "'***[f]or ISIS to survive***, a portion of that money ***had to enter the legitimate banking system*** again to ***pay external parties*** for weapons, goods and services.'"[148]

261.    *Second*, access to the international financial system allowed ISIS to store and move the "funds it acquire[d] locally."[149] The substantial profits generated from illicit oil sales were not "being transported in shoeboxes and placed under somebody's mattress"; that "money ha[d] to be entering into the financial system at some point" through "financial institutions,"

---

[146] Expert Testimony of Dr. Daveed Gartenstein-Ross, *Sotloff, et al.*, *v. Syrian Arab Republic*, No. 16-cv-725 (D.D.C. June 11, 2020), Dkt. 41 at 83-84.
[147] FATF Report at 12.
[148] Nasreddine, *supra* (quoting Henrich Böhmke (emphasis added)).
[149] Cohen Carnegie Speech.

including "Iraqi banks" or other "foreign banks."[150] Operating "entirely in cash" would have hamstrung ISIS because "cash is bulky, vulnerable to theft, and requires complicated logistics to transport."[151] Indeed, U.S. airstrikes in 2016 that destroyed stockpiles of ISIS's cash underscored how imperative access to the international financial system was for ISIS.

262.    *Third*, ISIS's "access to the international financial system" enabled it to "fund[] external operations" and "facilitat[e] the movement of foreign fighters."[152]

263.    *Finally*, ISIS's "access to banks enabled them to replenish the stock of cash within their borders," which was "important" because ISIS's self-proclaimed caliphate operated as "a cash economy."[153] After ISIS sent "money out," it "need[ed] cash to replenish behind that so that the economy can work."[154] Access allowed ISIS "to collect funds from abroad."[155] It was thus "critically important" for ISIS "to be able to get cash, as any economy does, in"—otherwise, its attempt at governing territory would not work.[156]

264.    Indeed, according to Dr. Matthew Levitt, a former Treasury official and counterterrorism expert at the Washington Institute for Near East Policy, ISIS's access to the

---

[150] Gurulé, *supra*, at 53-54; *see also* Juan Zarate, *How ISIS, Endowed By Conquest, Stocks Its War Chest*, NPR (June 18, 2014), https://www.npr.org/2014/06/18/323351043/how-isis-endowed-by-conquest-stocks-its-war-chest (ISIS has "the ability to place that money in banks and largely that then flows the trade that they have with, for example, Turkish companies.").

[151] Cohen Carnegie Speech; *see also* Matthew Levitt, Director of the Stein Program on Counterterrorism and Intelligence at The Washington Institute for Near East Policy, *The Islamic State's Backdoor Banking* (Mar. 24, 2015), https://www.washingtoninstitute.org/policy-analysis/islamic-states-backdoor-banking (ISIS also needed "access to banks" within "the territory it controls" to "avoid the risky business of operating entirely in cash, which is bulky and vulnerable to theft.").

[152] Cohen Carnegie Speech.

[153] Expert Testimony of Dr. Matthew Levitt, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. June 11, 2020), Dkt. 42 at 258.

[154] *Id.* at 262.

[155] Cohen Carnegie Speech.

[156] Expert Testimony of Dr. Matthew Levitt, *Sotloff, et al. v. Syrian Arab Republic*, No. 16-cv-725 (D.D.C. June 11, 2020), Dkt. 42 at 262.

international financial system through local banks was essential to the viability of its "proto-

state":

> [I]f the banks are cut off, there's no way for them to get infusions of new cash and then they're also paralyzed because people are going to want to take money out of the bank. The Islamic State is going to want people to take money out of the bank to be able to function as a local economy. If they cannot function as a local economy, ***their proto-state will fail***, but if they also don't have money that they can send abroad for purchasing power, they can't buy their weapons; they can't buy the things they need to run the oil industry; they can't buy the things they need to run society, the schools and garbage collection and everything else that a militant organization has to take care of when they take control of territory. So the access to banks is actually ***very, very critical***.[157]

265.    Deutsche Bank's participation in the Terror Fundraising Venture thus helped

sustain not only the Venture, but also the Venture's ability to commit Trafficking Crimes.

## IV.    Deutsche Bank Knew Or Recklessly Disregarded That The Terror Fundraising Venture Committed Trafficking Crimes

266.    At all relevant times, Deutsche Bank knew or recklessly disregarded that the

Terror Fundraising Venture committed Trafficking Crimes that violated U.S. laws.

267.    Deutsche Bank is a sophisticated, multinational financial institution. To stay

informed about global market conditions, comply with relevant laws and regulations, and advise

its clients, Deutsche Bank has a dedicated, well-resourced, in-house research unit as well as

dedicated due diligence and compliance functions. Deutsche Bank thus had the capabilities to—

and did—monitor publications from governmental bodies, non-governmental organizations, and

news outlets that described the Trafficking Crimes committed by al-Qaeda and AQI (and later,

ISIS) throughout the period relevant to the events described in this Complaint.

---

[157] *Id.* at 273-74; *see also* Expert Testimony of Dr. Daveed Gartenstein-Ross, *Sotloff, et al., v. Syrian Arab Republic*, No. 16-cv-725 (D.D.C. June 11, 2020), Dkt. 41 at 104-05 ("[I]n order to get this much control over such a significant swath of territory, ISIS was dependent upon money.").

268.    As set forth below, from the beginning of its participation in the Terror
Fundraising Venture, Deutsche Bank knew about, or recklessly disregarded, the voluminous
number of publications by the U.S. government, the United Nations, and mainstream media
outlets that discussed al-Qaeda's and AQI's (and later, ISIS's) Trafficking Crimes. Reports
supporting an inference of Deutsche Bank's knowledge are legion and included, but were not
limited to, the widely publicized reports discussed below and throughout the Complaint.

269.    **U.S. government reports** alerted Deutsche Bank that, by providing money-
laundering, U.S. dollar-clearing, correspondent banking, and other financial services for AQI and
ISIS, it was participating in a Venture that engaged in Trafficking Crimes. Such reports included,
but were not limited to:

a.    U.S. Department of Defense (2009). In a December 2009 report to Congress, the U.S.
Department of Defense highlighted AQI's efforts to raise money through "kidnappings
for ransom."[158]

b.    The White House (2011). The 2011 *National Strategy for Counterterrorism* explained
that "Al-Qa'ida and its affiliates . . . continue to derive significant financial support
. . . through kidnapping for ransom," and the United States would "expand and enhance
efforts aimed at blocking the flow of financial resources to and among terrorist
groups."[159]

c.    U.S. Treasury Department (2012). In a widely publicized October 2012 speech, David
Cohen, Under Secretary for Terrorism and Financial Intelligence at the U.S. Department
of Treasury, addressed the "serious threat posed by kidnapping for ransom" as a "growing
form of terrorist financing" for al-Qaeda and its affiliates.[160]

d.    U.S. Treasury Department (2014). In March 2014, Under Secretary Cohen delivered
another widely publicized speech where he explained that "[d]uring the past few years, a

---

[158] U.S. Dep't of Defense, Measuring Stability and Security in Iraq, December 2009 Report to
Congress in Accordance with Department of Defense Supplemental Appropriations Act 2008
(Section 9204, Public Law 110-252), at 31 (Jan. 29, 2010).

[159] The White House, National Strategy for Counterterrorism, at 10 (June 1, 2011).

[160] David Cohen, Under Secretary for Terrorism and Financial Intelligence at the U.S.
Department of Treasury, Remarks of Under Secretary David Cohen at Chatham House on
"Kidnapping for Ransom: The Growing Terrorist Financing Challenge," U.S. Dep't of the
Treasury (Oct. 5, 2012), https://home.treasury.gov/news/press-releases/tg1726.

diminished al-Qa'ida 'core' has spawned numerous affiliates," and these affiliates have embraced "kidnapping-for-ransom (KFR) as a fundraising strategy. Apart from state sponsorship, KFR is today's greatest source of terrorist funding and the most challenging terrorist financing threat."[161]

e.     The White House (2014). In an August 2014 speech, President Obama explained that he directed the U.S. military to "take targeted strikes against ISIL terrorist convoys," in part to stop ISIS's campaign of "rounding up families, conducting mass executions, and enslaving Yezidi women."[162]

270.     **U.N. Reports** alerted Deutsche Bank that, by providing money-laundering,

correspondent banking and other financial services to AQI and ISIS, it was participating in a

trafficking venture. Such reports included, but were not limited to:

a.     April 2011. A report to the U.N. Security Council explained that "groups affiliated with Al-Qaida . . . continue to raise money . . . illegally, such as through kidnapping for ransom."[163]

b.     August 2013. A report to the U.N. Security Council highlighted that "Al-Qaida and its affiliates . . . continue to exploit formal and informal financial systems in order to move funds across borders and to fund their activities. Kidnapping for ransom outside the European Union remains a particular challenge . . . . [and] deserves closer attention, first because of the revenue it generates for terrorists, and second because it can also implicate. . . financial institutions in the financing of terrorism."[164]

c.     January 2014. A report to the U.N. Security Council explained that a "number of hefty ransom payments to Al-Qaida and its affiliates in recent years have made kidnapping a core Al-Qaida tactic."[165]

---

[161] David Cohen, Remarks before the Center for A New American Security on "Confronting New Threats in Terrorist Financing" (Mar. 4, 2014), https://home.treasury.gov/news/press-releases/jl2308.

