UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

RICHARD MUELLER II, individually, and for the estate of KAYLA MUELLER; MARSHA MUELLER; ERIC MUELLER; DIANE FOLEY, individually, and for the estate of JAMES FOLEY; JOHN W. FOLEY; JOHN E. FOLEY; MARK FOLEY; KATHRYN SIMPSON; MICHAEL FOLEY; ARTHUR SOTLOFF, individually, and for the estate of STEVEN SOTLOFF; SHIRLEY SOTLOFF; and LAUREN SOTLOFF,

                Plaintiffs,

    v.

DEUTSCHE BANK AKTIENGESELLSCHAFT and DEUTSCHE BANK TRUST COMPANY AMERICAS,

                Defendants.

1:24-cv-6225 (DLC)

---

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

David G. Januszewski
Sheila C. Ramesh
Sesi V. Garimella
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
djanuszewski@cahill.com
sramesh@cahill.com
sgarimella@cahill.com

*Attorneys for Defendants Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas*

**TABLE OF CONTENTS**

I.    PLAINTIFFS FAIL TO PLEAD PERSONAL JURISDICTION OVER DB AG ............. 1

II.   PLAINTIFFS ASK THE COURT TO IGNORE *TWITTER* AND *WILDMAN* .................. 2

III.  PLAINTIFFS DO NOT STATE A CLAIM FOR BENEFICIARY LIABILITY.............. 3

   A.  Plaintiffs Have Not Adequately Pleaded that DB Knowingly Participated in a TVPRA Venture ................................................................................................................................ 3

   B.  Plaintiffs Fail to Allege that DB Had Any Knowledge of the Trafficking ....................... 8

   C.  Plaintiffs Do Not Plead Facts Sufficient to Show that DB Received Any Benefit from the "Terror Fundraising Venture" ........................................................................................ 10

CONCLUSION ................................................................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Cirino* v. *Bank of America.*,
  2015 WL 3669078 (C.D. Cal. Feb. 10, 2015) ..........................................................................7

*Corradino* v. *Liquidnet Holdings Inc.*,
  2021 WL 2853362 (S.D.N.Y. July 8, 2021) ..........................................................................10

*Doe #1* v. *Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ...........................................................................................5, 8

*Doe #9* v. *Wyndham Hotels & Resorts, Inc.*,
  2021 WL 1186333 (S.D. Tex. Mar. 30, 2021)..........................................................................9

*Doe 1* v. *Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024)....................................................................................................3

*Doe (G.N.C.)* v. *Uniquest Hospitality, LLC*,
  2024 WL 4149251 (S.D.N.Y. Sept. 11, 2024)..........................................................................8

*G.G.* v. *Salesforce.com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) ............................................................................................ *passim*

*Geiss* v. *Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019)................................................................................8, 10

*Honickman* v. *BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) .......................................................................................................7

*Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*,
  26 F. Supp. 2d 593 (S.D.N.Y. 1998)........................................................................................1

*Levin* v. *Sarah Lawrence College*,
  2024 WL 4026966 (S.D.N.Y. Sept. 3, 2024)..........................................................................10

*Licci* v. *Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)..................................................................................................1, 2

*Maria* v. *Massachusetts Institute of Technology*,
  2024 WL 4350826 (S.D.N.Y. Sept. 30, 2024).....................................................................6, 9

*Noble* v. *Weinstein*,
  335 F. Supp. 3d 504 (S.D.N.Y. 2018)......................................................................................8

*S.C.* v. *Wyndham Hotels & Resorts, Inc.*,
   728 F. Supp. 3d 771 (N.D. Ohio 2024)..................................................................................5, 6

*S.J.* v. *Choice Hotels International, Inc.*,
   473 F. Supp. 3d 147 (E.D.N.Y. 2020) ......................................................................................9

*Spetner* v. *Palestine Investment Bank*,
   70 F.4th 632 (2d Cir. 2023) ...................................................................................................1, 2

*Twitter, Inc.* v. *Taamneh*,
   598 U.S. 471 (2023).............................................................................................2, 3, 4, 6, 6 n.2

*Weir* v. *Cenlar FSB*,
   2018 WL 3443173 (S.D.N.Y. July 17, 2018) .......................................................................6, 7

*Wildman* v. *Deutsche Bank*,
   2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) ........................................................................3

*Williams* v. *New York City Department of Correction*,
   2021 WL 848709 (S.D.N.Y. Mar. 5, 2021) ............................................................................11

**Statutes**

18 U.S.C. § 1589, *et seq*................................................................................................... *passim*

**Other Authorities**

31 C.F.R. §1020.320 ........................................................................................................................8

Defendants ("DB")[1] respectfully submit this reply memorandum in further support of their motion to dismiss Plaintiffs' Complaint.