[162] The White House, *Statement by the President* (Aug. 7, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/08/07/statement-president.

[163] U.N. Security Council, Eleventh Report of the Analytical Support and Sanctions Implementation Monitoring Team Established Pursuant to Security Council Resolution 1526 (2004) and Extended by Resolution 1904 (2009) Concerning Al-Qaida and the Taliban and Associated Individuals and Entities ¶¶ 47-48 (Apr. 13, 2011).

[164] U.N. Security Council, Fourteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities ¶ 42 (Aug. 2, 2013) (footnote omitted).

[165] U.N. Security Council, Fifteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities ¶ 35 (Jan. 23, 2014).

d.   <u>November 2014</u>. A report to the U.N. Security Council highlighted that ISIS had "seized considerable assets in both Iraq and the Syrian Arab Republic and benefits from a substantial continuing revenue flow gained from a range of sources, including . . . kidnapping for ransom." ISIS was, according to the report, "notorious for its kidnappings."[166]

271.   **Widespread media reports** also alerted, or should have alerted, Deutsche Bank that, by providing money-laundering, correspondent banking and other financial services to al-Qaeda and AQI (and later, ISIS), it was participating in a Venture that committed Trafficking Crimes. Examples of such reports include:

a.   <u>April 2012</u>. *Deutsche Presse-Agentur* reported that "al-Qaeda has claimed responsibility for the kidnapping of [Saudi Arabia's] diplomat in Yemen last month, and has demanded the release of militants imprisoned in Yemen plus a ransom."[167]

b.   <u>October 2012</u>. *Jakarta Globe* reported that "Al Qaeda leader Ayman al-Zawahiri . . . called on Muslims to kidnap Westerners."[168]

c.   <u>February 2013</u>. The *National Post* reported that "al-Qaeda and associated groups have established a new trade: kidnapping."[169]

d.   <u>November 2013</u>. BBC reported on the "[d]ozens of kidnapping cases" involving ISIS.[170]

e.   <u>December 2013</u>. The *Guardian* reported on the "spate of kidnappings" committed by ISIS.[171]

f.   <u>December 2013</u>. The *Times* reported on the "growing number of foreign reporters held" by ISIS, "jihadists linked to al-Qaeda." "More than 30 foreign reporters and aid workers . . . have been kidnapped."[172]

---

[166] U.N. Security Council, The Islamic State in Iraq and the Levant and the Al-Nusrah Front for the People of the Levant: Report and Recommendations Submitted Pursuant to Resolution 2170 (2014) ¶¶ 52, 74 (Nov. 14, 2014).

[167] Deutsche Presse-Agentur, *Saudi Arabia says al-Qaeda behind kidnapping of diplomat in Yemen* (Apr. 17, 2012).

[168] Jakarta Globe, *Al Qaeda Leader Calls on Muslims to Kidnap Westerners* (Oct. 27, 2012).

[169] National Post (Canada), *Kidnapping: al-Qaeda's cash cow; Tourists and foreign workers easy marks in Africa's Sahel region* (Feb. 23, 2013).

[170] BBC Monitoring Middle East, *Syrian opposition paper reports on jihadist group's anti-media campaign* (Nov. 12, 2013).

[171] Guardian, *Wife breaks silence over Spanish journalist's kidnap in Syria* (Dec. 10, 2013).

[172] The Times (London), *Spanish Journalists are kidnapped by al-Qaeda* (Dec. 11, 2013).

g.    December 2013. *Agence France Presse* reported that "AFP contributor James Foley was among an estimated 30 reporters kidnapped" by ISIS.[173]

h.    November 2013. In November 2013, CBS's *60 Minutes* reported on, and interviewed, Matthew Schrier, an American who had been held hostage in Syria by an ISIS affiliate.[174]

i.    June 2014. CNN reported that ISIS "kidnapped" and held captive "more than 140 Kurdish schoolboys" in Syria in May 2014.[175]

272.    Not only was the spate of kidnappings committed by ISIS widely reported throughout the relevant period, but also many news reports during that period discussed the kidnappings of the individuals whose estates and family members are plaintiffs in this lawsuit.[176]

## V.    Deutsche Bank Knowingly Benefitted From Participating In The Terror Fundraising Venture

273.    Deutsche Bank knowingly and intentionally benefitted financially from its participation in the Terror Fundraising Venture, and those benefits accrued in the United States.

274.    Deutsche Bank earned interest, commissions, fees, and other monetary benefits by providing financial services, including correspondent-banking services, that aided the Terror Fundraising Venture.[177]

---

[173] Agence France Presse, AFP's 10 People of the Year (Dec. 11, 2013).
[174] CBS 60 Minutes, CBS News Transcripts (Nov. 10, 2013).
[175] CNN, *Syrian radicals 'brainwash' kidnapped Kurdish schoolchildren* (June 26, 2014), https://www.cnn.com/2014/06/25/world/meast/syria-isis-schoolboys/index.html.
[176] *See, e.g.*, Agence France Presse, *Kidnapped foreign journalists still held in Syria* (Apr. 19, 2014); Newsweek, *In Syria, Reporters Are Targets for Kidnapping* (May 9, 2014), https://www.newsweek.com/2014/05/09/syria-reporters-are-targets-kidnapping-248927.html.
[177] *See* Louise Shelley, Director, Terrorism, Transnational Crime and Corruptions Center at George Mason University, Prepared Statement for Hearing before Subcommittee on Counterterrorism and Intelligence (May 12, 2016), https://www.govinfo.gov/content/pkg/CHRG-114hhrg22761/html/CHRG-114hhrg22761.htm (footnotes omitted) ("Deutsche Bank. . . receive[d] funds that are associated with terrorists and criminals as this helps increase profits.").

275.    Deutsche Bank earned fees from transactions that were routed from Seized Banks through Deutsche Bank, even though Deutsche Bank knew that those transactions benefitted the Terror Fundraising Venture.

276.    Deutsche Bank earned commissions and fees from transactions where it served as a correspondent bank for banks in Iraq, even though it knew that those transactions benefitted the Terror Fundraising Venture.

277.    Deutsche Bank earned interest, commissions, and fees from maintaining accounts for the Azizi Cell, even though Deutsche Bank knew that doing so benefitted the Terror Fundraising Venture.

278.    Deutsche Bank earned commissions and fees from transactions performed by the Azizi Cell in connection with the Azizi Cell VAT fraud—the proceeds of which supported the Terror Fundraising Venture.

279.    Deutsche Bank knew that if it refused to execute transactions for the Azizi Cell, it would lose Azizi's accounts. Instead of refusing to execute transactions for a terrorist financier, it chose to profit from those transactions.

280.    Deutsche Bank earned interest, commissions, and fees from maintaining accounts for the Ahmed Cell, even though Deutsche Bank knew that doing so benefitted the Terror Fundraising Venture.

281.    Deutsche Bank earned commissions and fees from transactions performed by the Ahmed Cell in connection with the Ahmed Cell VAT fraud—the proceeds of which supported the Terror Fundraising Venture.

282.    Deutsche Bank knew that if it refused to execute transactions for the Ahmed Cell, it would lose Ahmed's accounts. Instead of refusing to execute transactions for a terrorist financier, it chose to profit from those transactions.

283.    On information and belief, Deutsche Bank charged fees above normal rates due to high-risk and suspicious nature of the individuals and entities involved in the transactions that supported the Terror Fundraising Venture.

## VI.    Deutsche Bank's Participation In The Terror Fundraising Venture Was Of A Piece With Its History Of Illegal Behavior

284.    Deutsche Bank's intentional participation in the Terror Fundraising Venture was not an isolated incident. To the contrary, Deutsche Bank's participation fits within a sustained pattern and practice of Deutsche Bank profiting through illegality, including providing financial services to criminal enterprises.[178]

285.    Relevant unlawful conduct includes, for example, Deutsche Bank's provision of financial services for Jeffrey Epstein's sex-trafficking enterprise; facilitating unlawful transactions by providing correspondent-banking services for banks in high-risk jurisdictions; conducting voluminous dollar-denominated transactions for sanctioned Iranian, Syrian, and Sudanese entities; and facilitating an illegal mirror-trading scheme for the Russian mafia.

286.    Over the past decade, Deutsche Bank has paid regulators **_hundreds of millions_** of dollars in penalties for its unlawful conduct.