## I. PLAINTIFFS FAIL TO PLEAD PERSONAL JURISDICTION OVER DB AG

Plaintiffs' Opposition (ECF 31) ("Opp.") confirms that their claims are based on the allegation that DBTCA executed dollar-clearing transactions in New York. Opp. 8-9; Compl. ¶¶102, 312. DBTCA is a New York corporation (*id.* ¶14), and does not challenge personal jurisdiction. DB AG, in contrast, is DBTCA's German ultimate parent. *Id.* ¶15. Plaintiffs' assertion of personal jurisdiction over DB AG rests on conclusory allegations that DB AG "directed" DBTCA. Opp. 8. No specifics are alleged. The argument is based on DB AG's status as ultimate parent. Such conclusory allegations of a parent-subsidiary relationship are insufficient to establish personal jurisdiction over the parent. *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, 26 F. Supp. 2d 593, 605 (S.D.N.Y. 1998) (personal jurisdiction over foreign parent based on the activities of its subsidiary in a forum is only appropriate when a parent's control over subsidiary's activities is so complete that the subsidiary is "merely a department" of the parent).

Plaintiffs' reliance on *Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), and *Spetner* v. *Palestine Investment Bank*, 70 F.4th 632 (2d Cir. 2023), misses the mark. Opp. 7-9. *Licci* involved a foreign bank's purposeful, repeated use of a correspondent banking account in New York. 732 F.3d at 165. A Lebanese bank with no other New York contacts utilized a correspondent account at American Express Bank in New York. *Id*. The issue was whether the existence of that New York account was enough to establish jurisdiction over the

---

[1] Unless otherwise stated, capitalized terms have the meanings ascribed to them in Defendants' Moving Brief (ECF 23), emphasis is added, and citations are omitted.

Lebanese bank. *Licci* confirmed prior New York case law finding that more than the existence of the New York account was required. *Id.* at 168. Similarly, *Spetner* involved a claim against a Palestinian bank with no presence in New York, other than its use, through intermediaries, of New York correspondent accounts at Citibank, Chase Manhattan, and Bank of New York Mellon. 70 F.4th at 637-38. The issue here is different because the German DB AG is not alleged to have had a correspondent banking relationship with its own New York subsidiary, DBTCA. Rather, Plaintiffs premise jurisdiction over DB AG based on its status as the corporate parent of DBTCA, and that is not sufficient. *Licci* and *Spetner* are not relevant to the issue.

Even if Plaintiffs' allegations were sufficient to tie DB AG to the alleged dollar-clearing transactions in New York, they do not satisfy the second prong of the long arm statute—the abductions and murders underlying their TVPRA trafficking claims did not "arise from" those transactions. MTD at 10-11. The horrific treatment of Plaintiffs' family members by ISIS was too remote and attenuated to "arise from" the dollar-clearing transactions. *See id.*; *infra* III.A.

## II.  PLAINTIFFS ASK THE COURT TO IGNORE *TWITTER* AND *WILDMAN*

The Supreme Court's unanimous decision in *Twitter, Inc.* v. *Taamneh*, 598 U.S. 471 (2023) underscores how far afield Plaintiffs ask this Court to stray in sustaining their claims. The *Twitter* Court explained that, in order to impose secondary liability on a financial institution or other ordinary service provider for the acts of foreign terrorist organizations, plaintiffs must plead "conscious, voluntary, and culpable" participation by the defendant. *Id.* at 493; *see also id.* at 505; MTD at 23-24. Plaintiffs' failing under the TVPRA is the same that the Supreme Court identified in *Twitter*—general or routine services do not suffice to demonstrate culpable participation sufficient to incur secondary liability for terrorist activity.

With a two-sentence footnote (Opp. 16 n.7), Plaintiffs blithely ask this Court to ignore *Twitter* altogether, simply because the claims against Twitter were brought under the

2

Antiterrorism Act ("ATA") instead of the TVPRA. They do not address, much less distinguish, the *Twitter* Court's reasoning. Nor do they explain why the unanimous Court's analysis does not require dismissal of their analogous claims here, and, as discussed in the moving brief, it does.