---

[178] *See generally* Henrik Böhme, *Deutsche Bank's biggest scandals* (Sept. 20, 2020), https://www.dw.com/en/deutsche-banks-biggest-scandals/a-54979535 (giving an "overview of Deutsche Bank's greatest scandals"); Olaf Storbeck, *Deutsche Bank looks to escape a decade of scandal and strife*, Financial Times (May 16, 2022), https://www.ft.com/content/06158598-daa0-4560-b072-a57bcbd7697c (discussing the "decade of scandal shaped by billions of euros in losses, a flurry of misconduct and compliance cases and boardroom battles").

287.     As part of these scandals and others, regulators repeatedly criticized—and penalized—Deutsche Bank for its grossly deficient AML policies and procedures, including with respect to clearing U.S. dollar transactions through the United States.

288.     The Federal Reserve Bank of New York, for example, identified "significant deficiencies in DBTCA's and the [NY] Branch's risk management and compliance with the [Bank Secrecy Act]/AML requirements" that "resulted in a violation of the regulatory compliance program requirement" and "prevented DBTCA from properly assessing [Bank Secrecy Act]/AML risk for billions of dollars in potentially suspicious transactions processed between 2011 and 2015."[179]

289.     On information and belief, the Deutsche Bank and DBTCA employees who were responsible for these regulatory violations—*i.e.*, the significant deficiencies in DBTCA's and Deutsche Bank's Bank Secrecy Act and AML risk, and the decisions to provide banking services to criminal and high-risk clients—were the same employees who were involved in Deutsche Bank's decision to provide correspondent banking services to the Seized Banks. Decisions by Deutsche Bank employees that resulted in the regulatory violations described below were made contemporaneously with the decision to provide correspondent banking services to the Seized Banks.

## A.     Deutsche Bank's Role in Jeffrey Epstein's Sex Trafficking Enterprise

290.     In July 2020, the New York State Department of Financial Services ("NYDFS") and Deutsche Bank entered into a Consent Order that resolved the Department's investigation

---

[179] Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent, Pursuant to the Federal Deposit Insurance Act, as Amended, *In the Matter of Deutsche Bank AG, et al.*, Docket No. 17-009-B-FB, *et al.* (May 26, 2017), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20170530a1.pdf.

into Deutsche Bank's relationship with notorious sex trafficker and serial child rapist Jeffrey

Epstein and entities affiliated with Epstein.[180]

291.    The Consent Order details Deutsche Bank's reprehensible decision to become

Epstein's bank-of-choice. Deutsche Bank onboarded Epstein as a client after he had already pled

guilty to "the solicitation of a minor to engage in prostitution" and had been "involved in 17 out-

of-court civil settlements" involving related conduct.[181] Undeterred, Deutsche Bank onboarded

Epstein because he could potentially "generate millions of dollars in revenue as well as leads for

other lucrative clients."[182]

292.    Epstein and his affiliates then "used Deutsche Bank accounts to send dozens of

wires, directly and indirectly," to sex-trafficking co-conspirators.[183]

293.    Deutsche Bank failed to monitor Epstein's "accounts for all potential crimes and

suspicious activity that could be implicated by Mr. Epstein's alleged past conduct, including

payments to co-conspirators and those that could be related to sex trafficking."[184] Deutsche Bank

also "failed" "to conduct due diligence commensurate" with the sex-trafficking risks posed by its

relationship with Epstein and failed "to tailor its transaction monitoring to detect suspicious or

unlawful activity."[185]

---

[180] Consent Order Under New York Banking Law §§ 39 and 44, *In the Matter of Deutsche Bank AG, et al.* (July 2020),
https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf [hereinafter "2020 NYDFS Consent Order"].
[181] 2020 NYDFS Consent Order ¶¶12, 20.
[182] *Id.* ¶18.
[183] *Id.* ¶27.
[184] *Id.* ¶42.
[185] *Id.* ¶55.

294.    Deutsche Bank "failed to scrutinize the activity in the accounts,"[186] including "suspicious" activity that "should have been obvious to Bank personnel at various levels."[187]

295.    For its "unsafe and unsound" banking practices and its "fail[ure] to maintain an effective and compliant anti-money laundering program" related to Jeffrey Epstein—as well as FBME Bank Ltd. ("FBME") and the Estonia branch of Denmark's Danske Bank ("Danske Estonia"), described *infra* at ¶¶ 302-311—Deutsche Bank paid a $150 million penalty.[188]

296.    Deutsche Bank settled a related class-action sex-trafficking lawsuit for $75 million,[189] after a court in this District denied Deutsche Bank's attempt to dismiss that lawsuit.[190]

### B.    Deutsche Bank's Systemic Failure to Adequately Monitor Correspondent Banking Relationships

297.    Deutsche Bank has also been penalized by regulators for its failure to adequately monitor correspondent banking relationships in high-risk jurisdictions.

298.    The acute and systemic failures described below mirror Deutsche Bank's decision to continue providing correspondent-banking services to the Seized Banks, notwithstanding its awareness that its true counterparty was ISIS.

299.    In a July 2020 Consent Order, NYDFS "concluded that Deutsche Bank failed to adequately monitor and manage" its "correspondent banking relationships with foreign banks, including several that were in high-risk jurisdictions or themselves had customers operating in

---

[186] *Id.* ¶56.
[187] *Id.* ¶57.
[188] *Id.* ¶¶112-114.
[189] *See* Order and Final Judgment, *Doe v. Deutsche Bank Aktiengesellschaft*, No. 22-cv-10018 (S.D.N.Y. Oct. 20, 2023), Dkt. 122.
[190] *See* Op. and Order, *Doe v. Deutsche Bank Aktiengesellschaft*, No. 22-cv-10018 (S.D.N.Y. May 1, 2023), Dkt. 75.

high-risk industries." Namely, Deutsche Bank failed to "adequately monitor and manage" its correspondent-banking relationships with FBME and Danske Estonia.[191]

300.    With respect to these "high-risk correspondent banking customers," Deutsche Bank "failed to maintain policies that set out sufficiently specific criteria, such as patterns of high [Risk Assessment Customer] scores or **high suspicious activity volumes**, under which [Deutsche Bank] would determine **whether to terminate** a correspondent banking relationship or whether lesser risk-mitigation measures would be appropriate."[192]

301.    Deutsche Bank also "failed to consistently maintain policies that provided practical guidance to facilitate their implementation, such as procedures for determining whether other foreign banks could use the respondent's correspondent account, or explanations of how employees could verify the identities of respondents' beneficial owners."[193]

### 1.    FBME

302.    According to NYDFS, Deutsche Bank "was aware of potential issues with FBME's compliance regime from very early in the active phase of the correspondent banking relationship."[194] FBME was consistently rated **by Deutsche Bank** as a "high-risk client," in part due to its association with "money laundering linked to Russian organized crime."[195]

303.    Despite identifying hundreds of "suspicious transactions" related to FBME, Deutsche Bank still "facilitated 478,379 dollar-denominated transactions" with FBME over the course of the relationship.[196]

---

[191] 2020 NYDFS Consent Order ¶60.
[192] Id. ¶106 (emphasis added).
[193] Id. ¶108.
[194] Id. ¶67.
[195] Id. ¶¶69-71.
[196] Id. ¶¶75-76.

304.    Several of those dollar-denominated transactions were suspicious. Notably, however, Deutsche Bank identified **far fewer** suspicious transactions related to FBME (*i.e.*, hundreds) than suspicious transactions related to the Seized Banks (*i.e.*, thousands).

305.    Despite the "high-risk nature of the FBME relationship, the red flags, numerous suspicious transactions, and overt lack of transparency exhibited by FBME," Deutsche Bank failed to timely "exit" its correspondent-banking "relationship" with FBME.[197]

### 2.  Danske Estonia

306.    Deutsche Bank also performed correspondent-banking services for Danske Estonia, despite that bank's presence in a "high-risk jurisdiction," the "volume of AML alerts and cases involving Danske Estonia's customers," and the "high-risk market segments serviced by Danske Estonia."[198]

307.    When "other major Western financial institutions began de-risking efforts in the Baltic region related to money laundering risks"—*i.e.*, closing correspondent-banking accounts—"Deutsche Bank elected to continue to do business" as usual.[199]

308.    Deutsche Bank "continued" the relationship with Danske Estonia, despite a "recommendation" from one of its own "high-ranking and seasoned compliance professional[s]" that the bank close the account.[200] Deutsche Bank cleared hundreds of billions of dollars for Danske Estonia.[201]

309.    Deutsche Bank facilitated those transactions despite having "identified" hundreds of "suspicious transactions that referenced Danske Estonia's dollar correspondent accounts."[202]

---

[197] *Id.* ¶82.
[198] *Id.* ¶¶84, 89.
[199] *Id.* ¶97.
[200] *Id.* ¶¶101-102.
[201] *Id.* ¶103.
[202] *Id.* ¶104.