Plaintiffs also fail to come to grips with *Wildman* v. *Deutsche Bank*, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022). The *Wildman* court dismissed ATA claims brought by these very same Plaintiffs' lawyers, based on these very same allegations concerning alleged VAT fraud and banking services provided to Samir Azizi and Imran Ahmed. *Id.* at *13-14; MTD at 5. As with *Twitter*, Plaintiffs do not engage with the court's analysis in a closely analogous context. Instead, they point out that *Wildman* involved different plaintiffs and a different statute, and was decided by an Eastern District court. Opp. 4. Tacitly recognizing the persuasive force of the District Court's analysis, they place all their chips on the possibility of a Second Circuit reversal, by pointing out twice that the decision is on appeal. *Id.*; *see also id.* at 13 n.5.

### III. PLAINTIFFS DO NOT STATE A CLAIM FOR BENEFICIARY LIABILITY

#### A. Plaintiffs Have Not Adequately Pleaded that DB Knowingly Participated in a TVPRA Venture

Plaintiffs fail to allege that DB and each perpetrator of trafficking had the specific "association in fact" required to constitute participation in a TVPRA "venture." Cases applying §1595 consistently hold that participation requires a close, continuous association in fact, involving shared risks and rewards. *See, e.g.*, *G.G.* v. *Salesforce.com, Inc.*, 76 F.4th 544, 559-60 (7th Cir. 2023) ("*Salesforce*") (plaintiff may allege participation in a venture by showing a "continuous business relationship" *and* "a desire to promote the wrongful venture's success."); *Doe 1* v. *Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024) ("[S]omething more than engaging in an ordinary buyer-seller transaction is required to establish 'participation' in an unlawful venture").

3

Plaintiffs fail to allege *any* relationship between DB and the traffickers, let alone a close and continuous one. Plaintiffs only allege that DB provided financial services to individuals or entities who were at some point connected to terrorist organizations. Absent is any allegation connecting DB, or even one of its customers, to those responsible for the abductions and murders. Plaintiffs argue that DB associated itself with the traffickers of Mueller, Foley, and Sotloff by facilitating Azizi's and Ahmed's VAT fraud. Opp. 3-5. But Plaintiffs do not allege that either Azizi or Ahmed were traffickers. Nor do Plaintiffs plausibly allege that the proceeds from the fraud contributed to the victims' trafficking or vice versa—that the proceeds from the victims' ransom or trafficking supported that fraud. The *only* link Plaintiffs attempt to draw is that Azizi's and Ahmed's VAT fraud funded, in unspecified ways, "al-Qaeda Core," which operated in Afghanistan and Pakistan (Opp. 8-9; Compl. ¶¶32, 123-26, 135-36); and that this support somehow enabled AQI operating in Iraq (which later became ISIS) to kidnap and murder Mueller, Sotloff and Foley in Syria. This chain of inferences is particularly implausible in light of the allegation that the Ahmed cell only operated until 2010 (two years *before* any of the victims was taken hostage). Compl. ¶127. Accepting Plaintiffs' attenuated causal chains would produce absurd results by threatening international banks with liability for every wrong that al-Qaeda Core, AQI, ISIS, and other terrorist organizations ever committed, anywhere in the world. Such a result would fly directly in the face of *Twitter*.

With respect to the "Seized Banks," Plaintiffs allege that, beginning in June 2014 (nearly a year *after* the abductions), ISIS began seizing bank branches in Iraq and that, by some unspecified point, it had seized 121 bank branches throughout Iraq. Compl. ¶145-47. Plaintiffs offer no detail about which branches were seized or when. Nor do they differentiate between seized *branches* and *banks*, choosing instead to lump them all together under the made-up term

"Seized Banks." The Complaint speculates that transactions "involving" these unidentified Seized Banks must have involved ISIS and therefore contributed to the Plaintiffs' injuries. *See, e.g.*, *id.* ¶¶200-201 (relying on transactions "involving Seized Banks"; "[d]ue to the presence of the Seized Banks in those transactions, it is virtually certain that a significant volume involved ISIS").