310.    Notably, as with FBME, Deutsche Bank identified **far fewer** suspicious transactions related to Danske Estonia (*i.e.*, hundreds) than suspicious transactions related to the Seized Banks (*i.e.*, thousands).

311.    Despite myriad concerns that "put Deutsche Bank on notice" of the risks of providing correspondent banking services for Danske Estonia, Deutsche Bank refused to timely exit that relationship.[203]

### C.    Deutsche Bank Conducted Voluminous Dollar-Clearing Transactions for Sanctioned Financial Institutions

312.    In 2015, NYDFS penalized Deutsche Bank for its "non-transparent methods and practices to conduct more than 27,200 U.S. dollar clearing transactions valued at over $10.86 billion on behalf of Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other entities subject to U.S. economic sanctions" from at least 1999 through 2006.[204]

313.    Deutsche Bank "knowingly process[ed]" these illicit transactions, denominated in U.S. dollars, while "effectively conceal[ing] the relationship of a sanctioned or possibly-sanctioned party to the transactions."[205] This concealment was intentional.[206]

314.    Deutsche Bank employees used various methods of handling transactions to "evade the sanctions-related protections and controls of Deutsche Bank New York and other

---

[203] *Id.* ¶¶104-105.

[204] Consent Order Under New York Banking Law §§ 39 and 44, *In the Matter of Deutsche Bank AG, Deutsche Bank AG New York Branch*, at 2 (Nov. 2015), https://www.dfs.ny.gov/system/files/documents/2020/04/ea151103_deutsche_bank.pdf (footnote omitted) [hereinafter "2015 NYDFS Consent Order"].

[205] 2015 NYDFS Consent Order at 2.

[206] *See, e.g.*, 2015 NYDFS Consent Order ¶10 ("Bank relationship managers and other employees worked with the Bank's sanctioned customers in the process of concealing the details about their payments from U.S. correspondents."); *id.* ¶ 14 ("Bank employees in many overseas offices, in different business divisions, and with various levels of seniority were actively involved or knew about it.").

correspondents."[207] Deutsche Bank did this to "facilitate what it saw as 'lucrative' U.S. dollar business for sanctioned customers."[208]

315.    Deutsche Bank ultimately paid a $258 million penalty for its malfeasance.[209]

316.    Deutsche Bank's willingness to provide dollar-clearing transactions for sanctioned customers mirrors its willingness to provide dollar-clearing services for Seized Banks—despite ISIS's control of those banks and the litany of warnings from the U.S. government and others to not provide such services.

**D.    Deutsche Bank Facilitated an Illegal Mirror-Trading Scheme**

317.    As part of the next chapter in its "substantial history of regulatory violations,"[210] in January 2017, Deutsche Bank entered yet another Consent Order with NYDFS. Serious deficiencies in Deutsche Bank's AML control policies and procedures "allowed a corrupt group of bank traders and offshore entities to improperly and covertly transfer more than $10 billion out of Russia, by conscripting Deutsche Bank operations in Moscow, London and New York to their improper purpose."[211] For its malfeasance, Deutsche Bank paid a $425 million penalty.[212]

318.    The so-called "mirror trading" scheme allowed the parties—Russian organized crime associates—to "surreptitiously convert rubles into U.S. dollars using Deutsche Bank." To execute the scheme, one party purchased certain Russian securities, paying in rubles, and shortly

---

[207] 2015 NYDFS Consent Order ¶4.
[208] 2015 NYDFS Consent Order ¶1.
[209] N.Y. Dep't of Fin. Servs., *NYDFS Announces Deutsche Bank To Pay $258 Million, Install Independent Monitor, Terminate Employees for Transactions on Behalf of Iran, Syria, Sudan, Other Sanctioned Entities* (Nov. 4, 2015), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1511041.
[210] 2017 NYDFS Consent Order ¶61.
[211] *Id.* ¶5.
[212] *Id.* ¶72; *see also* NYDFS, *DFS Fines Deutsche Bank $425 Million for Russian Mirror-Trading Scheme* (Jan. 30, 2017), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1701301.

thereafter, a related counterparty sold the identical quantity of securities. There was no

"legitimate economic rationale" for the trades. But the seller would be "paid for its shares in U.S.

dollars, which were routinely cleared through DBTCA."[213]

319.    The scheme ran between 2011 and early 2015,[214] "when Deutsche Bank was on

clear notice of the numerous deficiencies in its [Bank Secrecy Act]/AML systems and

management, and yet the steps it took to remediate the situation proved seriously inadequate."[215]

Deutsche Bank "traders knowingly and actively facilitated"[216] the scheme, and DBTCA "was the

entity through which the U.S. dollar payments flowed to the suspicious entities" involved.[217]

320.    "Deutsche Bank's AML control failures were longstanding and enterprise-wide,

enabling the mirror trade scheme to flourish and persist."[218] There were "extensive,"

"[n]umerous compliance failures."[219] Those included, among other failings, "widespread and

well-known weaknesses in its KYC processes for onboarding new clients,"[220] its "fail[ure] to

accurately rate its AML country and client risks throughout the relevant time period,"[221] its

"ineffective and understaffed [Anti-Financial Crime], AML, and Compliance Units,"[222] and its

"decentralized AML framework."[223] NYDFS also criticized Deutsche Bank's "corporate culture

---

[213] 2017 NYDFS Consent Order ¶¶ 12, 15.
[214] *Id.* ¶17.
[215] *Id.* ¶7.
[216] *Id.* ¶20.
[217] *Id.* ¶9.
[218] *Id.* ¶60.
[219] *Id.* ¶45.
[220] *Id.* ¶46.
[221] *Id.* ¶51.
[222] *Id.* ¶53.
[223] *Id.* ¶56.

that allow[ed] for **short-term profiteering through improper conduct**, at the expense of robust compliance."[224]

## VII.    The Terror Fundraising Venture's Trafficking Crimes Harmed Plaintiffs

321.    ISIS forcibly detained Kayla Mueller, James Foley, and Steven Sotloff. Each captive suffered months or years of horrific physical pain, unspeakable mental anguish, and—in Ms. Mueller's case—rape and sexual abuse. Each of them was murdered by ISIS while in captivity. Their estates and family members are Plaintiffs here.

322.    ISIS repeatedly tortured each captive—likely from the start of captivity and until the hostages' executions. In addition to physical torture, ISIS psychologically tortured the captives by forcing them to watch the torture and execution of others and subjecting them to death threats, solitary confinement, mock executions, and interrogations where they were forced to divulge personal information.[225]

323.    ISIS also forced its hostages to participate in propaganda videos. ISIS terrorists wrote, directed, filmed, and produced propaganda videos and proof-of-life videos about several hostages, including James Foley and Steven Sotloff.[226] ISIS terrorists considered the hostages "actors." Indeed, before the propaganda video depicting Mr. Foley's execution was released, one ISIS terrorist tweeted: "Message to America, the Islamic State is making a new movie. **Thank u**

---

[224] *Id.* ¶29 (emphasis added).

[225] *See Mueller v. Syrian Arab Republic*, 2023 WL 1398434, at *7 (D.D.C. Jan. 31, 2023); *see generally* Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1 at 36-39 (describing ISIS's torture methods, which Mr. Sotloff and Mr. Foley were likely subjected to).

[226] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 203-04) (explaining ISIS terrorists' roles in creating a propaganda video); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 7, 2022), Dkt. 352 (Saide Testimony at 38-39); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 78-79).

*for the actors.*"[227] ISIS terrorists even gave acting directions to captives, demanding that they "look" "more scared" "to make it more real" for people who will "see it outside."[228] The terrorists regularly demanded that the hostages repeat takes for staged propaganda videos until the performance was adequately "dramatic."[229] Hostages were often beaten violently before filming and threatened with death if they did not perform to ISIS's satisfaction. At least one hostage was told, "I will put a bullet in your head if you're not convincing enough."[230]

324.    ISIS benefitted from its propaganda videos. It used them successfully to recruit fighters, generate revenue, and solicit donations. ISIS, of course, did not compensate any of the hostages-conscripted-into-actors.

325.    American hostages faced particularly harsh treatment by ISIS in retaliation for America's foreign policy choices.[231]

326.    The U.S. government has since convicted certain ISIS terrorists who were responsible for, among other things, the kidnapping, reprehensible treatment, and brutal murder of Ms. Mueller, Mr. Foley, and Mr. Sotloff.[232]

---

[227] Nuno Tiago Pinto, *Inside the Foreign Fighter Pipeline to Syria: A Case Study of a Portuguese Islamic State Network*, CTC Sentinel, at 18 (Aug. 2020), https://ctc.westpoint.edu/wp-content/uploads/2020/08/CTC-SENTINEL-082020.pdf (emphasis added); *see also* James M. Dorsey, *The Hunt for "Jihadi John" Moves to Football*, Fair Observer (Jan. 26, 2015), https://tinyurl.com/5n98kxy2.