DB was too far removed from the traffickers to have reasonably participated in (or even known about) any of their wrongful acts. MTD at 21-22. This is true regardless of whether, as Plaintiffs claim, DB was aware that many terrorists generally engage in trafficking crimes. *See Doe #1* v. *Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021) ("Observing something is not the same as participating in it."); *S.C.* v. *Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 771, 778 (N.D. Ohio 2024) ("Although Defendants had general knowledge that sex trafficking afflicts the hotel industry, the Defendants had no contact with S.C.'s traffickers and received no specific notice of S.C.'s trafficking. Without direct contact, there can be no direct liability").

Plaintiffs attempt to sidestep this flaw by claiming that Azizi, Ahmed, and the Seized Banks "who were themselves ISIS operatives and agents, fully controlled by the on-the-ground traffickers–were not intermediaries at all, because ISIS was running them." Opp. 14. Setting aside that the Complaint alleges that Azizi and Ahmed were connected with al-Qaeda in Iraq, not ISIS in Syria, Plaintiffs' argument misses the point. Beyond claiming some association with ISIS, Plaintiffs allege no connection at all between Azizi, Ahmed, or any Seized Bank and the traffickers. Plaintiffs posit that they do not need to connect DB and the traffickers, because their complaint alleges a "Terror Fundraising Venture" (another made-up term) not a "trafficking venture." Opp. 14-15 (citing *Red Roof Inns*, 21 F.4th at 726). But *Red Roof* does not support

5

that argument and in fact expressly declined to consider it.[2] Moreover, other courts have repeatedly rejected this reading of the TVPRA. *See S.C.*, 728 F. Supp. 3d at 778 ("Plaintiff S.C. argues that the relevant venture here is the hotel venture between Defendants and their franchisees, not the sex trafficking venture run by Plaintiff's traffickers. The problem with this argument is that the 'venture,' for Trafficking Victims Act purposes, must be a sex trafficking venture. And there is no evidence that the hotel venture between Defendants and their franchisees ever committed a sex trafficking act."); *Maria* v. *Massachusetts Institute of Technology*, 2024 WL 4350826, at *17 (S.D.N.Y. Sept. 30, 2024) (plaintiff failed to plead a TVPRA claim where plaintiff did not allege "Defendants understood the connection between any purported benefits and any alleged trafficking scheme").

Regardless, even if this was a viable basis for TVPRA liability, it is still insufficient here because Plaintiffs have not plausibly alleged DB's participation in either a "trafficking venture" or a "Terror Fundraising Venture." DB has not argued, as Plaintiffs suggest (Opp. 15), that participation requires "direct involvement" in the TVPRA violation. But Plaintiffs cannot wish away the participation requirement altogether. As Plaintiffs' own authority confirms, the participant must actually assist, support, or facilitate a violation of the TVPRA. *See Salesforce.com*, 76 F.4th at 559 ("We read 'participation' in accord with our 'ordinary understanding of culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful venture's success[.]'"); *see also Twitter*, 598 U.S. at 506-07 (describing "culpable assistance"). Plaintiffs do not, and cannot, allege that DB wished to promote terrorist financing generally or trafficking specifically. *See, e.g.*, *Weir* v. *Cenlar FSB*, 2018 WL 3443173, at *6

---

[2] *Twitter* also rejected this argument as a basis for secondary liability, explaining "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 598 U.S. at 495.

6

(S.D.N.Y. July 17, 2018) ("[B]eing an 'instrumentality' does not thereby mean one shares a common purpose. Defendants allegedly used the mail in furtherance of the scheme, but that would not make the Postal Service [] a member of the enterprise."); *Cirino* v. *Bank of America*, 2015 WL 3669078, at *4 (C.D. Cal. Feb. 10, 2015) (allegations that vendors were used as "instrumentalities" to carry out an alleged RICO enterprise were insufficient to show vendors shared a common purpose with the enterprise).

Plaintiffs argue that their allegations resemble those the Seventh Circuit found sufficient to plead participation in *Salesforce*. Opp. 13-14. But *Salesforce* involved a direct and longstanding contractual relationship between Salesforce (the participant) and Backpage (the operator of a sex-trafficking website, *i.e.*, the perpetrator). 76 F.4th at 559-60. Salesforce facilitated Backpage's success by providing tailored services that improved the operation of its website. *Id.* Not only does the Complaint here fail to link DB to the perpetrators of a TVPRA crime, but there is no explanation of how DB facilitated such a crime, beyond the conclusory theory that DB is a bank, and money is generally needed to fund criminal activity. The Second Circuit has rejected that same theory of liability in the ATA context. *Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 498-99 (2d Cir. 2021).