[228] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 350 (Mejia Testimony at 106); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 7, 2022), Dkt. 352 (Saide Testimony at 39).

[229] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 87-88).

[230] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 88).

[231] *See Mueller*, 2023 WL 1398434 at *7.

[232] *See, e.g.*, Plea Agreement, *United States v. Kotey*, No. 20-cr-239 (E.D. Va. Sept. 2, 2021), Dkt. 89; Statement of Facts, *United States v. Kotey*, No. 20-cr-239 (E.D. Va. Sept. 2, 2021), Dkt. 90; Redacted Jury Verdict, *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 14, 2022), Dkt. 287.

327.    Ms. Mueller, Mr. Foley, and Mr. Sotloff were each murdered by ISIS while they were held captive. Details about their treatment while in captivity have been recounted by others who were held hostage by ISIS contemporaneously and in the same locations. Several surviving hostages witnessed first-hand the torture and abuse of Ms. Mueller, Mr. Foley, and Mr. Sotloff. Several surviving hostages spoke directly with Ms. Mueller, Mr. Foley, and Mr. Sotloff about the torture and abuse they suffered while in ISIS captivity. Those same surviving hostages have provided detailed, consistent accounts—both in sworn testimony in in U.S. federal court proceedings and in media publications—of the physical and psychological torture that Ms. Mueller, Mr. Foley, and Mr. Sotloff endured while in ISIS's captivity.[233]

### A.    The Torture and Murder of Kayla Mueller

328.    Kayla Mueller was an American humanitarian aid worker who was kidnapped, tortured, raped, and executed by ISIS terrorists.[234]

329.    On August 4, 2013, ISIS terrorists kidnapped Ms. Mueller at gunpoint near Aleppo, Syria.[235] ISIS forcibly held Ms. Mueller hostage for nearly two years, from August 2013 until February 2015.[236] Ms. Mueller was held against her will for the duration of her captivity.

---

[233] *See, e.g.*, *Sotloff, et al. v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 131 (D.D.C. 2021); *see* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 85, 134); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 at 163 (court concluding that it was "pretty clear that [Mr. Motka] saw many of the hostages" who were "later killed" "and may have spoken to them."); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 68, 73, 82); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 7, 2022), Dkt. 352 (Saide Testimony at 29); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 64).

[234] *See Mueller*, 2023 WL 1398434 at *1.

[235] *See Mueller*, 2023 WL 1398434 at *7.

[236] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 122-23).

Ms. Mueller endured physical and psychological torture throughout the time that ISIS held her captive.

330.    Upon kidnapping her, ISIS terrorists confiscated Ms. Mueller's personal belongings, including her passport.[237]

331.    During the first six months of captivity, Ms. Mueller was primarily held in isolation.[238]

332.    In at least one ISIS prison, Ms. Mueller was confined in a place "that was very small, ***like a dog kennel***, where she could not even stretch her hands."[239] In another location, she was held in a cramped, hot cell with other prisoners.[240] And in another location, she was detained in a bathroom for "[a]round two weeks."[241]

333.    Ms. Mueller was forced to endure abysmal and unsanitary living conditions.[242] She was regularly moved against her will between various ISIS-controlled prisons and safehouses.[243]

---

[237] *See* Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1; Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 63); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 71-72); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 65-66) (describing how ISIS terrorists took all belongings except his clothes).
[238] *See Mueller*, 2023 WL 1398434 at *7.
[239] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 101) (emphasis added).
[240] *See Mueller*, 2023 WL 1398434 at *7.
[241] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 98).
[242] *See Mueller*, 2023 WL 1398434 at *11.
[243] *See id.* at *7.

334.    ISIS terrorists routinely threatened Ms. Mueller and other captives, who were told that if they "resist or try to run away," the ISIS terrorists "would kill [them] immediately."[244]

335.    ISIS terrorists treated Ms. Mueller "more aggressive[ly]" than other hostages, and they "blame[d] her for everything that America has done."[245]

336.    ISIS terrorists forced Ms. Mueller to write letters to her family regarding her captivity and ISIS's ransom demands. ISIS dictated the contents of those letters.[246]

337.    In or around May 2014, ISIS terrorists emailed Ms. Mueller's parents, who were in the United States. ISIS terrorists wanted to use Ms. Mueller as a bargaining chip: the terrorists wanted to arrange either a prisoner exchange between the United States and ISIS or receive a €5 million (roughly $6.8 million) ransom payment from the Mueller family.

338.    These emails continued into summer 2014. In their emails to the Mueller family, ISIS terrorists repeatedly threatened to murder Ms. Mueller if their demands were not met, writing things like: "[I]t is more beloved to us to put a bullet in her head than release her for anything less" and "If you fail to meet this deadline, we will send you a picture of Kayla's dead body. This is not an empty threat. This is a promise that we will follow through."[247]

---

[244] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 196).

[245] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 104); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 7, 2022), Dkt. 352 (Saide Testimony at 37).

[246] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 108-111); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (M. Mueller Testimony at 25-30); *see* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 109).

[247] *See Mueller*, 2023 WL 1398434 at *8, 10; Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Chiappone Testimony at 199-201); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (M. Mueller Testimony at 37, 42-43, 45).

339.    In addition to threatening Ms. Mueller's life, ISIS terrorists also coerced Ms. Mueller into divulging private, personal information in connection with proof-of-life questions that were sent to her family.[248]

340.    Although negotiations for Ms. Mueller's freedom continued into September 2014, they eventually collapsed. ISIS terrorists stopped responding to Ms. Mueller's family's outreach. Ms. Mueller remained in ISIS's custody until she was murdered.[249]

341.    In the months leading up to her death, ISIS terrorists subjected Ms. Mueller to heinous atrocities.

342.    In or around September 2014, Ms. Mueller was transferred to the custody of high-ranking ISIS terrorist Abu Sayyaf and his wife, Umm Sayyaf.[250] Abu Sayyaf served in various ISIS leadership positions, including minister for oil and gas, and he reported directly to Baghdadi, ISIS's self-proclaimed caliph. Abu Sayyaf maintained multiple residences in Syria. Ms. Mueller was forcibly detained in at least one of them.[251]

343.    While held captive at a Sayyaf residence, Ms. Mueller was handcuffed, detained in locked rooms, and given daily orders with respect to her activities and movements. She was held in the Sayyaf residence against her will. And she was told that if she disobeyed the ISIS terrorists' orders, they would kill her. Ms. Mueller and the other female captives were "***treated . . . like slaves.***"[252]

---

[248] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (M. Mueller Testimony at 29-46).
[249] *Id.* at 29-57).
[250] *See Mueller*, 2023 WL 1398434 at *8; *see* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 198-99).
[251] *See* Criminal Compl. Affidavit, *U.S. v. Bahar*, No. 1:16-mj-63, at ¶¶9, 10, 12 (E.D. Va. Feb. 8, 2016); *Mueller*, 2023 WL 1398434 at *8.
[252] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 201) (emphasis added).

344.    While held captive at a Sayyaf residence, Ms. Mueller was mentally abused by ISIS terrorists. She was forced to watch extraordinarily violent ISIS propaganda videos—including videos of American hostages being beheaded.[253] She and other female captives were "force[d]" to "prep the young girls for ISIS" terrorists to abduct.[254] She was told that ISIS "owned" her and her fellow female captives.[255]

345.    On information and belief, Ms. Mueller was forced to perform domestic labor at Sayyaf residences.[256]

346.    Ms. Mueller was also repeatedly raped while in ISIS's captivity.[257] Ms. Mueller was raped and sexually abused by Baghdadi himself.[258] He believed he "owned" Ms. Mueller as a slave.[259]

347.    One time, the day after Ms. Mueller had been raped, a fellow hostage observed that Ms. Mueller was "very sad, very nervous, and . . . crying."[260] Ms. Mueller was "threatened" that if she tried to escape, the terrorists would murder all the female hostages.[261]

---

[253] *Id.* at 202-03.

[254] *Id.* at 201.

[255] *See Mueller*, 2023 WL 1398434 at *8.

[256] *See generally* Mtn. to Enforce Rights under Crime Victims' Rights Act, *U.S. v. Bahar*, No. 1:16-mj-63, at ¶9 (E.D. Va. Feb. 8, 2016), Dkt. 15 (testimony from several captured Yazidi women that they were forced to perform domestic labor at the Sayyaf residence); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 187, 205).

[257] *See* Mem. Op., *Mueller v. Syrian Arab Republic*, No. 18-cv-1229 (D.D.C.), Dkt. 34 at 2; Bahar (Umm Sayyaf) Criminal Complaint Affidavit.; Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 207-08).

[258] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 207-08).