Plaintiffs argue that providing "routine" financial services is sufficient to trigger TVPRA liability. Opp. 15-16 (citing *Salesforce*). The allegations in *Salesforce* went far beyond "routine" or standard services. Salesforce was alleged to have provided tailored and bespoke services to assist Backpage's trafficking website. 76 F.4th at 560. The court explained that if Salesforce engaged in a one-time sale of "an off-the-shelf software package, it would not have participated in the trafficking venture." *Id.* at 560 n.17.

7

Plaintiffs attempt to characterize certain DB transactions with Iraqi banks as other than routine by pointing to leaked suspicious activity reports ("SARs") alleged to have been filed by DB with the U.S. Government. Banks are required to file SARs under a wide range of specified circumstances, where there <u>may</u> have been a possible violation of law. 31 C.F.R. §1020.320(a). Disclosure of a SAR, or even the fact that one has been filed, is prohibited by federal law. *Id.* §1020.320(e). A bank filing a SAR is protected from liability for such filing. *Id.* §1020.320(f). Accordingly, Plaintiffs' reliance on these leaked documents to support their claims should be rejected. In any event, Plaintiffs' allegation that SARs were filed with respect to some transactions conducted with Iraqi banks provides no connection to the abductions and murders forming the basis of Plaintiffs' claims here, for the reasons discussed in our moving brief and herein.

Even if *Salesforce* and Plaintiffs' other cases supported the notion that passive facilitation through routine services can be sufficient for TVPRA liability—and they do not—they would run contrary to existing precedent in this District. *Noble* v. *Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018); *Geiss* v. *Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019).

**B. Plaintiffs Fail to Allege that DB Had Any Knowledge of the Trafficking**

Plaintiffs do not state a TVPRA beneficiary claim for the independent reason that the Complaint does not allege that DB had any knowledge that Mueller, Foley, or Sotloff was being trafficked. Plaintiffs' argument that nothing in the TVPRA's language requires such knowledge is wrong. The text of Section 1591 requires knowledge as to a specific victim. *Red Roof Inns*, 21 F. 4th at 719 (requiring "that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA *as to the plaintiff*."); *Doe (G.N.C.)* v. *Uniquest Hospitality, LLC*, 2024 WL 4149251, at *4 (S.D.N.Y. Sept. 11, 2024) (dismissing TVPRA

8

beneficiary claim where plaintiff failed to "identify any information *specific to the trafficking of Doe* that came to the attention of [defendant] that would support an allegation of actual or constructive knowledge of sex trafficking of Doe"); *Maria*, 2024 WL 4350826, at *17 ("[A] beneficiary claim under § 1595(a) succeeds where a plaintiff alleges that the defendant (1) knowingly benefited (2) from participating in a venture that violated the TVPA *as to plaintiff* (3) with constructive or actual knowledge that the venture violated the TVPA *as to the plaintiff*."); *Doe #9* v. *Wyndham Hotels & Resorts, Inc.*, 2021 WL 1186333, at *1 (S.D. Tex. Mar. 30, 2021) ("[T]he complaint must contain facts sufficient to establish that the defendant knew or should have known about the trafficking *of the plaintiff in particular*.").

Plaintiffs' Opposition proffers an alternate reading of cases requiring victim specific knowledge, *i.e.*, that the complaint must only plead knowledge as to the same venture that trafficked the plaintiff. *See* Opp. 22-23 (citing *Salesforce*). But even under that reading, their Complaint fails. In *Salesforce*, the court concluded that Salesforce had sufficient knowledge of the trafficking venture's activities based on specific allegations about Salesforce's understanding of Backpage's operational needs. 76 F.4th at 556. The Complaint here has no similar allegations of DB's knowledge. Plaintiffs rely exclusively on the allegation that DB was aware that terrorists generally engaged in trafficking crimes. Such generalized allegations are insufficient to sustain a TVPRA claim. *See S.J.* v. *Choice Hotels International, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) ("[K]nowledge or willful blindness of a general sex trafficking problem in low-budget lodgings does not satisfy the *mens rea* requirements of the TVPRA. Because plaintiff has not alleged that the franchisor defendants had the requisite knowledge *of a specific sex trafficking venture, they cannot be held directly liable under the*

9

*TVPRA*."). Even if Plaintiffs were offering a fair inference, they fail to connect their so-called "Terror Fundraising Venture" to the victims' trafficking here.