[259] *See* Criminal Compl. Affidavit, *U.S. v. Bahar*, No. 1:16-mj-63, at ¶18 (E.D. Va. Feb. 8, 2016); *See Mueller v. Syrian Arab Republic*, 2023 WL 1398434 at *8.

[260] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Mulla Testimony at 207-208).

[261] *Id.*

348.    In or around February 2015, ISIS terrorists murdered Ms. Mueller.[262]

349.    ISIS terrorists emailed pictures of Ms. Mueller's dead body to her family in the United States.[263]

350.    Judge Carl J. Nichols, District Judge for the United States District Court for the District of Columbia, determined that Ms. Mueller "certainly" "was tortured by ISIS."[264] The torture was "severe." "Credible evidence establish[ed] that [Ms. Mueller] was subjected to prolonged periods of solitary confinement, miserable living conditions, death threats, and sexual abuse."[265]

351.    Plaintiff Richard Mueller II is the father of Ms. Mueller. He brings claims in his representative capacity on behalf of Ms. Mueller's estate and in his individual capacity.

352.    Plaintiff Marsha Mueller is the mother of Ms. Mueller.

353.    Plaintiff Eric Mueller is the brother of Ms. Mueller.

354.    As a result of Ms. Mueller's kidnapping, captivity, and murder, each member of the Mueller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Mueller's society, companionship, and counsel.

355.    The Plaintiff members of the Mueller Family are victims of Trafficking Crimes committed by the Terror Fundraising Venture; are survivors and/or heirs of Ms. Mueller; and are

---

[262] *See Mueller*, 2023 WL 1398434 at *8 ("credible statements from ISIS insiders—two women involved in Kayla's captivity—demonstrate that it is more likely that Kayla was executed by ISIS" than killed in a Jordanian airstrike); *id.* at *11 ("[T]he evidence shows that ISIS deliberately killed [Ms. Mueller] because she was a security threat to ISIS.").
[263] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (M. Mueller Testimony at 59-60).
[264] *Mueller*, 2023 WL 1398434 at *11.
[265] *Mueller*, 2023 WL 1398434 at *11 (citations omitted).

thus entitled to recover for damages Ms. Mueller suffered as well as for their own pain, suffering, and other damages.

## B.    The Torture and Filmed Beheading of James Foley

356.    James Foley was an American journalist who was held captive, tortured, and executed by ISIS terrorists.

357.    On November 22, 2012, Mr. Foley was kidnapped near Raqqa, Syria. Shortly after the kidnapping, ISIS forcibly detained Mr. Foley. ISIS held Mr. Foley hostage for nearly two years—repeatedly moving him against his will between ISIS prisons and safehouses. Throughout that time, ISIS repeatedly tortured Mr. Foley, both physically and psychologically.

358.    Upon his detention by ISIS, Mr. Foley was strip-searched, and ISIS terrorists confiscated his belongings. ISIS terrorists coerced Mr. Foley into giving them access to his laptop and personal files.

359.    Mr. Foley was forced to live in "abysmal and unsanitary living conditions."[266] He was detained in complete darkness for months on end. He was fed "very little food" most days, and some days he was "not fed at all."[267] He was also routinely deprived of adequate water.[268] Fellow hostages observed that Mr. Foley appeared emaciated.[269]

---

[266] *Sotloff, et al. v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 137 (D.D.C. 2021); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 104).
[267] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 74-75, 100-101).
[268] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 58); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 68-69).
[269] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 130-31).

360.     While in captivity, Mr. Foley was chained to fellow captives, was held in narrow, cramped rooms, and was forced to relieve himself in bottles and buckets, instead of being allowed to use a toilet.

361.     Mr. Foley was regularly beaten—and those beatings were "extremely violent."[270] ISIS terrorists occasionally used an "electrocution gun" when beating Mr. Foley and other captives, which caused "sharp pain."[271]

362.     In one such episode, when the ISIS terrorists were in a frenzy, they concentrated on beating Mr. Foley. According to a witness: The terrorists told Mr. Foley "to stand in the middle of the room with his arms like Christ on the cross and started to beat him. And then they choked him . . . pushing the carotids to block the blood and the breathing. Then [Mr. Foley] fainted and [fell] on the concrete floor."[272] Mr. Foley hit the concrete so hard that "he had a huge bruise and very big black eye."[273]

363.     Other times, ISIS terrorists beat Mr. Foley and other captives with "thick cables," "sticks or some batons," or they kicked or punched him.[274] Beatings took place at "all" hours of the day, in part to prevent him from sleeping soundly.[275]

---

[270] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 74).
[271] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 108-09); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 81).
[272] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 76-77).
[273] *Id.* at 77.
[274] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 110); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 58).
[275] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 58).

364.    During the vicious beatings at the hands of ISIS terrorists, Mr. Foley's "ribs had been broken" but they never were "allowed to heal properly"—leaving him permanently disfigured with his ribs "pushed inside" his chest.[276] That injury was visible to fellow captives.[277]

365.    ISIS terrorists also "repeatedly waterboarded" Mr. Foley.[278] A fellow hostage described his own reaction to waterboarding as follows:

> [Y]ou start to panic a little bit. I was trying to breathe out of the side of my mouth initially. It seemed to work. And after a while. . . it's impossible to -- and then you start to lose oxygen and you start to gasp for breath, and then you just start drinking water, and eventually the water starts to go into your lungs. And then you start to shake a little bit. . . . That was by far the worst thing that had happened up until then.[279]

366.    Mr. Foley's "ankles were scarred because his captors had 'chained his feet to a bar and then hung the bar so that he was upside down from the ceiling.'"[280]

367.    Other captives heard Mr. Foley's screams when ISIS terrorists physically tortured him.

368.    ISIS repeatedly interrogated Mr. Foley, forcing him to divulge private information about himself.[281] ISIS used torture tactics during these interrogations. Through torture, ISIS coerced Mr. Foley into "making statements that ISIS could use for propaganda purposes."[282] This included "statements denouncing the United States."[283]

---

[276] *Sotloff*, 525 F. Supp. 3d at 131.

[277] *Id.*

[278] *Id.*; *see* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 112-16); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 81).

[279] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 116-17).

[280] *Sotloff*, 525 F. Supp. 3d at 131.

[281] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 86-87).

[282] *Sotloff*, 525 F. Supp. 3d at 131.

[283] *Id.* at 137.

369.    Mr. Foley was tortured psychologically. He was forced to watch videos of other hostages being executed, and he was regularly threatened with execution. He was made to "constantly fear[] torture and execution."[284] ISIS also subjected Mr. Foley to "mock executions" that were filmed. During those, Mr. Foley was "forced to recite a prepared message correctly and as directed." That gave ISIS "footage in which the messages were delivered as instructed" that they could "potentially splice . . . into video of the [hostages'] actual executions."[285]

370.    On at least one occasion, an ISIS terrorist used a "sword" to threaten Mr. Foley: He was told that would be "behead[ed]" if he tried to escape.[286] After that, ISIS terrorists "handcuffed" Mr. Foley "with handcuffs that basically linked [his] feet to [his] hands," and he was forced to suffer in that contorted position for "two or three days."[287]

371.    ISIS terrorists also used Mr. Foley as an object for their grotesque entertainment.[288] On at least one occasion, ISIS terrorists forced Mr. Foley to fight fellow hostages "in a sort of tag-team-style boxing-type match."[289] The losing hostages were threatened with "waterboard[ing]."[290] The terrorists "called" the fighting spectacle "'the Royal Rumble.'"[291] During the fight, Mr. Foley "passed out" from exhaustion and pain.[292]

---

[284] *Id.* at 131.

[285] *See* Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1 at 40-42.

[286] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 158).

[287] *See id.*

[288] *See id.* at 131 ("They were super excited. It was kind of like their fun event of the day.").

[289] *See id.*

[290] *See id.* at 132.

[291] *See id.* at 131.

[292] *See id.* at 132.

372.    Fellow ISIS captive Marcos Marginedas Izquierdo once witnessed Mr. Foley

being "forced" to "spend the entire night standing up, handcuffed really, really tight, as a

punishment [despite] doing nothing [wrong]."[293]

373.    "ISIS inflicted severe physical and mental pain on [Mr.] Foley in part because he

was an American and had a brother in the U.S. Air Force."[294]

374.    ISIS emailed Mr. Foley's parents, who were in the United States. In one email on

or around August 12, 2014, Mr. Foley's parents were told that their son would "be executed as a

direct result of [America's] transgressions."[295]

375.    Examining the circumstances of Mr. Foley's kidnapping and detention, the Hon.

Judge Timothy J. Kelly of the United States District Court for the District of Columbia had "no

trouble concluding that ISIS tortured Foley."[296]

376.    On information and belief, ISIS physically and psychologically tortured Mr. Foley

in other ways—but the details of those forms of torture are unknowable due to the murder of Mr.

Foley and the deaths of some of his torturers.

377.    On or about August 19, 2014, ISIS terrorists beheaded Mr. Foley.

378.    Contemporaneous with Mr. Foley's execution, ISIS released a propaganda video

depicting Mr. Foley's beheading entitled "A Message to America." In that video, Mr. Foley wore

an orange jumpsuit, reminiscent of prison garb worn by detainees held at Guantanamo Bay. Mr.

Foley was forced to kneel in front of a camera and recite a statement denouncing the United

---

[293] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351
(Marginedas Izquierdo Testimony at 101); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239
(E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 172, 174).
[294] *Sotloff*, 525 F. Supp. 3d at 137.
[295] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350
(Chiappone Testimony at 204-205).
[296] *Sotloff*, 525 F. Supp. 3d at 137.

States. Mr. Foley's statement was prepared by ISIS, he was coerced into making it, and ISIS used his words for propaganda purposes. Soon after, an ISIS terrorist used a knife to behead Mr. Foley.

379.    The video recording of Mr. Foley's beheading was widely distributed through ISIS's propaganda channels.

380.    ISIS raised money and attracted recruits through the distribution of the video recording of Mr. Foley's beheading.

381.    Plaintiff Diane Foley is the mother of Mr. Foley. She brings claims in her representative capacity on behalf of Mr. Foley's estate and in her individual capacity.

382.    Plaintiff John W. Foley is the father of Mr. Foley.

383.    Plaintiff John E. Foley is the brother of Mr. Foley.

384.    Plaintiff Mark Foley is the brother of Mr. Foley.

385.    Plaintiff Kathryn Simpson is the sister of Mr. Foley.

386.    Plaintiff Michael Foley is the brother of Mr. Foley.

387.    As a result of his trafficking, captivity, and murder, Mr. Foley was injured in his person and/or property.

388.    As a result of Mr. Foley's kidnapping, captivity, and murder, each member of the Foley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Foley's society, companionship, and counsel.

389.    The Plaintiff members of the Foley Family are victims of Trafficking Crimes committed by the Terror Fundraising Venture; are survivors and/or heirs of Mr. Foley; and are thus entitled to recover for damages Mr. James Foley suffered as well as for their own pain, suffering, and other damages.

C.      **The Torture and Filmed Beheading of Steven Sotloff**

390.    Steven Sotloff was an American-Israeli journalist who was kidnapped, tortured, and executed by ISIS terrorists.

391.    On August 4, 2013, ISIS kidnapped Mr. Sotloff near Aleppo, Syria.

392.    ISIS forcibly held Mr. Sotloff hostage for roughly one year. After Mr. Sotloff was taken near Aleppo, ISIS regularly moved him between safehouses in Raqqa, his last reported location before his murder.

393.    Upon detaining Mr. Sotloff, ISIS terrorists coerced him into giving them access to his laptop and personal files.[297]

394.    While in ISIS captivity, Mr. Sotloff was starved, beaten, waterboarded, confined in cramped cells and in complete darkness for months, and forced to relieve himself in buckets and bottles, instead of being allowed to use a toilet. He was occasionally chained to fellow captives.

395.    Mr. Sotloff was undernourished while in ISIS's captivity. He was fed "very little food" most days, and some days was "not fed at all."[298] He was routinely deprived of adequate water.[299]

396.    ISIS terrorists interrogated Mr. Sotloff, using torture tactics and coercive threats to force him to divulge private personal information. During at least one interrogation, ISIS

---

[297] *See* Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1 at 36-37; Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 63); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 1, 2022), Dkt. 350 (Mejia Testimony at 71-72).
[298] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 74-75, 100-101).
[299] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 11, 2022), Dkt. 353 (Francois Testimony at 58); Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 68-69).

terrorists—using "pliers—threatened Mr. Sotloff with "cutting a finger off" or "pulling a fingernail" off.[300]

397.    ISIS terrorists frequently physically beat Mr. Sotloff in part "because they suspected that he was Jewish."[301] At times, multiple terrorists "savagely" beat him" "in front of the rest of the group" of hostages.[302] At least one fellow captive "witnessed Sotloff's severe suffering at the hands of his ISIS captors. On one instance, two men punched and kicked Sotloff dozens of times."[303]

398.    At one point, ISIS terrorists "handcuffed" Mr. Sotloff "with handcuffs that basically linked [his] feet to [his] hands," and he was forced to suffer in that contorted position for "two or three days."[304]

399.    ISIS captors regularly threatened Mr. Sotloff's life.

400.    ISIS's treatment caused Mr. Sotloff to suffer crippling bouts of severe depression.

401.    Examining the circumstances of Mr. Sotloff's kidnapping and detention, the Hon. Judge Timothy J. Kelly of the United States District Court for the District of Columbia had "no trouble concluding that ISIS tortured" Mr. Sotloff.[305]

402.    On information and belief, ISIS physically and psychologically tortured Mr. Sotloff in other ways—but the details of those forms of torture are unknowable due to the murder of Mr. Sotloff and the deaths of some of his torturers.

---

[300] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 143-44).
[301] Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Apr. 5, 2022), Dkt. 351 (Marginedas Izquierdo Testimony at 77).
[302] *Id.* at 79, 84.
[303] *Sotloff*, 525 F. Supp. 3d at 131-32 (citing Henin Aff.).
[304] *See* Trial Tr., *United States v. Elsheikh*, No. 20-cr-239 (E.D. Va. Mar. 31, 2022), Dkt. 349 (Motka Testimony at 158).
[305] *Sotloff*, 525 F. Supp. 3d at 137.

403.    In or around December 2013, ISIS terrorists emailed family members and friends of Mr. Sotloff who were in the United States. In that email, ISIS terrorists attempted to use Mr. Sotloff as a bargaining chip: In exchange for Mr. Sotloff's release, the ISIS terrorists demanded either the release of certain prisoners who had been imprisoned by the U.S. government or a ransom payment of €100 million (roughly $135 million).

404.    Mr. Sotloff likely endured psychological and physical torture similar to that endured by Mr. Foley, given their contemporaneous detention in the same locations, at the hands of the same or affiliated ISIS captors, and ISIS's consistency in torturing hostages—especially Americans.[306]

405.    ISIS terrorists beheaded Mr. Sotloff on or about September 2, 2014.

406.    ISIS terrorists filmed Mr. Sotloff's beheading and included footage of Mr. Sotloff's execution as part of a propaganda video.[307] In that video—entitled "A Second Message to America"—Mr. Sotloff was forced to kneel in an orange jumpsuit and recite a statement blaming the United States and President Obama's foreign policy for his death. Mr. Sotloff's statement was prepared by ISIS, he was coerced into making it, and ISIS used his words for propaganda purposes.

407.    The propaganda video showed an ISIS terrorist "cutting [Mr.] Sotloff's throat" and "conclude[d] with an image of Sotloff's dismembered corpse."[308]

---

[306] *See generally* Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1.

[307] *Sotloff*, 525 F. Supp. 3d at 132; *see* Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1 at 30-36.

[308] Expert Report of Daveed Gartenstein-Ross, *Sotloff, et al. v. Syrian Arab Republic*, No. 1:16-cv-725 (D.D.C. filed Sept. 19, 2019), Dkt. 21-1 at 33.

408.    The video recording of Mr. Sotloff's beheading was widely distributed through ISIS's propaganda channels.

409.    ISIS raised money and attracted recruits through the distribution of the video recording of Mr. Sotloff's beheading.

410.    Plaintiff Arthur Sotloff is the father of Mr. Sotloff. He brings claims in his representative capacity on behalf of Mr. Sotloff's estate and in his individual capacity.

411.    Plaintiff Shirley Sotloff is the mother of Mr. Sotloff.

412.    Plaintiff Lauren Sotloff is the sister of Mr. Sotloff.

413.    As a result of his trafficking and murder, Mr. Sotloff was injured in his person and/or property.

414.    As a result of Mr. Sotloff's kidnapping, captivity, and murder, each member of the Sotloff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sotloff's society, companionship, and counsel.

415.    The Plaintiff members of the Sotloff Family are victims of Trafficking Crimes committed by the Terror Fundraising Venture; are survivors and/or heirs of Mr. Sotloff; and are thus entitled to recover for damages Mr. Steven Sotloff suffered as well as for their own pain, suffering, and other damages.

## VIII. Plaintiffs' Claims Are Timely

416.    Plaintiffs' claims are timely. The TVPRA provides that civil actions must be brought within "10 years after the cause of action arose." 18 U.S.C. §1595(c)(1). Each Plaintiff's cause of action arose within 10 years of the filing of the Complaint:

a.    The cause of action for James Foley, whose estate and family members are Plaintiffs, arose no earlier than August 19, 2014, upon his execution while being held hostage.

b.  The cause of action for Steven Sotloff, whose estate and family members are Plaintiffs, arose no earlier than September 2, 2014, upon his execution while being held hostage.

c.  The cause of action for Kayla Mueller, whose estate and family members are Plaintiffs, arose no earlier than February 6, 2015, upon her death while being held hostage.

417.  If the Court concludes that Plaintiffs' cause of action accrued earlier, and to the extent tolling is required for any claim, Plaintiffs are entitled to equitable tolling in these extraordinary circumstances: James Foley, Steven Sotloff, and Kayla Mueller were held hostage against their will, while they were subject to ongoing trafficking offenses and other torts, and they were unable to vindicate their legal rights.

418.  Plaintiffs are also entitled to equitable tolling in these circumstances because Deutsche Bank concealed its participation in the Venture from public scrutiny, which rendered any plaintiff exercising reasonable diligence unable to discover Deutsche Bank's illegal behavior.

419.  No plaintiff exercising reasonable diligence could have discovered Deutsche Bank's participation in the Azizi Cell's and Ahmed Cell's VAT fraud schemes before (at the earliest) Deutsche Bank employees were arrested by German law enforcement officials on August 13, 2015, for their participation in VAT fraud schemes.

420.  No plaintiff exercising reasonable diligence could have discovered Deutsche Bank's provision of illicit financial services to ISIS before (at the earliest) September 20, 2020, when journalists reported on leaked SARs that inculpated Deutsche Bank in the provision of those services.

421.    No plaintiff exercising reasonable diligence could have discovered Defendants'
misconduct at an earlier time because the fact, nature, and extent of Deutsche Bank's
participation in the Terror Fundraising Venture was not discoverable via public information prior
to these revelations.

422.    Deutsche Bank's efforts to conceal their schemes from public scrutiny was
intentional: The bank systematically concealed its misdeeds from independent monitors that were
appointed, beginning in April 2015, as part of settlements with law enforcement and regulatory
authorities, including NYDFS, to root out such compliance failures and misconduct.

## <u>CLAIMS FOR RELIEF</u>

### VIOLATIONS OF 18 U.S.C. CHAPTER 77

423.    Plaintiffs incorporate the factual allegations in the Complaint.

424.    The Terror Fundraising Venture engaged in acts that violated 18 U.S.C. Chapter 77, including acts that violated the TVPRA (codified at 18 U.S.C. §1589 *et seq.*).

425.    **<u>Section 1584 (Involuntary Servitude).</u>** In violation of 18 U.S.C. §1584, the Terror Fundraising Venture knowingly and willfully held individuals, including Ms. Mueller, Mr. Foley, and Mr. Sotloff, in conditions of involuntary servitude, and the Venture knowingly and willfully sold individuals into conditions of involuntary servitude. The Venture's acts in violation of 18 U.S.C. §1584 resulted in death, including the death of Ms. Mueller, Mr. Foley, and Mr. Sotloff. The Venture's acts in violation of 18 U.S.C. §1584 included kidnapping and the provision of forced labor and services, as in the case of Ms. Mueller, Mr. Foley, and Mr. Sotloff, and rape and aggravated sexual abuse, as in the case of Ms. Mueller. Deutsche Bank knowingly benefitted, or attempted or conspired to benefit, from participating in the Venture, while Deutsche Bank knew or should have known the Venture violated §1584. *See* 18 U.S.C. §1595.

426.    **<u>Section 1589 (Forced Labor).</u>** In violation of 18 U.S.C. §1589, the Terror Fundraising Venture knowingly obtained the labor and/or services of its hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff, by the following means:

   a.  Force, threats of force, and physical restraint used against its hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff;

   b.  Serious harm and threats of serious harm used against its hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff; and/or

c.   Schemes, plans, and/or patterns intended to cause hostages (including Ms. Mueller, Mr. Foley, and Mr. Sotloff) to believe that, if the hostages did not perform such labor or services, the hostages would suffer serious harm or physical restraint.

427.   Deutsche Bank knowingly benefitted, financially and/or by receiving anything of value, from participating in the Terror Fundraising Venture, knowing or in reckless disregard of the fact that the Venture obtained labor or services by at least one of the means described in the above paragraph. *See* 18 U.S.C. §1589(b).

428.   Moreover, the Terror Fundraising Venture's acts in violation of 18 U.S.C. §1589 resulted in the death of hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff, and included kidnapping and aggravated sexual abuse committed against hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff. *See* 18 U.S.C. §1589(d).

429.   Deutsche Bank knowingly benefitted, or attempted to benefit, or conspired to benefit (financially or by receiving anything of value) from participating in the Terror Fundraising Venture, which Deutsche Bank knew or should have known the Venture violated §1589. *See* 18 U.S.C. §1595.

430.   **Section 1590 (Trafficking).** In violation of 18 U.S.C. §1590, the Terror Fundraising Venture knowingly transported hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff, for labor or services in violation of 18 U.S.C. Chapter 77. The Terror Fundraising Venture's violation of 18 U.S.C. §1590 resulted in the death of hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff, and included kidnapping and aggravated sexual abuse committed against hostages, including Ms. Mueller, Mr. Foley, and Mr. Sotloff. *See* 18 U.S.C. §1590(a).

431.   Deutsche Bank knowingly benefitted, or attempted to benefit, or conspired to benefit (financially or by receiving anything of value) from participating in the Terror

Fundraising Venture, which Deutsche Bank knew or should have known the Venture violated §1590. *See* 18 U.S.C. §1595.

432.    **Section 1591 (Sex Trafficking)**. In violation of 18 U.S.C. §1591, the Venture knowingly benefitted, financially or by receiving anything of value, by transporting persons, including Ms. Mueller, to engage commercial sex acts, including by using force, threats of force, and coercion.

433.    Deutsche Bank benefitted, financially or by receiving anything of value, from participating in a venture that engaged in acts described in §1591(a)(1) knowing, or, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or a combination of such means were used to cause persons to engage in commercial sex acts. *See* 18 U.S.C. §1591(a)(2).

434.    Deutsche Bank knowingly benefitted, or attempted to benefit, or conspired to benefit (financially or by receiving anything of value) from participating in the Venture, which Deutsche Bank knew or should have known the Venture violated §1591. *See* 18 U.S.C. §1595.

435.    Ms. Mueller, Mr. Foley, and Mr. Sotloff, and their family members who are Plaintiffs, were harmed by the Terror Fundraising Venture's violations of 18 U.S.C. Chapter 77 in at least the following ways:

a.  Ms. Mueller and her family members were victims of the Venture's violations of 18 U.S.C. §§ 1584, 1589, 1590 & 1591.

b.  Mr. Foley and his family members were victims of the Venture's violations of 18 U.S.C. §§ 1584, 1589 & 1590.

c.  Mr. Sotloff and his family members were victims of the Venture's violations of 18 U.S.C. §§ 1584, 1589 & 1590.

436.    Deutsche Bank knew, should have known, or recklessly disregarded that the Venture had engaged in acts that violated at least one, if not multiple, sections of 18 U.S.C. Chapter 77.

437.    Plaintiffs may bring a civil action against Deutsche Bank because it knowingly benefitted, attempted or conspired to benefit—financially or by receiving anything of value—from participating in the Terror Fundraising Venture; a venture which Deutsche Bank knew, recklessly disregarded, or should have known engaged in an act in violation of 18 U.S.C. Chapter 77. *See* 18 U.S.C. §1595.

438.    Deutsche Bank is liable to Plaintiffs for damages and attorneys' fees under 18 U.S.C. §1595(a).

439.    Deutsche Bank is liable to Plaintiffs for mandatory restitution under 18 U.S.C. §1593.

## JURY DEMAND

440.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

441.    Plaintiffs request that the Court:

  a.    Enter judgment against Defendants finding them liable to Plaintiffs on all claims for relief;

  b.    Award Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to restitution;

  c.    Award Plaintiffs monetary damages for mental anguish, pain, and suffering.

  d.    Award Plaintiffs punitive damages;

e.    Award Plaintiffs any and all other damages allowed by law, according to

proof to be determined at trial;

f.    Award Plaintiffs reasonable attorneys' fees and costs; and

g.    Grant such other relief as the Court deems just and equitable.

Dated: 8/16/2024                        Respectfully submitted,

*/s/ Adam J. Goldstein*
Ryan R. Sparacino (*pro hac vice* forthcoming)
Geoffrey P. Eaton (*pro hac vice* forthcoming)
Adam J. Goldstein
Matthew J. Fisher (*pro hac vice* forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
adam.goldstein@sparacinopllc.com
matt.fisher@sparacinopllc.com

Scott F. Hessell (*pro hac vice* forthcoming)
Daniel A. Shmikler (*pro hac vice*
forthcoming)
Martin Amaro (*pro hac vice* forthcoming)
SPERLING & SLATER, LLC
55 W. Monroe, Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200
shessell@sperling-law.com
dshmikler@sperling-law.com
mamaro@sperling-law.com

*Counsel for Plaintiffs*