### C. Plaintiffs Do Not Plead Facts Sufficient to Show That DB Received any Benefit from the "Terror Fundraising Venture"

Plaintiffs argue that DB benefitted from the "Terror Fundraising Venture" by earning fees from transactions with Ahmed, Azizi, and the Seized Banks. Opp. 24. Courts in this District require some causal relationship between the benefit the defendant receives and the conduct furthering the trafficking venture. *See* MTD at 24-25 (citing *Geiss*, 383 F. Supp. 3d 156). While Plaintiffs claim that *Geiss* is an outlier (Opp. 25), Judges Liman and Schofield recently arrived at the same conclusion as Judge Hellerstein. *Levin* v. *Sarah Lawrence College*, 2024 WL 4026966, at *24 (S.D.N.Y. Sept. 3, 2024) (Liman, J.) (dismissing TVPRA claim where "Complaint does not allege that the tuition payments and housing fees SLC charged bore any relationship to the alleged sex and labor trafficking venture. There is no allegation that Ray paid any tuition or housing fees to SLC, or that SLC would not have received those payments in the absence of the alleged sex or labor trafficking. Plaintiffs do not allege that SLC received any other financial benefit or thing of value in connection with any TVPRA violation."); *see also Corradino* v. *Liquidnet Holdings Inc.*, 2021 WL 2853362, *4 (S.D.N.Y. July 8, 2021) (Schofield, J.) (requiring a "causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit, with actual or, in the civil context, constructive knowledge of that causal relationship.").

Plaintiffs' reliance on *Salesforce* does not help them. Opp. 24. While *Salesforce* expansively described "knowing benefit," the court relied on the close connection established by direct contract payments from Backpage (the trafficker) to Salesforce (the beneficiary), which had been derived almost entirely from trafficking revenues. 76 F.4th at 550 n.2, 565. Here,

10

there is no allegation that DB ever contracted with or provided services directly to the traffickers. Nor do Plaintiffs allege that DB received any benefit from the trafficking itself.

Plaintiffs do not sufficiently allege that DB benefitted from the "Terror Fundraising Venture." Plaintiffs argue that the Complaint adequately pleads that DB knew it was benefitting from the "Venture" because "Defendants knew they would lose [the Ahmed and Azizi Accounts] if they refused to execute the transactions." Opp. 25. That claim is supported by nothing more than bare allegations of knowledge—and only as to the Azizi and Ahmed VAT fraud. *See* Compl. ¶279 ("Deutsche Bank knew that if it refused to execute transactions for the Azizi Cell, it would lose Azizi's accounts."); *id.* ¶282 ("Deutsche Bank knew that if it refused to execute transactions for the Ahmed Cell, it would lose Ahmed's accounts. Instead of refusing to execute transactions for a terrorist financier, it chose to profit from those transactions."). Plaintiffs also argue that DB "charged above-normal rates due to the high-risk and suspicious nature of these transactions." Opp. 25. This bare allegation is made only "on information and belief." Compl. ¶283. That is not good enough. *See Williams* v. *New York City Department of Correction*, 2021 WL 848709, at *3 (S.D.N.Y. Mar. 5, 2021) ("[C]onclusory pleadings on 'information and belief' are inadequate as a matter of law" to survive a motion to dismiss.").

## CONCLUSION

The Complaint should be dismissed. Plaintiffs have not asked for leave to amend, and dismissal should be with prejudice.

11

Dated: February 3, 2025

                                            CAHILL GORDON & REINDEL LLP

                                            By: _____
                                            David G. Januszewski
                                            Sheila C. Ramesh
                                            Sesi V. Garimella
                                            32 Old Slip
                                            New York, New York 10005
                                            (212) 701-3000
                                            djanuszewski@cahill.com
                                            sramesh@cahill.com
                                            sgarimella@cahill.com

                                            *Attorneys for Defendants Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas*

12

## WORD COUNT CERTIFICATION

I, David G. Januszewski, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 3,422 words in the document.

David G. Januszewski
Cahill Gordon & Reindel LLP
32 Old Slip
New York, New York 10005
djanuszewski@cahill.com
(212) 701-3000

*Attorneys for Defendants Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas*